Prabhjot Uppal, MD
650 W. Olive Ave
Merced, CA 95348
Telephone: (312) 576-4000
Email: jodyuppal@hotmail.com
Pro Se Plaintiff

15CV8077
JUDGE KOCORAS
MAG. JUDGE MASON

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

SEP 1 4 2015
Sep 14, 2015
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

PRABHJOT UPPAL, MD,

                    Plaintiff,

vs.

K. MICHAEL WELCH, President and Trustee
of Rosalind Franklin University of Medicine &
Science; GAIL L. WARDEN, Chair of Board
of Trustees of Rosalind Franklin University of
Medicine & Science; MARC ABEL, Trustee of
Rosalind Franklin University of Medicine &
Science; PAULA A. BANKS-JONES, Trustee
of Rosalind Franklin University of Medicine &
Science; LAWYER L. BURKS III, Trustee of
Rosalind Franklin University of Medicine &
Science; JOHN CALAMARI, Trustee of
Rosalind Franklin University of Medicine &
Science; ELIZABETH COULSON, Trustee of
Rosalind Franklin University of Medicine &
Science; A. MICHAEL DRACHLER, Trustee
of Rosalind Franklin University of Medicine &
Science; MICHAEL C. FOLTZ, Trustee of
Rosalind Franklin University of Medicine &
Science; ROSALIND FRANKLIN
JEKOWSKY, Trustee of Rosalind Franklin
University of Medicine & Science; MICHAEL
J. HRILJAC, Trustee of Rosalind Franklin
University of Medicine & Science; JACK W.
HUTTER, Trustee of Rosalind Franklin
University of Medicine & Science; PATRICK
DEANE KENT, Trustee of Rosalind Franklin
University of Medicine & Science; CHERYL
KRAFF-COOPER, Trustee of Rosalind
Franklin University of Medicine & Science;

Case No.:

**CONSPIRACY TO INTERFERE WITH
CIVIL RIGHTS; CIVIL ACTION FOR
DEPRIVATION OF RIGHTS; ACTION
FOR NEGLECT TO PREVENT;
SPOLIATION OF EVIDENCE; ABUSE OF
PROCESS; FALSE IMPRISONMENT;
UNJUST ENRICHMENT;
PRESERVATION OF EVIDENCE
PRELIMINARY AND PERMANENT
INJUNCTION; NEGLIGENT INFLICTION
OF EMOTIONAL DISTRESS; BREACH
OF FIDUCIARY DUTY; FRAUDULENT
CONCEALMENT; FRAUDULENT
MISREPRESENTATION; AIDING AND
ABETTING; TRESPASS OF CHATTELS;
FALSE LIGHT; RESPONDEAT
SUPERIOR**

**JURY DEMANDED**

VERIFIED COMPLAINT - 1

WILFRED J. LUCAS, Trustee of Rosalind
Franklin University of Medicine & Science;
THOMAS G. MOORE, Trustee of Rosalind
Franklin University of Medicine & Science;
FRANK H. MYNARD, Trustee of Rosalind
Franklin University of Medicine & Science;
FRANKLIN D. PRATT, Trustee of Rosalind
Franklin University of Medicine & Science,
PAMELA SCHOLL, Trustee of Rosalind
Franklin University of Medicine & Science;
KATHLEEN M. STONE; Trustee of Rosalind
Franklin University of Medicine & Science;
DEBORAH TAYLOR, Trustee of Rosalind
Franklin University of Medicine & Science;
ALAN WEINSTEIN, Trustee of Rosalind
Franklin University of Medicine & Science;
BOARD OF TRUSTEES OF ROSALIND
FRANKLIN UNIVERSITY OF MEDICINE
AND SCIENCE; ROSALIND FRANKLIN
UNIVERSITY OF MEDICINE & SCIENCE;
RALPH E. MECZYK; ANTHONY A.
ARMADA

              Defendants.

## VERIFIED COMPLAINT

      Plaintiff, Dr. Prabhjot Uppal ("Dr. Uppal"), for her Verified Complaint, *pro se*, is informed and believes and thereupon alleges as follows:

## INTRODUCTION

      The primary cause of this complex civil action is a conspiracy to achieve a lawful purpose, a merger between Rosalind Franklin University of Medicine & Science, a private not-for-profit graduate school in North Chicago, Illinois, with Advocate Lutheran General Hospital, a private not-for-profit hospital in Park Ridge, Illinois, by unlawful means. The objective of this

VERIFIED COMPLAINT - 2

conspiracy was to replace Mt. Sinai Hospital, a not-for-profit community based hospital in Chicago, Illinois, with Advocate Lutheran General Hospital for required clinical training of third and fourth year medical students to facilitate an immaterialized scheme by formerly elected and unelected officials in Cook County government and other third parties to demolish Mt. Sinai Hospital without the graduate school losing its accreditation.

The conspiracy began in 2004 when Rosalind Franklin University of Medicine & Science spokesperson and President, K. Michael Welch, announced the intent to commence a merger with Advocate Lutheran General Hospital. Due to long-standing problems regarding Advocate Lutheran General Hospital's qualifications as a teaching hospital, the Liaison Committee on Medical Education placed Rosalind Franklin University of Medicine & Science on probation status. In 2006 the Plaintiff, a graduate of Rosalind Franklin University of Medicine & Science, filed a complaint under Title VII of the Civil Rights Acts of 1964 with the Equal Employment Opportunity Commission against Advocate Lutheran General Hospital which included substantial allegations of violations that occurred when she was a fourth year medical student completing a clinical rotation at the hospital. While Rosalind Franklin University of Medicine & Science continued to push for the change in affiliation, the Liaison Committee on Medical Education would not approve of the merger until the Plaintiff's EEOC complaint was resolved.

On January 23, 2009, Plaintiff was falsely arrested following a complaint to the Northbrook Police Department by a faculty member of Advocate Lutheran General Hospital who was the primary subject of the then ongoing EEOC investigation. On August 14, 2009, the Plaintiff received her 90-day Right to Sue Notice from the EEOC and within three days at least two or more of the Defendants named in this Verified Complaint, along with other known and not yet known co-conspirators including a Cook County Circuit Court Judge, conspired to have

Plaintiff taken into custody on November 3, 2009 without legal excuse on the criminal charges the conspirators knew beforehand and at the time to be fabricated in order to prevent Plaintiff from filing her suit against Advocate Lutheran General Hospital and induce her to plead guilty to a felony crime she did not commit. In violation of Plaintiff's civil and constitutional rights as well as numerous federal and state laws, the conspirators achieved their unlawful means to push through the merger between the medical school and hospital through deception, misrepresentation, fraud, intimidation, oppression and obstruction as well as spoliation and concealment of the material facts regarding the 2009 criminal charges from the Plaintiff and the public continuing to the present time.

In 2010, the Plaintiff, though still unaware of the material facts and scope of her injuries in the 2009 criminal case, learned of the scheme to demolish Mt. Sinai Hospital while working as a health care fellow for Congressman Danny Davis in the 7th Congressional District of Illinois and acted as whistleblower alerting elected and unelected officials to the possibility of unlawful obstruction of the EEOC case to facilitate the merger and thereby the plan to demolish Mt. Sinai Hospital. As a direct and indirect result of Plaintiff's actions, the scheme to demolish Mt. Sinai Hospital was defeated however the Plaintiff continues to suffer irreparable harm as a direct result of the unlawful means employed by the conspirators in 2009 and 2010.

Since January 2009, the conspirators have acted overtly on multiple occasions to prevent Plaintiff from discovery of the material facts and evidence of the conspiracy; specifically the material facts and evidence of the 2009 criminal case that was brought against her. The entire case file which would normally be stored by the State's Attorney has gone missing and numerous attempts by the Plaintiff to seek discovery of the material facts of the 2009 criminal case have resulted in significant harm, monetary losses and injuries to Plaintiff and her family by

and through the conspirators both known and not yet known. Throughout this time period, from 2004 to the present, the conspirators have acted with extreme malice to oppress, threaten, harm and injure Plaintiff as well as obstruct, hinder and delay official court proceedings to evade being held culpable for their actions.

## THE PARTIES

1.      Plaintiff, Prabhjot Uppal, MD, a United States citizen and 2005 graduate of Chicago Medical School at Rosalind Franklin University of Medicine & Science formerly d/b/a Finch University of Health Sciences ("FUHS"), and is a permanent resident of Merced, California.

2.      Defendant, Rosalind Franklin University of Medicine & Science ("RFUMS") is an Illinois not-for-profit corporation organized and existing under the laws of the State of Illinois and operating a university offering graduate level education in the health sciences with its primary place of business at 3333 Green Bay Road, North Chicago, Illinois 60064.

3.      Defendant, Board of Trustees of Rosalind Franklin University of Medicine and Science (the "Board of Trustees"), is an Illinois corporation. The Board of Trustees has a role in the appointment and employment of the President of the Rosalind Franklin University of Medicine & Science. At all times relevant to the actions described in this Verified Complaint, the Board of Trustees was acting under color of law.

4.      Defendant, K. Michael Welch ("Welch"), is the President of Rosalind Franklin University of Medicine & Science since 2002 to the present time with primary place of business at 3333 Green Bay Road, North Chicago, Illinois 60064. At all times relevant to the actions

described in this Verified Complaint, Welch was acting under color of law.[1]

5.    Defendant, Ralph E. Meczyk, is a private attorney and former trial counsel for Plaintiff from or about June of 2008 through January 19, 2010 with primary place of business at 111 W. Washington St, Chicago, Illinois 60602. At all times relevant to the actions described in this Verified Complaint, Welch was acting under color of law.[1]

6.    Defendants Gail L. Warden, Marc Abel, Paula A. Banks-Jones, Lawyer L. Burks III, John Calamari, PhD, Elizabeth Coulson, A. Michael Drachler, MD, Michael C. Foltz, Rosalind Franklin Jekowsky, Michael J. Hriljac, DPM, Jack W. Hunter, DPM, Patrick Deane Kent, Cheryl Kraff-Cooper, MD, Wilfred J. Lucas, Thomas G. Moore, Frank H. Mynard, Franklin D. Pratt, MD, Pamela Scholl, Kathleen M. Stone, DPM, Deborah Taylor and Alan D.Weinstein are members of the Board of Trustees of Rosalind Franklin University of Medicine & Science (collectively, the "Trustee Defendants") and at least fifteen are residents of the State of Illinois. They each have voted for, facilitated, cooperated with and/or approved of K. Michael Welch's employment and performance as President of Rosalind Franklin University of Medicine & Science as well as the change in primary clinical teaching affiliation from Mt. Sinai Hospital to Advocate Lutheran General Hospital that was executed in 2011.[1]

7.    Anthony A. Armada, was President for Advocate Lutheran General Hospital between October 2009 and November 2013 and is currently Chief Executive of Swedish Health Services with primary place of business at 747 Broadway, Seattle, WA 98122. [1]

---

[1] "Private persons, jointly engaged with state officials in the challenged actions, are acting "under color" of law for purposes of § 1983 actions. Judicial immunity does not insulate from damages liability those private persons who corruptly conspire with a Judge. *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980).

VERIFIED COMPLAINT - 6

## OTHER PERSONS AND ENTITIES

8.      Nishay K. Sanan, is a private attorney and former appellate counsel who represented Dr. Uppal in matters relevant to this Verified Complaint from April 2014 through May 2015 with primary place of business at 53 W. Jackson Blvd #1437, Chicago, Illinois 60604.

9.      Justin D. Kaplan, is a private attorney who represented the Plaintiff in matters relevant to this Verified Complaint between April and August, 2015 with primary place of business at 150 S. Wacker Drive #2600, Chicago, IL 60606

10.      William McErlean, is an attorney of counsel for Rosalind Franklin University of Medicine & Science who represented RFUMS from April 2015 to August 27, 2015 in matters relevant to this Verified Complaint with primary place of business at One North Wacker Drive, Suite 4400, Chicago, IL 60606-2833.

11.      Advocate Lutheran General Hospital is an Illinois not-for-profit corporation organized and existing under the laws of the State of Illinois and operating a hospital with its primary place of business at 1775 Dempster St, Park Ridge, Illinois 60068.

## VENUE & JURISDICTION

12.      Venue is proper in the Northern District of Illinois under 28 USC § 1391(b)(1) because at least four of the defendants are citizens of the State of Illinois and, moreover, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Northern District of Illinois.

13.      Venue is proper under 28 USC § 1331 because the conduct at issue involves a federal question(s) or issue(s).

14.     Venue is proper under 42 USC § 1983, §1985 and § 1986 and 28 U.S.C. § 1343 because the conduct at issue deprived the Plaintiff of rights, privileges, or immunities guaranteed under federal laws of the U.S. Constitution and was conducted "under color" of law.

15.     This Court has jurisdiction over this matter pursuant to 28 USC § 1332(a) because Dr. Uppal is a permanent resident of California while at least four of the defendants are citizens in Illinois and the amount in controversy exceeds $75,000 exclusive of interest and costs.

**FACTUAL BACKGROUND**

16.     In 1999 the National Labor Relations Board ("NLRB") ruled that resident physicians in graduate medical education programs, who were previously classified as "students," were employees and had the right to unionize. The position was supported by the American Medical Association ("AMA") citing physicians' and physicians-in-training duties under the Principles of Medical Ethics including the obligation to provide access to care (Exhibit 1).

17.     In the summer of 2000, resident physicians at Advocate Lutheran General Hospital ("LGH") in Park Ridge, Illinois with significant help and financial support from the AMA began the process to unionize. Amongst issues faced by residents was the need for protection from hospital managers and "fear of retribution if they spoke publicly." In addition, as the "first line of care to patients," residents needed to have input in the "conditions that impact patient care and medical training" (Exhibit 1).

18.     In 2000, nearly 180 resident physicians at LGH in Park Ridge, Illinois voted to form a union (Exhibit 1).

19.     In 2001, the AMA's labor group, Physicians for Responsible Negotiation, filed an unfair labor practices complaint against LGH with the NLRB citing intimidation, retaliation and

threats from hospital managers amongst issues (Exhibit 1).

20.     In September 2002, K. Michael Welch was appointed President of Rosalind Franklin University of Medicine & Science ("RFUMS") in North Chicago, Illinois, then d/b/a Finch University of Health Sciences, from a previous position at the University of Kansas Medical Center where he was the senior associate dean of research since 1998 and ultimately the Vice Chancellor for research (Exhibit 2). In April 2002, just prior to being appointed President, Welch was investigated by and cited by the Office of Human Research Protections of the Department of Health and Human Services for research approved of and completed under his purview during which elderly patients suffering from dementia were given experimental therapies that significantly worsened their dementia without informed consent (Exhibit 2).

21.     In 2003, Patricia Bergeson became the general counsel at the then renamed RFUMS. From roughly 1998 to 2003, Bergeson was associate general counsel at University of Chicago. During the time Bergeson was at University of Chicago, Valerie Jarrett, Senior Advisor to the President of the United States from 2009 to the present, was on both the University of Chicago Medical Center Board and the University of Chicago Board, serving as the latter's Vice Chair in 2002 and then Chair in 2006 until January 2009.  Prior to beginning her stint in academic law, Patricia Bergeson was deputy corporation counsel for the City of Chicago, under former Mayor Richard M. Daley, specializing in real estate development (Exhibit 3).

22.     In 2003, the NLRB ruled in favor of the residents making LGH the first hospital in the country where residents would be able to collectively bargain, however LGH vowed to fight the residents (Exhibit 1).

23.     In 2004, Cathy Lazarus, formerly from Tulane University, joined RFUMS as Dean of Student Affairs and Thomas Vargish, MD became Chief of Surgery at Mt. Sinai

Hospital and Chairman of Surgery at RFUMS.

24.     In 2004, Defendant K. Michael Welch announced his decision to switch RFUMS from long time clinical teaching affiliate Mt. Sinai Hospital to LGH for the training of third and fourth year medical students and the Liaison Committee for Medical Education ("LCME"), which the AMA is a sponsor of, immediately placed RFUMS on probation; the only medical school in the country to be placed on probation at the time (Exhibit 4).

25.     In 2004, Benn Greenspan and David Ansell abruptly left their positions at Mt. Sinai Hospital. Benn Greenspan, PhD, had served in various executive positions at Mt. Sinai Hospital since 1985 and ultimately as the President and CEO from 1991 to 2004 until he departed to join UIC. David Ansell had served as the Chairman of the Department of Internal Medicine at Mt. Sinai Hospital since 1995 until he joined RUSH in 2004.

26.     In the Fall of 2004, Dr. Uppal was asked by the alumni association to bring to publication a book compiling narratives written by alumni to commemorate the historic relationship between Chicago Medical School and Mt. Sinai Hospital. Dr. Uppal was asked to take on this project because she had already published a critically reviewed book on health care policy as a medical student (Exhibit 5).

27.     In June 2005, the Plaintiff, Prabhjot Uppal, MD ("Uppal"), was conferred her Doctorate of Medicine degree from RFUMS (Exhibit 6). On July 1, 2005 she began a one-year preliminary internal medicine residency at LGH requisite for her advanced standing position in Neurology at Loyola University Medical Center.

28.     On July 19, 2005, Uppal was unexpectedly called off the hospital floors to a meeting with residency advisor Dr. Natalie Correia, Vice Chairman of Medicine of RFUMS and internal medicine residency program director, Dr. Glen Solomon, and LGH's Vice President of

Human Resources, Penny Pilarczyk. At this meeting, Dr. Uppal was told that she had been "spotted" by a neurosurgeon named George Bovis ("Bovis") who had written a letter to the Department of Medicine demanding that restrictions be placed on Dr. Uppal's training. Dr. Uppal recognized the name of the doctor as the same who had behaved inappropriately with her when she was a fourth year medical student completing a rotation at LGH but did not know him personally nor had seen or had any contact with him since that time nor at any time since she began her residency at LGH.

29. On July 27, 2005, Dr. Uppal was called back to meet with Dr. Natalie Correia and told to sign a piece of paper agreeing to restrictions on her training which included not having contact with any neurosurgical patients, even though neuro-critical care/neuro-intensive care was Dr. Uppal's intended specialization focus for her Neurology residency and she had completed research as a PhD candidate in neurophysiology. Dr. Uppal was also told not to have any contact with Dr. Bovis, his patients or any of his partners (Exhibit 7). Dr. Uppal was also told that she would be fired if she violated any of the restrictions and if she refused to sign the paper; she was also told not to talk to any of the other residents about these matters. This was in the afternoon of July 27, 2005. Dr. Uppal was post-call as she had been on-call all night on July 26, 2005, had not slept in nearly 36 hours and can't recall clearly everything that resulted in her signing that document (Exhibit 8).

30. The restrictions placed on Dr. Uppal were clearly discriminatory and in violation of the Accreditation Council of Graduate Medical Education ("ACGME") policies and procedures which govern graduate medical education including the core purpose of medical residency to provide resident physicians with experiential learning activities as a "primarily educational experience in patient-centered care" and mandating "responsiveness to patient needs

that supersedes self-interest" (Exhibit 9). In addition, program directors are required to "be committed to and responsible for promoting patient safety and resident well-being in a supportive educational environment" and ensure "the safety and welfare of patients entrusted to [residents'] care" (Exhibit 9).

31.     The restrictions placed on Dr. Uppal were typical of the very same issues, particularly rampant violation of ACGME policies and patient care issues affecting residents as the "first line of defense," that had initiated the successful efforts of residents to unionize in 2000 at LGH. Unfortunately for Dr. Uppal, in 2003 only 13 of the residents who voted for unionization were still in residency at LGH and in 2005 were no longer employed at the hospital (Exhibit 1). Further, Advocate spokeswoman Kim Waterman told the press in 2003 that "This election has been determined by residents who are no longer at the hospital, and we are looking at what that means" (Exhibit 1). Clearly, what it meant to LGH was that they could resume violating the ACGME policies and rules with impunity.

32.     The restrictions placed on Dr. Uppal substantially interfered with her ability to perform her duties as a resident physician. Commonsense alone would suffice for it to be understood that threatening a resident physician, who provides overnight in-house coverage and serves as a first-responder for inpatients, with termination if they have any contact with an entire population of admitted patients who are in need of 24/7 monitoring would not only disrupt patient care but place those patients' safety at imminent risk in the event of the inevitable medical emergency where any delay in treatment or care could result in malpractice or a wrongful death. Furthermore, resident physicians' liability for malpractice is based on the expected level of performance at their year of training and thus resident physicians are not immune from liability should they be negligent in providing care to patients. In addition, medical

staff by-laws (LGH's medical staff by-laws are not available) at sister Advocate hospitals,

Sherman and Christ, both typically state the following in regards to disruption to patient care:

**Advocate Sherman Hospital Medical Staff By-Laws**
**SECTION 1. ROUTINE CORRECTIVE ACTION**

Subsection 1. Criteria for Initiating: Whenever a practitioner with membership or clinical privileges engages in statements, or professional conduct, either within or outside of the Hospital, and the same is, or is reasonably likely to be, or may reasonably be expected to lead to conduct or acts that are either detrimental to patient safety or to the delivery of quality patient care in the Hospital, or disruptive to Hospital operations, corrective action against the practitioner may be initiated by any of the following: (a) any officer of the Medical Staff; (b) the Chief of any Clinical Department or Director of any Clinical Service Department; (c) the CEO; or (d) the Chairman of the Board

(Exhibit 10)

**Advocate Christ Hospital Medical Staff By-Laws**
**7.F. INDICATIONS AND PROCESS FOR RECOMMENDING TERMINATION OR SUSPENSION OF APPOINTMENT AND PRIVILEGES OR REDUCTION OF PRIVILEGES**

Following an investigation or a determination that there is sufficient information upon which to base a recommendation, the Medical Executive Committee may recommend suspension or revocation of appointment or clinical privileges or scope of practice based on concerns about (a) clinical competence or practice; (b) safety or proper care being provided to patients; (c) violation of ethical standards or the Bylaws, policies, or Rules and Regulations of the Hospital or the Medical Staff; or (d) conduct that is considered lower than the standards of the Hospital or disruptive to the orderly operation of the Hospital or its Medical Staff.

(Exhibit 10)

33. In addition to medical staff by-laws, the AMA has published their own opinion on

medical ethics regarding disruptive physician conduct as unethical and defined as "conduct that

may negatively affect patient care" and "conduct that interferes with one's ability to work with

VERIFIED COMPLAINT - 13

other members of the health care team" (Exhibit 11). Not surprisingly, the Vice President of Human Resources, Penny Pilarczyk, who placed the restrictions on Dr. Uppal had testified previously during a hearing for the NLRB's ruling on unionization at LGH that she "was completely unfamiliar with the bylaws, rules and regulations for the Employer's medical staff" (Exhibit 12, p. 9).

34.     During the month of September 2005, Dr. Uppal was assigned to the Oncology Unit at LGH. Near the end of the month long rotation, Dr. Uppal was alerted by the oncology nurse that a patient was in distress during an evening when Dr. Uppal was the on-call house-staff covering the unit (Exhibit 8). The patient had been admitted by a partner of Bovis' who she was not allowed to have any "contact" with, Dr. John Ruge, for a subdural hematoma. The patient had metastatic breast cancer and advanced cardiovascular disease and was on the therapeutic blood thinner Coumadin. Dr. Ruge had stopped the Coumadin because of her cranial bleed. Dr. Uppal's presumptive diagnosis on physical examination was that the patient was in acute cardiogenic shock, a medical emergency with a 90% mortality rate. Dr. Uppal notified the senior resident covering the general medical floors but had already unknowingly violated the restrictions placed on her by immediately examining the patient when alerted by the nurse that the patient was in distress. Dr. Uppal then knowingly violated the restrictions after reading the patient's history in the chart and ordering STAT cardiac enzymes, EKG and chest X-ray so as not to delay diagnosis. Dr. Uppal's presumptive diagnosis was confirmed by a 2D-Doppler that showed the patient suffered a severe thromboembolic event that resulted in collapse of one of the four chambers of her heart. Dr. Correia was the hospitalist on-call that night and came to see the patient as did Dr. Ruge. No actions were taken against Dr. Uppal nor was any reference or

acknowledgment of the incident made by either Dr. Ruge or Dr. Correia. Dr. Uppal dictated the discharge summary.

35.     In November of 2005, Dr. Uppal had begun her elective rotation in Radiology and was allotted ten days' vacation of her three week vacation time per annum to attend the World Congress of Neurology meeting in Sydney, Australia (Exhibits 8 and 13). Upon returning from the conference, Dr. Correia called Dr. Uppal to come in for a meeting. Dr. Uppal was terminated from her residency position without any explanation. After she left the hospital a letter was mailed to her stating she was terminated for violating the restrictions she had signed to on July 27, 2015 (Exhibit 14).

36.     Dr. Uppal's termination from LGH was in clear violation of ACGME Institutional Requirements which states the following regarding dismissals from residency programs:

> ACGME Institutional Requirements
> IV. C. 1. a)     The Sponsoring Institution must ensure that each of its programs provides a resident/fellow with a written notice of intent when that resident's/fellow's agreement will not be renewed, when that resident/fellow will not be promoted to the next level of training, or when that resident/fellow will be dismissed. [Core]
> IV. C. 1. b)     The Sponsoring Institution must have a policy that provides residents/fellows with due process relating to the following actions regardless of when the action is taken during the appointment period: suspension, non-renewal, non-promotion, or dismissal. [Core]
> *Core Requirements: Statements that define structure, resource, or process elements essential to every graduate medical educational program.

> (Exhibit 15, pp.11-12,14)

Dr. Uppal never received the notice of intent to dismiss which is a "core requirement" of all graduate medical education programs; the only letter that Dr. Uppal received was _after_ she had

been terminated and Dr. Uppal was also never given any information regarding due process which is also mandated. Furthermore Program Directors are required to ensure that due process procedures are adhered to (Exhibit 15).

37.     After her termination Dr. Uppal was told by the Dean of Student Affairs, Dr. Cathy Lazarus, at RFUMS to "Go back to California and stay there." Dr. Uppal was advised by the ACGME to initiate due process proceedings but she was not responded to after repeatedly requesting the Program Director and Vice Chairman of Medicine at RFUMS, Dr. Glen Solomon, to initiate the due process proceedings as he was required to do by the ACGME.

38.     In the Spring of 2006, Dr. Correia agreed to write a letter on behalf of Dr. Uppal but refused to send it to RFUMS as was the normal procedure for processing letters of support. Dr. Correia sent the letter to a colleague of Dr. Uppal's at MD Anderson Cancer Center in Houston and copied it to Dr. Uppal so that she would have it in hand; it was evident that Dr. Correia did not want RFUMS to discover her assistance to Dr. Uppal. In this letter, Dr. Correia stated:

> "Dr. Uppal's clinical skills and medical knowledge were at or above the level anticipated for an early year intern. She was conscientious in the care she provided to patients and I am not aware of any concerns regarding her clinical ability."

(Exhibit 16)

39.     On June 26, 2006, Dr. Uppal filed a complaint with the EEOC for sex discrimination/retaliation against LGH (Exhibit 17).

40.     Dr. Uppal met with Dr. Thomas Vargish, Chief of Surgery at Mt. Sinai Hospital and Chairman of Surgery at RFUMS. Dr. Vargish discussed with Dr. Uppal the issues she faced at LGH and the alumni book. Dr. Uppal inquired as to whether she should continue the project in

lieu of her termination from LGH. Dr. Vargish advised Dr. Uppal to complete the book and write "the truth, the good and the bad."

41.    After Dr. Uppal completed the manuscript, she sent it to RFUMS and it was at this time she learned that there were accreditation issues and somehow the book was involved, related or impacting this but it was not clear how or why (Exhibit 18).

42.    The book, *White Coat Tales: Becoming and Being Urban Doctors: 1946-2006*, was published in July 2006 and critically reviewed as a "must read" by Melvin Konner, MD, PhD, a renowned medical ethicist at Emory University who had previously testified on end-of-life issues before the U.S. Senate with current Mayor of Chicago Rahm Emanuel's brother Ezekiel Emanuel, MD (Exhibit 19).

43.    Less than two months after Dr. Uppal filed her EEOC complaint of which Bovis was the primary subject, Bovis began filing false police complaints about Dr. Uppal with the Northbrook Police Department. In 2006, Bovis alleged as recorded by Detective Jeff Petersen of the Northbrook Police Department:

> "[Bovis] then discovered that sometime in August 2005 she took employment at LGH. The phone calls to his house started up again and he attempted to address the matter with her. During these incidents he continually kept Dr. Caldwell and Dr. Herman up to date on what was happening. He then addressed the issue with LGH administration and human resources, as she was now an employee of the hospital. LGH administration confronted Jodie and told her to have absolutely no contact with him. This was around the time that he filed the first police report with P.O. Hieser. He then added that the phone calls to his house continued from Jodie and he brought this to LGH's attention. Upon showing them proof that she called his house, LGH terminated Jodie from her position."

(Exhibit 20)

VERIFIED COMPLAINT - 17

Dr. Uppal never had any contact with Bovis as a resident or following her termination from LGH. The date the first police report was filed by Bovis was October 31, 2005, apparently while Dr. Uppal was still a resident at LGH, and it is this date which he alleges was when he placed restrictions on Dr. Uppal's training (Exhibit 7 and 20). The actual date that Bovis contacted LGH to have restrictions placed on Dr. Uppal's training was between July 1st and July 19th, 2005, and his actions were unsolicited. It was clear from his false statements to the police that Dr. Uppal's termination was an action taken by Bovis to cover up his reckless conduct that endangered the safety of patients and that his lies to the police after the fact were an effort in historical revisionism to make it appear that no restrictions were placed on Dr. Uppal prior to the neurosurgical patient emergency as well as to portray himself falsely as a victim rather than he is in reality, the perpetrator. Bovis also established himself as deceptive and lacking in credibility; willing to lie to authorities.

44.     In August 2006, Dr. Uppal met with Dr. David Ansell at RUSH to discuss her termination from LGH. Dr. Ansell also wanted a copy of her book in which he had been acknowledged for his years teaching at Mt. Sinai Hospital. In the brief meeting with Dr. Ansell, his demeanor was very uncharacteristic of how she had previously known him. He was upset over the actions and behavior of Bovis at LGH towards her and LGH's decision to terminate her from her residency. Dr. Ansell told Dr. Uppal to "get reinstated" and when she explained to him the refusal of Glen Solomon, MD to assist her he became increasingly irate. He then looked at the book, staring for an inordinate period of time at the photo of Mt. Sinai Hospital, then suddenly became very angry, called her some foreign name she did not recognize and told her to "get out of [his] office" (Exhibit 21).

45.     In October 2006, leading up to the annual alumni meeting, Dr. Uppal received an unexpected email from the director of alumni affairs at RFUMS, Caryn Schultz, stating that "under the authority of the President of the University," Dr. Uppal was prohibited from giving away copies of her book *White Coat Tales*, even though this had already been pre-arranged with the alumni (Exhibit 22). The sudden and unexplained prohibitions were particularly strange given that the book was a compilation of alumni narratives with all proceedings being donated in full to the school and that the school regularly promoted the books and achievements of alumni at their annual meetings. In addition, the books were not being sold to the alumni, they were being given away to them and had been ordered by alumni out of state directly involved in the book project and sent to Dr. Uppal in Chicago for her to take to the meeting.  Additionally, it was clear that Dr. Uppal was being singled out as a "third party" to be excluded as no longer a member of the university community as other alumni. Upon learning of RFUMS' actions, the alumni gathered in Chicago requested that Dr. Uppal then bring their books directly to them at their hotel. Outside of the hotel, as the alumni picked up their books, Caryn Schultz arrived and began grabbing the books from as many of the alumni as she could until she was admonished and asked to leave the scene.

46.     After this incident, Patricia Bergeson began isolating Dr. Uppal from RFUMS by making herself the only point-of-contact with the University.  In doing so, Bergeson singularly had power over all of Dr. Uppal's academic and business affairs. From 2006 through 2007 Bergeson habitually refused to assist Dr. Uppal in the ways most medical schools assist prior year graduates in regards to post-graduate medical training. Bergeson refused to upload required letters of support for Dr. Uppal's residency applications as required by the AAMC, and refused to assist her with "scrambling" into an unfilled position following the conclusion of the National

Residency Matching Program. In particular, Bergeson falsely denied receiving a letter from Dr. Rangan Murali who was Dr. Uppal's attending physician during her internal medicine rotation at Cook County Hospital and attempted to impede Dr. Uppal from meeting with the long-standing Chairman of Medicine, Dr. Eric Gall, for a chairman's letter that is required for all internal medicine residency applications (Exhibit 23).

47. Surprised by the sudden hostility toward her after the book's publication, Dr. Uppal then asked Dr. Vargish for further information regarding the affiliation issues. Dr. Vargish explained that the decision for RFUMS to change partners from Mt. Sinai Hospital to LGH was historically controversial and the school was concerned of rousing sentiments amongst the alumni (Exhibit 4).

48. Dr. Uppal, concerned of how these issues were impacting her career in medicine, limited her communications with RFUMS to just her efforts to secure another residency position and never raised issues regarding the book or the alumni association again. In December 2006, Dr. Melvin Konner, who had critically reviewed her book, roused controversy of his own at Emory University regarding issues in the Middle East (Exhibit 24). Even though Dr. Uppal has no background or interest in foreign policy, as is typical of controversies, Dr. Konner's association with Dr. Uppal on her book piqued outside interests' concerns regarding Uppal's termination in the middle of her internship and RFUMS' refusal to assist her and even hinder her efforts to complete her residency training.

49. The Arnold Gold Foundation, a charitable organization involved with the Association of American Medical Colleges (AAMC) and the Association of American Medical Students (AMSA) to promote "caring, compassionate, and collaborative learning environments" for prospective physicians, contacted RFUMS to inquire about Dr. Uppal and her treatment by

the school. Dr. Uppal received an unsolicited, hostile and defensive email from Patricia Bergeson blaming Dr. Uppal's termination from LGH on her "conduct" and denying RFUMS' involvement even though the Program Director at LGH, Glen Solomon, M.D., was the Vice Chairman of Medicine at RFUMS and the one who made the decision to terminate Dr. Uppal and deny her due process in violation of ACGME policies. Bergeson also denied that RFUMS had taken any actions to make it difficult for her to continue in medicine even though Bergeson had herself blocked Dr. Uppal from having letters of support uploaded for her residency applications and Dr. Uppal had twice been denied assistance with the "scramble" (Exhibit 25). Bergeson also made derogatory and spiteful remarks about Dr. Uppal's book. It was clearly evident by Bergeson's tone that she was not pleased about external inquiries regarding the activities taking place at RFUMS and in particular in relation to Dr. Uppal and that she chose to address these inquiries by attacking and attempting to discredit Dr. Uppal. This tactic would prove to be a consistent pattern of abuse and bullying or "academic mobbing" utilized by RFUMS to dissuade outside investigations into their activities and mistreatment of Dr. Uppal.

50. In spite of Bergeson's obstructive efforts, Dr. Uppal eventually secured the required letters she needed to complete a residency application, however, only after the application season for that year had ended and therefore Dr. Uppal was never able to send out completed residency applications for the 2006-2007 season. Dr. Uppal then requested advice from Dr. Art Levine, an alumni and Dean of the University of Pittsburgh School of Medicine, who wrote the foreword for her book. By email, Dr. Levine advised Dr. Uppal of the following:

> "I assume that you failed to secure a residency in the match or in the 'scramble.' Your implication is that your medical school is not helping you in any way, although I cannot imagine what there might be about your book that would make the school 'antagonistic.' In any case, the school is obligated to help you secure a residency since its accreditation (and credibility) depends,

at least to an extent, on its ability to place its graduates. I suggest that you meet with your Dean."

(Exhibit 26)

Dr. Uppal attempted to meet with the Dean at RFUMS, Art Ross, MD, but was ignored. During this time Dr. Uppal had also maintained contact with her former class-fellows from medical school and learned that RFUMS was giving full assistance, including during the "scramble," to other prior-year graduates who had failed to match into residency programs.

51.     In the fall of 2007, Dr. Uppal, having had finally secured all of her required letters of support, sent out completed residency applications for the first time since 2004. She was overwhelmed with offers of interviews around the country and was grateful just to be able to get out of Chicago and talk with doctors on the outside about the issues she was facing (Exhibit 27). During these interviews, Dr. Uppal learned that her termination and the actions and inactions of RFUMS were in violation of ACGME, LCME and AMA policies and that she needed to be reinstated to her position so that she wouldn't face problems with medical licensure due to an unjustified interruption in her training.

52.     In October 2007, Dr. Uppal was disturbed to learn that the long-standing Chairman of Medicine, Dr. Eric Gall, and numerous other faculty were leaving the school and that Dr. Glen Solomon was to become the next Chairman of Medicine (Exhibit 28).

53.     As a result of Dr. Uppal's interviews, which occurred between November 2007 and February 2008, the AMA was notified of her situation as well as of the ongoing EEOC investigation. Summarily, CEO Bruce Campbell and Glen Solomon, MD resigned from LGH (Exhibit 29).  As a result of Solomon's resignation, Dr. Gall continued on as the Chairman of Medicine. As is required by the LCME, in order for LGH to be RFUMS' primary clinical teaching hospital for third and fourth year medical students, RFUMS Department Heads require

authority over the training of the students which is accomplished by the Department Heads at RFUMS being represented by LGH staff. Given the long-standing problems at LGH, Dr. Gall and other faculty at RFUMS apparently preferred to resign from the medical school rather than join LGH. As an indirect result of Dr. Uppal's interviews between 2007-2008, Defendant Welch's plans to merge RFUMS with LGH were at least temporarily placed on hold but he still appointed Dr. William Rhoades, an internal medicine physician at LGH, as the "interim chair" even as Dr. Gall continued as acting chair.

54.     In August of 2008, the EEOC investigation was still ongoing and upon requesting her token to apply for residency positions for the 2008-2009 application season, Dr. Uppal instead received a letter from Dr. Cathy Lazarus stating that she was "no longer endorsed by the Chicago Medical School," barring her from applying to residency positions (Exhibit 30).

55.     Meanwhile, Dr. Uppal was informed by her civil rights attorney handling the EEOC case that LGH had reviewed Bovis' false police statements in 2006 and verified her U.S. Passport that she had attended the conference in Australia and stated that "[they] made a big mistake." Dr. Uppal was told to "shut the door on Bovis," referring to the false criminal charges he had brought against her in 2006 and that she would be reinstated and his privileges would be revoked.

56.     Dr. Uppal then hired Defendant Ralph E. Meczyk ("Meczyk"), to represent her and paid him an up-front retainer of $70,000 that he said was the usual "trial fee."

57.     After receiving his retainer in full, Meczyk met with Dr. Uppal and told her that she needed someone from the hospital who was involved in the September 2005 neurosurgery patient medical emergency to speak for her or he wouldn't prepare her case for trial. Dr. Uppal provided Meczyk with the names and contact information for Dr. Ruge and Dr. Solomon but she

was not able to locate Dr. Correia or the physician who was the senior resident on-call.

58.     Meczyk told Dr. Uppal that she needed to call these individuals to see if they would be willing to speak on her behalf. Dr. Uppal questioned why he wasn't contacting them himself and he said that he didn't understand all the "medical mumbo jumbo" and that if she didn't contact anyone he would not prepare her case for trial.

59.     Dr. Uppal attempted to contact Dr. Solomon at Wright State University but never heard back from him. As the trial date approached, Meczyk again said he wouldn't prepare the case for trial unless she was able to get someone to come forward on her behalf. Dr. Uppal then discussed the situation with Dr. Vargish as she had no-contact orders from the Court with Bovis. Dr. Vargish confirmed that on January 20, 2009 Dr. Bovis would not be on-call and that she could page Dr. Ruge on that evening so as to avoid contacting Dr. Bovis.

60.     On January 20, 2009, Dr. Uppal again called Meczyk and asked him to contact Dr. Ruge and he again refused. Dr. Uppal then contacted Dr. Vargish at Mt. Sinai Hospital and confirmed that Bovis was not on-call as call schedules cannot be altered within 24 hours of the date on-call in accordance with the Centers of Medicare and Medicaid Services ("CMS") and the Emergency Medical Treatment and Labor Act ("EMTALA") (Exhibit 31). Dr. Uppal then again tried to contact Dr. Solomon in the hope that if she were able to reach him she would no longer need to contact Dr. Ruge, but this effort was to no avail. She called Meczyk again and told him that Bovis was confirmed not to be on-call that night and asked Meczyk again to contact Dr. Ruge but he refused. Dr. Uppal then asked Meczyk whether she would be violating any court orders, laws or conditions if she paged Dr. Ruge that evening. Meczyk told her that if the information that Bovis was not on-call was accurate then she was "fine" and to call him afterwards to let him know what happened (Exhibit 32).

61.     At 8:19 pm Dr. Uppal paged Dr. Ruge. At 8:23 pm Dr. Uppal received a call back from LGH, relayed that she had been a provider for a patient of Dr. Ruge's and for him to contact her attorney if he could. Dr. Uppal then called Meczyk and he returned the call to her at 8:49 pm and she related her conversation to him (Exhibit 32).

62.     On January 23, 2009 at her regularly scheduled court date, Dr. Uppal was taken into custody for violating the no-contact terms of her bond. She bonded out ten days later and never saw or spoke with Meczyk again until the end of October 2009 (Exhibit 33). During this time, Meczyk's son-in-law, Darryl Goldberg appeared on Meczyk's behalf.

63.     In August 2009, Dr. Uppal received her Right to Sue Notice from the EEOC and was given 90 days to file suit which was by November 14, 2009 (Exhibit 34). Dr. Uppal contacted Meczyk's office and spoke with Darryl Goldberg and told him of the notice and he told her to send it to him; Dr. Uppal then faxed the letter to Meczyk's office. On August 21, 2009, Dr. Uppal also emailed a copy of the letter to Meczyk's son-in-law, Darryl Goldberg (Exhibit 35).

64.     Unknown to Dr. Uppal at the time, shortly after Dr. Uppal notified Meczyk of the EEOC Right to Sue notice, a "special request" had been made to have the presiding Judge, Timothy Chambers, replaced by Judge Larry Axelrood. This was confirmed at a later date, when Judge Garritt Howard who was presiding over a post-conviction hearing for the 2009 case stated "Is this *that* case?" and referred to the "special request" that had been made to switch the presiding Judges. In 2015, Dr. Uppal also received the common law record for the 2009 criminal case in which it is shown clearly that on August 17, 2009, Judge Chambers' stamped name on the court schedule for her case was scratched out and Judge Axelrood's name was hand-written in (Exhibit 36).

65.     In the end of October, Meczyk finally responded to Dr. Uppal's requests to know what was going on and told her that there would be no trial, that the charges would be dismissed and to be at court on November 3, 2009. Meczyk also told Dr. Uppal's mother the same information and instructed her not to come to Chicago because there would be no trial and he had personally spoken to the State's Attorney and the charges would be dismissed. Dr. Uppal then contacted her civil rights lawyer and informed him of this and then met with him in his office on November 2, 2009. She reviewed the EEOC investigative report with him and told him to go ahead and file suit. The civil rights lawyer told her to call him after her court date. (Exhibit 33)

66.     On November 3, 2009, Dr. Uppal appeared before Judge Larry Axelrood. In a complete surprise, a trial had in fact been prepared to take place on that date. When Dr. Uppal questioned Defendant Meczyk to explain to her what was going on, he told her she had to plead guilty to a felony because she was "guaranteed to lose." Dr. Uppal refused and told Meczyk that if she did she wouldn't be able to practice medicine and he told her that "[she could] go find something else to do with [her] life." Dr. Uppal refused and Meczyk then told Dr. Uppal to give permission for him to discuss the matter with the Judge in a 402 conference without explaining to Dr. Uppal what a 402 conference was. While Meczyk was in the 402 conference, Dr. Uppal contacted her mother and her civil rights attorney who instructed her to tell Meczyk that she did not want to plead guilty; that she wanted to take the case to trial. Dr. Uppal called Meczyk's office and he called her back on her cell phone. Dr. Uppal told Meczyk that she did not want to plead guilty, that she wanted to take the case to trial and he told her to "wait until [he called her]." Dr. Uppal waited for an inordinate amount of time, eventually watching as people left for lunch and the court room door was locked. Dr. Uppal then received a cell phone call from Meczyk who

instructed her to return to Court where his assistant Joshua Adams was waiting for her. Dr. Uppal did as she instructed.

67.     Unknown to Dr. Uppal, Meczyk had falsely told the Court that Dr. Uppal had absented herself. When the A.S.A. Cathy Crowley told Judge Axelrood that Meczyk had tried all of Dr. Uppal's phone numbers to contact her and tell her to return to the court room, his reply was "Okay" (Exhibits 33 and 37). When Dr. Uppal appeared before Judge Axelrood with Mr. Adams she was shocked to learn that a warrant had been issued for her arrest. When Judge Axelrood made statements that she had absented herself on purpose to defeat the Court, Dr. Uppal told the Judge, "But your honor, they told me there was no trial" (Exhibit 37). In response to her statement, Mr. Adams told Dr. Uppal to "Shut up!" but this was not recorded in the transcript even though it was very loudly stated likely because it was an address directed at Dr. Uppal and not to the Court.  Judge Axelrood ignored Dr. Uppal's statement and ordered Dr. Uppal to be taken into custody and placed in Maximum Security with no bail (Exhibits 33, 36 & 37).

68.     While Dr. Uppal was in custody she was unable to contact her civil rights lawyer in spite of attempts to do so and requested Meczyk to make sure her EEOC case was filed on time.  Meczyk, however, never once visited her while she was in custody in spite of numerous requests by Dr. Uppal and her mother for him to do so, he also refused to let Dr. Uppal or her mother see the police reports or any evidence in the case and when Dr. Uppal did see Meczyk at court dates he would tell her if she plead guilty she could go home and when she refused he would leave (Exhibit 33).

69.     On January 19, 2010, Dr. Uppal capitulated to a guilty plea never knowing any facts about the charges against her (Exhibits 33 & 38). In the "factual" basis that Meczyk

VERIFIED COMPLAINT - 27

stipulated to with A.S.A. Crowley, it was stated that Bovis was "at home" at the time of the alleged incident. However, on-call physicians frequently take call from their homes and Dr. Uppal could not recall from where her page was returned on January 20, 2009. Upon being released from custody, Dr. Uppal learned that the EEOC case had not been filed and since the 90 day period in which to file had expired; the case was closed. As a direct result of Judge Axelrood's and Defendant Meczyk's actions and inactions, Dr. Uppal had been deprived her right to sue under the Title VII Civil Rights Acts of 1964.

70. After being released from custody, Dr. Uppal contacted Defendant Meczyk and asked to see the police reports for her 2009 case. Meczyk refused and told her if she appealed she was guaranteed to lose and would be sentenced the maximum time of seven years in prison. Meczyk told her that she should be grateful that he got her probation and he also told her never to contact him again. Meczyk never let Dr. Uppal see or have any access to the police reports or evidence in the 2009 case.

71. Dr. Uppal contacted the Northbrook Police Department and they told her that they no longer had any of the evidence in the case as it had been turned over to the State's Attorney's office. This was reiterated again by Detective Jeff Petersen in 2015 (Exhibit 39). Dr. Uppal attempted numerous times to get information about her case from the Clerk of the County Clerk to no avail for reasons she was to discover at a later date.

72. In May 2010, Dr. Uppal contacted Congressman Danny Davis for assistance and learning about her background writing and publishing on health care policy, he gave her a position as a health care fellow to assist with implementation of the high risk pools that summer for the Patient Protection and Affordable Care Act as well as other health policy issues. One of Dr. Uppal's duties was to go through incoming mailings to the Congressman related to health

VERIFIED COMPLAINT - 28

care issues.

73.     In the end of September 2010, Mt. Sinai Hospital had sent their regularly mailed newsletter to Congressman Davis and Dr. Uppal saw that Dr. Thomas Vargish was retiring. Dr. Uppal called Dr. Vargish and learned that he had been "forced out" after her guilty plea and that Dr. Eric Gall had also left his position (Exhibit 40). LGH staff physicians Dr. William Rhoades and Dr. John White had been appointed as the Department Heads at RFUMS to succeed Dr. Gall and Dr. Vargish respectively (Exhibit 41). Dr. Uppal also learned that because RFUMS is required to comply with Title VII Civil Rights Acts of 1964, her EEOC complaint, which focused largely on misconduct that occurred while she was a fourth year medical student, had impeded the LCME approval of a merger between RFUMS and LGH. It is also likely given that the since the AMA is the major sponsor of the LCME and were aware of her EEOC investigation and circumstances of her termination, they refused to approve an affiliation change until she was reinstated to her residency position.

74.     On March 31, 2010, the LCME had approved of the merger between RFUMS and LGH (Exhibit 42 and 68). Dr. Uppal felt something wrong had transpired and brought her concerns to Dan Cantrell, the district deputy for Congressman Davis. Dr. Uppal felt that her EEOC case was meritorious and that if she had not been taken into custody on November 3, 2009 by Judge Axelrood the case would have been timely filed. It was then that Dr. Uppal learned about the Cook County Health Board that had been established in 2008 and that they had decided to move forward with a plan to demolish Mt. Sinai Hospital. It became clear to Dr. Uppal that the motive of the Defendants to end RFUMS' affiliation with and dependence on Mt. Sinai Hospital for clinical training was to facilitate the demolition of Mt. Sinai Hospital. If Mt. Sinai Hospital were demolished prior to the LCME approving a merger between RFUMS and

LGH, RFUMS would lose its accreditation as it would not have a teaching hospital to provide the third and fourth year medical students with the required core clerkships for conferring the Doctorate of Medicine. Dr. Uppal realized then why Dr. David Ansell and Dr. Benn Greenspan had left their long-standing positions at Mt. Sinai Hospital in 2004; they knew about the plans to demolish the hospital. Dr. Uppal learned, disturbingly, that both Ansell and Greenspan were inaugural members of this Cook County Health Board as well as Quinshaunta Golden, a close relative of Congressman Danny Davis') and that in May 2009, William Foley was appointed the board's CEO (Exhibit 43).

75.     At this point, Dr. Uppal realized that though the plans to demolish Mt. Sinai Hospital had commenced at least as early as 2004, they hadn't begun to materialize until 2008 and that her pending EEOC case and long-standing issues of the AMA with LGH had served as an obstacle to the switch in the affiliation from Mt. Sinai Hospital to LGH and thereby had impeded the plans to demolish Mt. Sinai Hospital; an obstacle that was removed when Dr. Uppal was taken into custody without legal excuse on November 3, 2009 through and past the final filing date of her EEOC case on November 14, 2009.

76.     Dr. Uppal, like most of the general public, was also very much aware that Michael Reese Hospital was also being demolished. Dr. Quentin Young, who served as Michael Reese's medical director up until that decision was made, was well-known and a respected health care activist; Michael Reese was also at one point the largest community hospital in the United States. It was also well publicized that the Michael Reese site was the one chosen for the ill-fated 2016 Olympics bid promoted by former Mayor Richard M. Daley and Senior Advisor to President Obama, Valerie Jarrett (Exhibit 44). Dr. Uppal asked Dan Cantrell if these plans to

demolish Mt. Sinai Hospital had anything to do with Mayor Richard M. Daley and Valerie Jarrett to which he replied in the affirmative but cautioned her "to be careful."

77.     Dr. Uppal then looked through the White House visitor of logs for Valerie Jarrett and saw that on April 6, 2010, less than a week after the LCME approved of the merger between RFUMS and LGH on March 31, 2010, a meeting had indeed been scheduled for William Foley, Ruth Rothstein, Larry Goodman (CEO of RUSH) and Robert Weinstein (Chairman at Cook County Hospital) (Exhibit 45).

78.     It was around this time former Mayor Daley suddenly announced his resignation and much commotion broke out in the Congressman's office. Soon after it was announced that Rahm Emanuel, who has long personal and family ties to Mt. Sinai Hospital, was running for Mayor.

79.     Dr. Uppal, though still not knowing the material facts of the 2009 criminal case, recalled statements that Judge Larry Axelrood had made prior to having her taken into custody on November 3, 2009 and felt, regardless of what she was accused of, that his actions were wrong and unjustified and in violation of her Constitutional right to Due Process:

> "The difficulty in this case is that, on a previous occasion when the case was prepared for trial on 07 CR 2129, Ms. Uppal did certain things which caused a second case, the '09 case, to be filed. In that case, as well as the '07, for a trial posture. It is my belief that her actions were dilatory and was an attempt to defeat the Court from being able to go forward to trial today, and that she absented herself so that we would not be able to proceed to trial today, thus inconveniencing the witnesses and disrupting the Court's ability to resolve this case."
>
> (Exhibit 37)

Dr. Uppal had not absented herself from the Court on November 3, 2009 nor did she take or would ever take any actions to hinder court proceedings. As on January 20, 2009, Dr. Uppal was following the instructions and directions of Defendant Meczyk. Dr. Uppal's trust and confidence

that she had reposed in Defendant Meczyk had been betrayed who had done nothing to stop Judge Axelrood from taking her into custody and had actually facilitated it; nor did Meczyk take any actions to have Judge Axelrood recused for his disqualifying statements.

80.     Judge Axelrood's statements on November 3, 2009 made it clear that there was no question he had a prejudgment of the 2007 and 2009 criminal cases and of Dr. Uppal with a fixed, unalterable belief that Dr. Uppal was guilty. This, in addition, to the harsh conditions and assaults that Dr. Uppal was subjected to inside of the Maximum Security Unit of the Cook County Jail, the significant personal loss she had incurred compounded with the realization that if she had not been taken into custody, the EEOC case would not have been obstructed, her teachers would not have been forced out of their positions at the medical school, the affiliation switch would not have moved forward, and the plan now in action to demolish Mt. Sinai Hospital would not have been facilitated, weighed heavily on her.

81.     Given the diminishing reimbursements for Medicare and Medicaid, many hospitals and providers have sought to evade these patients and avoid the associated costs and financial losses. In addition, the Department of Health and Human Services had begun to incentivize hospitals to focus on investing in reducing hospital admissions by improving health in communities rather than what has taken place over decades: exploiting the desire for health rather than actually providing it. These incentives have included fining hospitals when patients are "frequent fliers" or "kickbacks;" in other words penalizing hospitals for patients who are admitted to the hospital and then within a month or three weeks later are readmitted because they were not followed-up on as outpatients and their readmissions were preventable. In Chicago, underserved, low-income minority communities have a disproportionate number of Medicare and Medicaid patients. While some hospitals systems, like Sinai Health System, provide a safety-

net for these patients, other systems like Advocate Health Care avoid these patients by shuttering down their hospitals in these communities. For example, in 2006 Advocate Health Care closed units at Bethany Hospital diverting their resources instead to their hospitals that serve more affluent communities like LGH (Exhibit 46). In addition, safety net hospitals work together to provide care for communities and do so with very limited and stretched resources. When one safety net closes it creates a substantial strain on other safety nets causing essentially a domino effect; the end result being entire communities without any access to health care services or "health deserts" often resulting in the eventual displacement of these communities. Had this scheme to demolish Mt. Sinai Hospital gone through the impact it would have had both on the short-term life-saving needs of the West Side community and the long-term isolation of low-income patients would have become increasingly devastating and certainly the opposite intended effect of reforming health care by emphasizing improving health of communities and equitable access to health care services. The loss of Mt. Sinai Hospital, as one of only two Trauma Level I providers for both adult and pediatric patients in the Chicago region, would be a devastating blow both in terms of its direct care as well as investment in public health through the Sinai Urban Health Institute. Additionally, the tax benefits and jobs created by Sinai Health System as one of the largest employers in the West Side community would be lost. It was clear that, like the Michael Reese situation, the scheme to demolish Mt. Sinai Hospital was less about the objective indicators of critical health care needs and more about a speculative real estate adventure of politically powerful insiders improperly influencing a county health board. Such political influence likely resulted in the hiring of William Foley as CEO of the Cook County Health Board, a clear violation of the Shakman Decrees and other Cook County government ordinances.

82.     Dr. Uppal considered that her only personal goal was to become a physician, and not a physician who would commit Medicare fraud or exploit patients to make money, but one who would help communities facing barriers to health particularly vulnerable populations like the elderly and the poor. It was at this time that Dr. Uppal decided that she necessarily had to "blow the whistle" that her EEOC case was obstructed by improper actions in violation of her Constitutional rights by Judge Larry Axelrood that Defendant Meczyk facilitated. A complete halt needed to be brought to any plans to move forward on demolishing Mt. Sinai Hospital at least until a further investigation had been completed.  Dr. Uppal composed a narrative over the events concerning her arrest on January 20, 2009 and again on November 3, 2009 and sent it to Dr. Vargish and Mt. Sinai Hospital. In hindsight, while Dr. Uppal and her family have suffered and continue to suffer tremendously for this decision, it remains one devoid of any regret for as it turned out if Dr. Uppal hadn't blown the whistle at that time, Mt. Sinai Hospital would not be standing and serving today.  Dr. Uppal exposed the lawyers and Judge who had her taken into custody without legal excuse on November 3, 2009 in an electronic communication to the White House and copied it to Rahm Emanuel to bring it to his attention. Soon after, Dr. Uppal's apartment was raided by a SWAT team and she was taken into custody (Exhibit 47).

83.     After Dr. Uppal was arrested, she was denied bond. When she was eventually given a bond it was an extraordinarily inappropriate $500,000, in fact Dr. Uppal should not have been arrested at all. During the period of her custody, however, both Rahm Emanuel and former President Bill Clinton advocated vigorously on her and Mt. Sinai Hospital's behalf to President Obama. Upon being apprised of the events had taken and were taking place in Chicago, President Obama ordered Dr. Uppal to be released and on January 3, 2011 Dr. Uppal's bond was drastically reduced to $100,000-D ($10,000) and she bonded out (Exhibit 47).

84.    Even though Dr. Uppal's decision was risky, she felt that she had already been convicted of a felony and, unaware of any relief at the time nor even the true facts of her 2009 case that would support such relief, would therefore never be able to practice medicine but if she could prevent the demolition of a safety-net hospital serving a low-income minority population, and one of only two Trauma Level I emergency rooms for both adult and pediatric patients, even if she could not directly care for patients and save lives she would be indirectly enabling hundreds of doctors, residents and medical students to train and provide care in an area of critical need and continue to have the opportunity to do so on a daily basis possibly ad infinitum. Dr. Uppal also knew of the tremendous support and wisdom of her parents who told her to study hard so she could become something not to make money but to give back to help others less than fortunate her. Dr. Uppal relied on her faith, principles and beliefs from her upbringing to stand and defend others in the face of gross injustice because they were too poor or weak to stand up for themselves.

85.    Contrary to the sensationalistic journalism of an uninformed press, the only thing Dr. Uppal expressed the desire to "blow up" or expose was the misconduct in violation of her constitutional rights that resulted in the interference of her civil rights; the obstruction of her EEOC case.  Dr. Uppal has long been an advocate of non-violent communication even having had illustrated a children's book, *The Little Bird Who Found Herself/La Parajita Que Se Encontro A Si Misma*, published in Spanish, English and Dutch educating children on the practice (Exhibit 48). A significant part of improving health in communities is, after all, necessarily the need for reducing violence.

86.    As will be described later in this Verified Complaint with particularity, the next several years Dr. Uppal has met with consistent malice, oppression, obstruction, concealment,

fraud, intimidation and threats by the Defendants as well as other co-conspirators both known and not yet known. Most recently, the Defendants corruptly persuaded a federal court to become unwittingly complicit in their criminal cover-up by placing a protective order with orders to destroy evidence material to the 2009 case; for the obvious reason to bar Dr. Uppal from access to evidence in a form that would be admissible in a court proceeding in accordance to Rule 901 of Federal Rules of Evidence against them. As Dr. Uppal's efforts to secure the material facts of her 2009 case progressed, she did ultimately succeed at filing a motion in the post-conviction proceedings for the 2009 case on April 10, 2015; this was the first complete and forthcoming narrative to be introduced into court proceeding. Soon after, the 2010 charges were suddenly dropped. Dr. Uppal took what is considered the next best thing to an acquittal, a misdemeanor with one year of non-reporting court supervision with no adjudication of guilt or conviction entered upon its successful completion that can be expunged if Dr. Uppal is able to clear her 2009 felony conviction; **the equivalent of a parking ticket**. In addition, the charge itself is unlikely to have any bearing on its own on medical licensure particularly given the circumstances and the AMA's knowledge of the events as described in this Verified Complaint. Prior to accepting this deal Dr. Uppal had consulted with a lawyer regarding the 2010 case and what she was being offered, his reply to her was "So what you're showing me is, they charged you like a terrorist but now are treating it like a parking ticket?!" In the recently released documentary film, *War on Whistleblowers* (2013), the following was narrated regarding the Thomas Drake whistleblowing case with the NSA:

| | |
|---|---|
| News Anchor 1: | A high profile failure for the justice department. |
| News Anchor 2: | Federal prosecutors today dropped nearly all the charges against Thomas Drake. |
| News Anchor 3: | A former NSA official accused of handling classified data strikes a plea deal today. |

| | |
|---|---|
| News Anchor 4: | He is only pleading guilty to a misdemeanor of exceeding authorized use of a computer |
| Jesselyn Radack: | **It's the legal equivalent of a parking ticket** |
| Voice: | There was a judge with the integrity to say, you're not doing the right thing prosecutor. |
| Voice: | The federal judge in this case actually berated the prosecutors, he berated the government for years of persecution, the threat of 35 years behind bars and the charges were suddenly dropped. |
| Jane Mayer: | So the whole case did fall apart and, um, of its own weight, I think, really. |
| Seymour Hersh: | The government does tend to overreact, overcharge and over dramatize |
| Daniel Ellsberg: | He was vindicated in the end, essentially, but had his life for the moment ruined. |
| Thomas Drake: | It's extremely dangerous in America right now to be right as whistleblower when the government is so wrong, so speaking truth to power is now a criminal act. |

[Emphasis supplied]

(Exhibit 49)

87.     After Rahm Emanuel was elected Mayor of Chicago in February 2011, one of the first, if not the first things to occur was the immediate resignation of William Foley as CEO of the Cook County Health Board (Exhibit 50).  Dr. Cathy Lazarus and Patricia Bergeson also summarily resigned their positions from RFUMS. Subsequently, Dr. David Ansell was not recommended for reappointment and Benn Greenspan resigned (Exhibit 50). Importantly, the Cook County Health Board necessarily had to undergo review as well as training by the Cook County System Chief Compliance Officer, Independent Inspector General, and Shakman Compliance Administrator attended by an investigator of the Inspector General (Exhibit 50).

88.     After Dr. Uppal's release from custody in January 2011, she then embarked on another five years of facing non-stop obstruction, harassment, intimidation, injuries, monetary

losses and fraud by the Defendants and their co-conspirators both known and not yet known. During this time, Defendant Meczyk twice attempted to run for a position of Judge thereby exposing at least one of the benefits he sought in exchange for his role in injuring Dr. Uppal and obstructing the EEOC case. In 2011 Meczyk appeared before the Cook County Board in an effort to be slated as a candidate but failed due to a previous conviction, not surprisingly, for fraud and also possibly because of the change in leadership in both City Hall and Cook County. Again in 2014 Meczyk ran for Judge but lost.

89.     In the summer of 2011, Dr. Uppal was invited to Columbia University purportedly to interview for the narrative medicine program (Exhibit 51). She discovered though that the true intent was interrogate her about Emanuel, about whom she had little information. She left the interview, however, well-informed that she had aroused the ire of certain ideological groups critical of Israeli policies and U.S. foreign policy towards the State of Israel who apparently were keen on demolishing both Michael Reese and Mt. Sinai Hospital, two historic Jewish hospitals, without regard apparently to the community benefits they provided; an objective desperately wanting for relevance to foreign policy concerns.

90.     Upon returning from Columbia University, Dr. Uppal expressed her concerns to her family that she had been dragged into a situation she had nothing to do with and felt that her career in medicine was unjustly destroyed for evidently nonsense ideological reasons. Dr. Uppal reiterated that she did not page Bovis on January 20, 2009 and that she may have been wrong in her prior belief that the information regarding the neurosurgical call schedule on that night by Dr. Vargish was not accurate and in her reliance on Defendant Meczyk. The fact that Dr. Uppal was unable to locate any information on her case with the Clerk of Cook County also began to raise significant suspicions regarding the criminal case in 2009.

91.     In 2011, Dr. Uppal's family had their lawyer contact Meczyk to preserve her case file and make arrangements for her it to be sent to Merced, California. Defendant Meczyk instead filed a false complaint against Dr. Uppal with the State's Attorney that she was harassing him by phone in an attempt to have her violated on her probation and remanded into custody even though Dr. Uppal never contacted Meczyk (Exhibit 52). The meritless case went before Judge Garritt Howard and was instantly dismissed

92.     In spite of suspicions that were gradually materializing, the reality is that Defendant Meczyk's actions to attempt to have Dr. Uppal arrested and taken into custody in 2011 ignited intense fears for Dr. Uppal and her family over her safety. Given that it took an intervention by a former White House Chief of Staff and both a sitting and former President for her to be released from jail, Defendant Meczyk's continued unfettered abuse of the court system to harm Dr. Uppal was overwhelmingly intimidating and invoked intense fear in both Dr. Uppal and her family. The situation was that at any time, for any reason, she could be remanded into custody and this created an environment deeply oppressive and menacing. The impression given was that the Cook County Justice System was a weapon to be used to target and tether Dr. Uppal rather than an impartial government body bound by the law, and that Defendant Meczyk acted with the confidence of one who was given full authority to utilize the system to harm and intimidate Dr. Uppal and her family to prevent her from gaining knowledge on the material facts of the 2009 criminal case.

93.     Nevertheless, in 2012, Dr. Uppal learned about post-conviction relief and hired Daniel Florey as appellate counsel.

94.     In preparation of the post-conviction matter, Florey repeatedly requested Defendant Meczyk to turn over his file for the 2009 case. Meczyk refused to do so (Exhibit 53).

95.    On January 18, 2013 Florey had to file Dr. Uppal's first petition for post-conviction relief for the 2009 criminal case without ever having any of the files from Meczyk (Exhibit 33 and 53).

96.    In March 2013, the Assistant State's Attorney, Cathy Crowley, who handled Dr. Uppal's 2009 case suddenly retired (Exhibit 54).

97.    On March 28, 2013, Judge Garritt Howard issued a Court Order to Meczyk to turn over his case file. Meczyk still refused to turn over Dr. Uppal's case file (Exhibit 53).

98.    On June 7, 2013 Florey initiated a petition to hold Meczyk in contempt of court (Exhibit 53).

99.    Near the end of September 2013, Florey contacted Dr. Uppal and told her that Meczyk had finally turned over her case file. Dr. Uppal reviewed the box he had turned over with Florey and all it contained were two phone reports for one outgoing call and one unknown number. There was no call detail record showing incoming calls and no sworn affidavit which would be case determinative (Exhibits 55 & 56).

100.    Dr. Uppal was made to believe by Meczyk that she was guilty of the 2009 charges; that she had received wrong information about the call schedule and she had indeed contacted Bovis on January 20, 2009 and there was nothing she could do to prove otherwise. Reviewing the reports tendered to Florey, Dr. Uppal realized, in shock, that she and her family had been completely deceived by Meczyk who had concealed significant material facts regarding her 2009 case by refusing to allow Dr. Uppal or her mother to review the police reports that stated the following:

> 1. Type of Incident: HARASSMENT BY TELEPHONE
> 2. Date, Time (F6): Tue Jan 20 22:34:23 CST 2009
> 3. Officer Name: S. Pozniak #118
> 4. Narrative

VERIFIED COMPLAINT - 40

The complainant related that on 01/20/09 at 2019 hrs and 2135 hrs. he received two pages from (312) 951-0275. Complainant called back at 2019 hrs. and spoke with a woman who related that she was Dr. Perez, an intern at Northwestern with a patient with a brain tumor who needs your attention. Complainant recognized the voice as Prabhjot Uppal, a woman that he currently proceeding on a felony case for harassment by telephone. The case is an ongoing case with Det. Petersen and complainant wanted this incident documented for the upcoming court date on Friday 01/23/09. A copy of this report will be forwarded to Det. Petersen.

1. Address of Occurrence: redacted
2. Type of incident: Harassing telephone call
3. Details of Supplemental Narrative:

On January 21, 2009 at approximately 12:15 P.M. I spoke with [Bovis] about these cases. [Bovis] related that he knew Uppal's court case was getting closer as the State's Attorney's office had been in contact with him. [Bovis] added that on January 20, 2009 at approximately 8:19 P.M. he received a page on his work pager. The number that appeared was (312) 951-0275. **He was at home when he received the page and thought it was odd as he was not on-call for the night.** [Bovis] is a neurosurgeon who works out of LGH. He called the number and a female answered stating Northwestern Oncology. [Bovis] responded, [Bovis] I was paged. The female was heard asking did someone page [Bovis]. After a short pause, the same female that first answered spoke again. She stated that she was Doctor Perez and was calling regarding one of his patients, XXXXX. The female added that she was with XXXXX who was suffering from an anterior meningioma. She requested to have surgery and wished to have redacted consult in the matter. XXXXX asked if the patient was symptomatic. The female hesitated and responded that [Bovis] had seen XXXXX in the past as she had a tumor. XXXXX advised me that the nature of this page was not unusual. In the past he has returned pages and usually a nurse answers and identifies their location. After identifying himself, the nurse transfers the call on. Further, he in fact has seen a patient with the name of XXXXX however she did not have a brain tumor. [Bovis] stated that he quickly realized that during this call he was speaking with Prabhjot Uppal, who also goes by Jody Uppal. [Bovis] stated that at point in the conversation he was asked to speak with the nurse. The female then terminated the call. [Bovis] related that at approximately 9:35 P.M. he received another page displaying the number of (312) 951-0275. He did not call the number back. [Bovis] stated that he then responded to the Northbrook Police Department and filed a report regarding the calls with Police Officer Pozniak. [Bovis] related that he had already spoken with the State's Attorney's office about the page and phone conversation. I advised Bovis that I was assigned

to the case and that I would discuss the matter with the State's Attorney. I then conducted an Internet search on Entersect and discovered that the phone number of (312) 951-0275 was an Ameritech Illinois Wireless number registered to Prabhjot Uppal of Chicago, Illinois. On January 21, 2009 at approximately 3:00 P.M. I responded to the Cook County Skokie court house and met with A.S.A. Morris. We discussed the above matters and Morris stated that on January 23, 2009 she would be filing a violation of condition of bail against Uppal for this incident. Court time is set for 9:30 A.M. Case pending.
1. Date, Time (F6): Thu Jan 22 16:17:01 CST 2009
2. Reporting Officer: Det J. Petersen #137
On January 23, 2009 at approximately 9:30 A.M. I responded to the Cook County Skokie court house and met with [Bovis]. Myself and [Bovis] then met with felony review A.S.A. Hemeley and reviewed this case with her. **Bovis swore to the facts of the complaint and signed it.** A.S.A. Hemeley approved the felony charge and warrant. [Emphasis supplied]

(Exhibit 20)

101.    Dr. Uppal realized that Bovis, by swearing and signing his name to his false complaint, had committed perjury. While Dr. Uppal couldn't remember where the incoming phone calls came from, she did know that when he said he was "not on call" that she had not been mistaken about the call schedule and knowing the liability associated with hospital compliance with EMTALA and CMS on-call policies and procedures, his claim that he received and returned a page when he was not on-call was a lie; the incoming phone calls to Dr. Uppal's phone would be case determinative. Dr. Uppal asked Florey to subpoena the incoming call records, but he told her they were "too old" (Exhibit 56). Dr. Uppal found her old phones in storage and the three incoming calls recorded to her number on January 20, 2009 are, in order, from Mt. Sinai Hospital, LGH and from Meczyk's phone (312) 636-6360 (Exhibit 32). Dr. Bovis never received a page, never returned a page, never had any conversation with Dr. Uppal and completely fabricated his complaint against Dr. Uppal based clearly on whatever was related to him by the on-call physician. Additionally, it is highly unlikely that routine practices at LGH

VERIFIED COMPLAINT - 42

regarding on-call duties would violate both federal CMS and EMTALA laws conveniently on the night Dr. Uppal paged Dr. Ruge just so Bovis could allege he received a page when in fact he did not and could not have (Exhibit 31). Bovis' lies, of course were nothing new, and the intent again was closely aligned his previous false statements to LGH to have Dr. Uppal fired and to the police in 2006: to cover up the September 2005 patient emergency in which a patient was endangered by his reckless conduct at LGH.

102.    Dr. Uppal turned her phone with caller ID over to Florey and he filed a Motion to Admit Newly Discovered Evidence on October 9, 2013 (Exhibits 56 and 57). On October 18, 2013 a hearing took place before Judge Garritt Howard and the following exchange ensued:

| | |
|---|---|
| THE COURT: | What is it you're seeking to subpoena? |
| MR. FLOREY: | Judge, that would be phone records. |
| THE COURT: | Phone records relating to? |
| MR. FLOREY: | Relating to the time of this alleged incident going all the back to – |
| THE COURT: | Wasn't this done before? |
| MR. FLOREY: | No. And that's what is – now, Judge if you remember, I had a hard time getting the trial file on this and in my file, there is no subpoenas, and the State has tendered discovery that I have in the file. I don't see any phone records subpoenaed and I don't think I'm going to be able to get them this late but my client asked me to at least try. And here is the thing about the phone, Judge. It was just discovered at the end of September when my client was going through some personal belongings in storage – |
| THE COURT: | I read your amended motion. |
| MR. FLOREY: | So – |
| THE COURT: | That doesn't really prove anything. |
| MR. FLOREY: | Well, |
| THE COURT: | The phone records would. |
| MR. FLOREY: | I know. |
| THE COURT: | Well, you can subpoenas the phone records. I'm surprised the State, when they initially worked up the case, of course, you didn't have the case initially, whoever worked up |

VERIFIED COMPLAINT - 43

|  | the case initially would have gotten these records since it was part and parcel of the offense. |
|---|---|
| MS. MEENAN: | **Your Honor, as I stand here today, I don't know. I was not able to get our trial file. Our warehouse did not locate our trial file.** |
| THE COURT: | Well, get your file. I would be surprised that they are not in there. |
| MR. FLOREY: | Judge, I don't' want to overstate it to you. There is one phone record in there but it's not phone records that we think would be case determinative. If my recollection is accurate, there was one page of a phone record but not from my client's phone and not from the alleged complaining witness' phone. |
| THE COURT: | **I can't imagine attorneys working on this case at the time would not have gotten those records.** |
| MR. FLOREY: | It's possible I just don't have it in the file. |
| THE COURT: | Could be. Well, we will give it a date, issue your subpoena, check your file. They should be in there. |
| MR. FLOREY: | Okay. |
| ... | |
| THE COURT: | You can subpoena your client's phone records though. You don't need the State's agreement for that. |
| MR. FLOREY: | What about the phone itself? |
| THE COURT: | What about it? |
| MR. FLOREY: | That was part of the motion to admit that into evidence. |
| THE COURT: | Well, let's get the records first. One step at a time. |
| ... | |
| THE COURT: | How much time are you going to need do you think, probably about six weeks to make sure you get them? |
| MR. FLOREY: | Yes. |
| THE COURT: | So sometime late November. [Emphasis Supplied] |

(Exhibit 56)

The cause of Dr. Uppal's difficulty over the years of securing any material facts about her 2009 criminal case from the Clerk of Cook County was ultimately revealed: the entire case file was missing. Dr. Uppal's situation now seemed to be eerily similar to the Vanecko case involving former Mayor of Chicago Richard M. Daley's nephew (Exhibit 58). As with Dr. Uppal's case, a criminal act was committed and instead of filing charges against the criminal, the file with the evidence of the crime went missing, the Assistant State's Attorney involved resigned and the victim's life destroyed (Exhibit 54).

103.    Following the October 18, 2013 hearing, however, Florey did not subpoena the phone records as ordered by Judge Howard, nor did he return any calls or emails to Dr. Uppal. In December 2013, Florey did not show up to the court date. This was greatly distressing to Dr. Uppal as it was clear by now what had transpired and she was anxious to see a quick resolution and the vacating of her felony conviction. Given Florey's initial robust representation of her, his sudden retreat was unexpected and deeply concerning. Month after month passed and when Dr. Uppal finally arranged a meeting with him and asked him why he hadn't subpoenaed the records he told her that "it's not a good idea." She questioned him what he meant by this, and he expressed that he was being discouraged from subpoenaing the records but would only say by "someone you know." Florey demanded more money if Dr. Uppal wanted him to subpoena the phone records even though she had already paid him $20,000 by written contract for him to handle the entire post-conviction matter. Dr. Uppal told Florey he would need to talk to her parents. Dr. Uppal's mother paid Florey additional money and on February 17, 2014, Florey finally subpoenaed the call detail record for Dr. Uppal's number on January 20, 2009 (Exhibit 32). The incoming numbers were consistent with her caller ID. After securing the call detail for Dr. Uppal's phone number, however, Florey continued to express his reluctance in continuing as her appellate counsel. At this point his reason was that "You don't go up against a Judge." Dr.

VERIFIED COMPLAINT - 45

Uppal reviewed again the transcript of the plea hearing on January 19, 2010. It is here where she realized that Judge Axelrood did not have a fixed, permanent belief in her guilt, but actually knew that she was factually innocent. This was exposed in Judge Axelrood's statements during sentencing of Dr. Uppal as follows:

THE COURT:     What is most important, young lady, is that during the time that you are on this probation, you are to have no contact whatsoever with Dr. George Bovis or **anyone** at Lutheran General Hospital.

…

THE COURT:     Make sure that you comply with every aspect of this probation. I am going to tell you something. You have one of the best lawyers in the State of Illinois.

MR. MECZYK:    Thank you, your Honor.
[Emphasis Supplied]

(Exhibit 38)

Judge Axelrood's sentence was not based on the charged offense but on the actual "offense" which was no offense at all. This statement revealed his knowledge that Dr. Uppal never had any contact directly or indirectly with Bovis on January 20, 2009 but instead had contact with the on-call neurosurgeon who was physically located in Park Ridge, Illinois. If the case had gone to trial and the full evidence brought before the Court, due to Bovis' decision to add a twist to his pattern of lying by swearing and signing to it, it would have been Bovis and not Dr. Uppal who would be convicted of a felony and it would have been Dr. Uppal and not Bovis who would be practicing medicine today. Protecting Bovis from felony criminal charges and exonerating Dr. Uppal were mutually exclusive and Judge Axelrood clearly had decided it was Dr. Uppal and her EEOC case against LGH that was to be disposed of. Axelrood shamelessly did not hesitate to express his appreciation of Meczyk's cooperation in the obstruction of justice describing him as "one of the best lawyers in the State of Illinois," essentially giving Meczyk a slap on the back as a "good 'ol boy." Nevertheless, Florey's lack of reliability resulted in Dr. Uppal deciding to try

different counsel as she felt that Meczyk had "gotten to Florey" and Defendant Nishay K. Sanan ("Sanan") was substituted as appellate counsel (Exhibit 59).

104.    Dr. Uppal told Mr. Sanan to subpoena the phone companies to verify the incoming phone numbers, he said that he would. He did not. Sanan misled Dr. Uppal and her family telling them that he was busy investigating the post-conviction case when in fact only two months after being retained he filed an amended petition (Exhibit 59). Sanan issued no subpoenas, did no investigation but continuously told Dr. Uppal that he was working on the case and kept delaying court dates, asking the presiding Judge for lengthy continuances and telling Dr. Uppal and her family that he would not be able to get things resolved before the end of the year even though phone reports take only 6-8 weeks to subpoena.

105.    In October 2014, at a hearing for Dr. Uppal's post-conviction matter, the A.S.A. gave her answer and in her answer she challenged the authenticity of documents that Sanan had filed in the amended petition, specifically a paper for the (847) 823-2050 number describing it as a "mobile" phone (Exhibit 59 & 60 p.14). In both the police reports and in the stipulated testimony, it is clear that Bovis was "at home" (Exhibits 20 & 38). In the police reports, Bovis' home address is listed as 3428 Whirlaway Drive, Northbrook, Illinois. Public property searches, voter registration and political donations also confirm Northbrook as Bovis' home before and after the date of the alleged incident and it was the Northbrook Police Department, as opposed to the Park Ridge Police Department, where Bovis filed his false complaints against Dr. Uppal (Exhibit 20 & 61).  All numbers with the NPA-NXX prefix of (847) 823 – XXXX are landlines wired in Park Ridge, Illinois and the hospital number is likely even decades old (Exhibit 32). Additionally, LGH has published policies prohibiting mobile phone use, and finally if one were to call this number they would find it would say it is a "non-working number." That is because it is a landline phone on a Unit within the hospital and Unit phones do not accept phone calls from

VERIFIED COMPLAINT - 47

outside the hospital. Likewise, if one were to call the number that Dr. Vargish returned his page from at Mt. Sinai Hospital on January 20, 2009, (773) 475-5966, it will say "this number is being checked for trouble," because it is also a Unit landline from within a hospital (Exhibit 32). The page Dr. Uppal sent was returned from someone physically within the hospital in Park Ridge, Illinois and Bovis was physically in Northbrook, Illinois. Sanan's fraud by submitting a fake phone report alleging that the page was returned from a mobile number was a clear overt act to commit fraud against the Court and Dr. Uppal, to reconcile the call detail record with Bovis' false statements rather than exonerate Dr. Uppal and to conceal the authentic origin of the incoming calls to Dr. Uppal on January 20, 2009. Ultimately the A.S.A. exploited the Sanan's fraud to suggest that Bovis could have used a "mobile" hospital phone to return the page from his home (Exhibit 60).

106.    Dr. Uppal tried to confront Mr. Sanan after the hearing but he said to call her later as he had another court appearance. Dr. Uppal repeatedly tried to contact Mr. Sanan to have him subpoena the incoming numbers and authenticate them. He never replied to her. She then flew back to Chicago knowing that the decision on her post-conviction matter was to be held on April 16, 2015 and confronted Mr. Sanan in his office accompanied with her attorney Justin D. Kaplan. Dr. Uppal demanded to see the amended petition and looked at the phone report listing the hospital number as a "mobile" phone. Dr. Uppal told Sanan to subpoena the phone companies to authenticate the incoming calls and he told her, "It's too late." Dr. Uppal also saw that there was a second, albeit identical, call detail report for her number 312-951-0275 in the amended petition, but that it bore Ralph Meczyk's signature and was dated February 2009 (Exhibit 62). This was the exact report that Dr. Uppal and Florey had searched for and ultimately had to subpoena at significant time and expense for Dr. Uppal, not to mention the possibility that the record could have been, as Florey repeatedly stated, "too old" for her have been able to subpoena.

VERIFIED COMPLAINT - 48

107.     Dr. Uppal interrogated Mr. Sanan as to where he got the original call detail record subpoenaed in 2009 for her phone number. Initially, Sanan told her and Mr. Kaplan that he had found it the file. Dr. Uppal told him that both she and Florey had turned the box upside down looking specifically for it and he replied that "it was crumpled in the corner. Upon being pressed further, Sanan finally admitted that Defendant Meczyk had given it to him shortly after he had been retained by Dr. Uppal in April 2014. Meczyk had the record of incoming calls all along, just as he kept two subscriber phone reports for an outgoing and unknown number, and likely also has the affidavit sworn to by Bovis as well, but deliberately concealed these material facts from Dr. Uppal even after being put on notice that a post-conviction proceeding and probable legal malpractice suit had commenced and being repeatedly requested and even ordered by the Court to turn these records over. Meczyk only turned the call detail record over <u>after</u> Dr. Uppal had successfully subpoenaed it in an overt attempt to conceal his concealment as well as having hindered and delayed Dr. Uppal's efforts to discover all the material facts in the 2009 case. Given the temporal perishability of phone records, hindering and delaying serves the obvious purpose of ensuring such records will never be accessible to Dr. Uppal and the evidence in the 2009 criminal case permanently destroyed in addition to running the statute of limitations to evade criminal and civil sanctions which in hindsight is clearly what Sanan was doing by delaying the case past January 19, 2015.

108.     In a desperate bid to save her post-conviction matter from the damage inflicted by Sanan's malicious fraud, Dr. Uppal contacted Detective Peterson of the Northbrook Police Department to see if he had any of the evidence, in particular the sworn affidavit, from the 2009 criminal case. As expected, Detective Peterson replied that all the records had been turned over to the State's Attorney and had been destroyed (Exhibit 39). On April 10, 2015, Dr. Uppal filed a *pro se* Motion for Subpoena Power to Authenticate the Incoming Phone Numbers and for Leave

to File a Second Amended Petition which included a detailed description of Sanan's fraudulent phone report and his ineffective assistance of counsel plus numerous additional claims of constitutional violations not previously raised (Exhibit 63).

109.    On April 16, 2015, the Judge presiding over the post-conviction matter dismissed the petition, stating that she knew Dr. Uppal had filed a motion but had not read it and Mr. Sanan had Dr. Uppal's motion struck from the record. Again Dr. Uppal asked Sanan if there was any way to subpoena the phone companies and he told her, "Don't ever tell anyone I faked the phone report." Again Dr. Uppal asked him if there was any way to get the authenticated reports, and he said, "No, never."

110.    After Dr. Uppal had commenced her post-conviction proceedings, she continued to be denied by RFUMS a token that is supplied by the degree-conferring medical school to applicants for residency programs even though this is a requirement of the AAMC. This seemed odd to her given the departures of Dr. Lazarus and Patricia Bergeson in 2011 and became increasingly concerned that Defendant Welch, was behind this unending discrimination and that he was not a mere bystander who exploited Dr. Uppal's misfortune to push forward a merger with LGH but was actually complicit in the scheme. Dr. Uppal attempted to address these issues with the new Dean of Student Affairs of the medical school and was told that the policies of Dr. Lazarus would be continued (Exhibit 64).

111.    When Dr. Uppal again tried to communicate with RFUMS on August 2, 2013, the school responded with a malicious denial of service ("DOS") attack flooding her email server with thousands of emails (Exhibit 65). Dr. Uppal then filed a complaint with the U.S. Department of Education ("DOE") (Exhibit 65). Dr. Uppal never emailed or attempted to contact RFUMS staff again.

112.    While Dr. Uppal was awaiting the processing of her complaint with the DOE, on September 13, 2013 she noticed alerts from an old Yahoo email account dated on September 10, 2013 (Exhibit 65). These alerts informed her that her email account had been accessed by a computer in Belarus (a country in Eastern Europe) and that her password had been changed. Dr. Uppal then tried to log into her Yahoo account and was unable to until after going through the security features. When Dr. Uppal finally was able to access her Yahoo account, she saw that a second malicious DOS attack had occurred flooding her email with over 2,000 emails (Exhibit 65). On reviewing the second DOS attack, Dr. Uppal saw that this attack had been triggered by an email sent from her account to Ian Szekeres with an RFUMS email address immediately after the account had been hacked into. The second DOS attack ran for two hours resulting in nearly 14,000 pages of emails. Due to the sheer volume of the second DOS attack, the relevant Exhibit shows just the first and last DOS emails for both DOS attacks (Exhibit 65).

113.    Dr. Uppal tried to contact the DOE but wasn't able to. She continued to try to notify them but then had to post-pone this until after the 2013 government shutdown had relented. On November 5, 2013, Dr. Uppal received another notice regarding her Yahoo mail account, notifying her that the account had been "locked" due to "unusual activity" (Exhibit 65). When Dr. Uppal was finally able to reach the DOE, they told her that they would not be addressing the email hacking on September 10, 2013 as this was not part of her original complaint (Exhibit 66).

114.    The DOE did confront RFUMS, however, and was falsely told that the August 3, 2013 DOS attack was a "technical glitch" that Google was responsible for and that had affected everyone not just Dr. Uppal even though the DOS attack emails clearly state the error was due to a rejection by RFUMS' server (Exhibit 65). Further, they told the DOE that they had resolved the "glitch" by August 14, 2013. The staff who gave these reports to the DOE knowingly and intentionally lied to the federal investigators (Exhibit 65). After the August 2, 2013 DOS attack,

one of Dr. Uppal's friends sent an email to the school to check if it would result in a DOS response; it did not. Secondly, the second DOS attack occurred well after August 14, 2013 and it is clear that the cause of the DOS was an email sent to RFUMS by someone who had hacked into her Yahoo account (Exhibit 65). Further, it is also reasonable to see that the November 5, 2013 "unusual activity" on her Yahoo account that resulted in the account being locked as a security precaution was the result of a second attempt by the IT staff at RFUMS to unlawfully access the account in an effort to destroy the evidence of the second DOS attack. Likely, the IT staff believed that because the DOE did not address the email hacking with RFUMS that the DOE and Dr. Uppal may not have been aware that it had occurred and believed they could destroy the evidence before it was discovered.

115.    It became clear to Dr. Uppal that the computer crimes committed against her were intended to deter her from communicating with members of the university community as well as intimidate and harass her. Additionally, in 2013 RFUMS was again having accreditation issues and placed back on probation (Exhibit 67).  As in 2004, the accreditation issues were attributed to the affiliation with Advocate Lutheran General Hospital. Even though, due in large part to Dr. Uppal's and Rahm Emanuel's actions in 2010 and 2011, the plans to demolish Mt. Sinai Hospital had been aborted, RFUMS pushed forward the merger anyway and since has had both Mt. Sinai Hospital faculty and LGH faculty providing clinical teaching. As expected, however, there are significant enduring issues stemming from LGH becoming the primary affiliate in 2011 not to mention that the contract was achieved through unlawful, criminal means. The current status of RFUMS in terms of the clinical training of third and fourth year medical students appears to be in flux as expressed by the Dean who was appointed in 2013 in the following LCME report:

> Since his arrival as Dean of Chicago Medical School in
> October 2013, John Tomkowiak, MD, MOL, has been working to
> organize and lead clinical departments in a completely new

direction. The contract for Advocate Lutheran General Hospital to provide clinical chairs in all departments was not renewed when it ended on 4/20/14. We are currently in an interim phase in which most clinical chairs have agreed on an individual basis to continue in their roles identified in Table 2 above. Three Advocate department chairs who stepped down have been replaced by interim chairs in Family Medicine, Psychiatry, and Surgery. Appendix IS-11.1 is the Chair position template for our current department chairs.

As a community-based medical school, most of our clinical faculty are located at hospitals throughout the Chicago metropolitan area, and no single hospital leadership group can readily govern the educational activities of faculty throughout our system effectively. The goal for a Chicago Medical School-based Department of Clinical Sciences will be to do exactly that--to coordinate and develop the efforts of faculty at the full range of hospitals to the best advantage of our students. Given that our clinical departments have been mostly engaged in supporting our educational mission, it makes sense to organize them into a single department with education as the focus.

(Exhibit 67)

116.     On April 30, 2015, Dr. Uppal filed a federal complaint against RFUMS for breach of contract, this was filed by Justin D. Kaplan. Dr. Uppal told Mr. Kaplan to amend the complaint as a breach of fiduciary duty to address RFUMS' refusal since 2008 to allow Dr. Uppal to apply for residency in violation of AAMC policies and to add the additional claims brought forward now in this Verified Complaint. Dr. Uppal also had Mr. Kaplan send out subpoenas to authenticate the incoming phone numbers to her phone on January 20, 2009 in support of the claims she intended to bring forward knowing that due to the age of the records they were imminently vulnerable to being permanently perished.

117.     As expected, RFUMS' representative, William McErlean, moved to quash the subpoenas using inflammatory, false and outrageously defamatory descriptions of Dr. Uppal to corruptly persuade the Court to bar Dr. Uppal from ever authenticating the origins of numbers to her own phone (Exhibit 68). Much of false and offensive efforts McErlean put forward included

suggesting that Dr. Uppal was mentally disabled and a threat to public safety; tactics previously utilized by Dr. Cathy Lazarus and Patricia Bergeson to discourage external investigations into RFUMS' activities by discrediting her. The people who seek to conceal their identities when calling someone on the phone or going to their house are generally criminals like thieves and stalkers; in this case it is no different. The true intent to bar Dr. Uppal from having access to the evidence authenticating the origins of the calls to her <u>own</u> phone number on January 20, 2009 was a continuing effort by the Defendants to conceal and destroy evidence of the their criminal and tortious acts against Dr. Uppal. The fact that Dr.Uppal sent subpoenas for these specific numbers in addition to her initial disclosures put RFUMS on notice of the claims that would be forthcoming and McErlean's actions to quash and place protective orders on this evidence exposed RFUMS as being knowledgeable of the criminal conspiracy to obstruct Dr. Uppal's EEOC case and exposed RFUMS' knowledge of the intimate details regarding Dr. Uppal's 2009 case and that they know she is factually innocent.

118.    As the federal case against RFUMS progressed, their initial disclosures also revealed that they had only two named witnesses, Patricia Bergeson and Cathy Lazarus, both of whom had departed RFUMS in 2011. The other witnesses were unnamed LGH staff. There were no other witnesses apparently from RFUMS willing or able to support the decision by RFUMS to deny Dr. Uppal annually a token to apply for applying to residency programs since 2008 (Exhibit 69). All of RFUMS' witnesses were either representatives of LGH or former employees who had joined the university for the purpose of pushing the merger through. Given that the legal counsel of RFUMS is directed by the leadership at the university and not the faculty, there is no question left regarding the direct involvement of Defendants Welch, the Board of Trustees and Trustee Defendants in the conspiracy against Dr. Uppal and their culpability in the criminal and tortious acts that have been committed.

119.    The motion to quash the incoming phone reports, however, was denied. As if on-cue, co-conspirator Defendant Meczyk then appeared also in an attempt to quash the subpoenas knowing full well that these were records from January 20, 2009.  Meczyk's motion to quash the phone subpoenas was also denied.  The Court, however, placed a protective order on the reports so that they would be for "attorneys' eyes only."  This seemed strange given their obvious relevance and it was then Dr. Uppal discovered that Mr. Kaplan had not brought the claims in the first amended complaint that are being brought now in this Verified Complaint. Dr. Uppal instructed Mr. Kaplan to ask the Court for leave to file a second amended complaint, but he did not.

120.    Dr. Uppal, however, had secured enough evidence that anyone who is even remotely familiar with hospital on-call policies would know on face value that Dr. Uppal was innocent in the 2009 criminal case and she had been releasing this information to members of the university community starting in 2013 when she commenced her post-conviction proceedings prior to filing her case in federal court. The knowledge, participation and assistance of the RFUMS Chair of the Board of Trustees, Gail Warden, in the conspiracy against Dr. Uppal emerged in 2013 when Anthony Armada suddenly resigned as CEO of Lutheran General Hospital in October 2013 as the LCME began monitoring RFUMS and its affiliation with LGH again. After Dr. Uppal's interviews between 2007 and 2008 alerted the AMA to her difficulties at LGH and resulted in the resignations of Bruce Campbell, CEO of LGH, and Dr. Glen Solomon, LGH had difficulty finding a new CEO willing to be complicit in a merger resultant from a criminal conspiracy essentially to kidnap Dr. Uppal and hold her hostage to prevent her from filing her suit against LGH on time and until she plead to a crime she didn't commit to exonerate LGH from wrongdoing in Dr. Uppal's termination during her residency training and secure the LCME's approval of the merger (Exhibit 74).   Their first choice, David Stark

apparently couldn't stomach the scheme and abruptly resigned, and Gail Warden, who remained the President Emeritus at Henry Ford Health System after becoming Vice Chair and then Chair of RFUMS Board of Trustees in 2003, anxious to see the merger and demolition of Mt. Sinai Hospital through, recruited one of his own from Henry Ford, Anthony Armada to push it through (Exhibit 74). It was during the time Armada was CEO of LGH from October 2009 through November 2013, that the unlawful means and objective of the conspiracy to merge LGH with RFUMS was executed (Exhibit 74). Between Dr. Uppal continuing to investigate the 2009 criminal case and releasing this information and the LCME supervision of RFUMS in 2013, it is obvious that the upper administration of RFUMS is deeply concerned about Dr. Uppal getting her hands on the phone reports that were subpoenaed by her in June 2015. One of the areas of concern raised by the LCME in 2013 were inconsistencies between the Faculty ByLaws and University Faculty ByLaws (Exhibit 67). Prior to 2015, the Just Cause for terminating a faculty member at RFUMS had been unchanged for years, but then was completely rewritten after Dr. Uppal filed her complaint in federal court clearly reflecting the injuries that the conspiracy to merge with LGH incurred on Dr. Uppal and the responsibility of those injuries being attributed in part to individuals at RFUMS:

Section 5:2-02 Terminations (May 2014)
The only circumstances under which the University may terminate a faculty member prematurely, whether tenured or not, are where just cause, financial exigency, or elimination of a program exists. As part of the termination, a tenured faculty member shall forfeit tenure.
I. Just Cause: Incompetence, moral turpitude, neglect of duty, commission of a felony, improper professional conduct, or academic misconduct including scientific misconduct shall constitute just cause for termination of the appointment of a faculty member.

Section 5:2-02 Terminations (May 2015)
The remainder of this section pertains to faculty appointments for individuals who are employed by the University.

The only circumstances under which the University may terminate an employed faculty member prematurely, whether tenured or not, are where there is a determination, consistent with process described in this Section, of just cause, financial exigency, or elimination of a program. As part of the termination, a tenured faculty member shall forfeit tenure.

I. Just Cause: Terminations for just cause may occur upon the determination that the faculty member has exhibited behavior such as major violations of the University's Code of Conduct, willful material concealment or misrepresentation during the application for employment process, gross incompetence in the performance of duties, substantial neglect of duty, flagrant unprofessional or abusive conduct towards a member of the University community or within the University environment, willful violation of policy resulting in a significant loss of resources or risk of harm to a person, commission of a crime against the University or against any member of the University community, or commission of a felony.

Procedures:

The Dean of the school or college shall review the information available and, if deemed warranted, to make a recommendation the Vice President for Faculty and Academic Affairs to initiate the process for termination for just cause. The Vice President for Faculty and Academic Affairs shall review the recommendation and information available and will either, as deemed appropriate, prepare formal charges or return the matter to the dean for further information gathering.

(Exhibit 70)

It is clear from the revised Faculty ByLaws that there is significant awareness amongst faculty at RFUMS of the crimes committed against Dr. Uppal over the years under the leadership of RFUMS including Defendant Welch and these changes in Faculty ByLaws are not reflected in the University Faculty ByLaws. There is no question that the administrative levels of RFUMS are in conflict with members of the faculty due to the decisions made since 2004 and that these upper administrative levels, namely the Chair of the Board of Trustees and President, do not want evidence in a form admissible to a court proceeding of their actions to come to light before any court or to be secured in the possession of Dr. Uppal. They also clearly have zero regard for

Dr. Uppal's well-being and have acted to ensure that she remains wrongfully convicted for the rest of her life as they had originally planned and executed.

121.    William McErlean was hired as legal counsel in a federal case brought against RFUMS. As such, all of his actions were taken as a representative of RFUMS under the authority of the Board of Trustees as described in Article IV of the University By-Laws stated here:

ARTICLE IV<br>BOARD OF TRUSTEES

Section 1. Management, Authority and Responsibility.
(a) The Board of Trustees (sometimes herein termed "Board") shall manage the affairs of the University, have and exercise those corporate powers prescribed by law, and be responsible for the financial health and welfare of the University. The Board of Trustees shall exercise ultimate institutional authority as set forth in these bylaws and in such other policy documents it deems to be appropriate. These bylaws and other board policy statements shall take precedence over all other institutional statements, documents, and policies (including faculty bylaws). By way of illustration, these bylaws anticipate that the Board of Trustees will exercise authority with respect to:

…
2.      Appointing the President and setting appropriate conditions of employment.
3.      Establishing the conditions of employment of other key institutional officers who serve at the pleasure of the President (in consultation with the Board).
4.      Supporting and assessing the performance of the President.

(Exhibit 71)

While the Board of Trustees may not "adopt a plan of merger or adopt a plan of consolidation with another corporation" (Exhibit 71), the Board of Trustees does decide on the <u>appointment and employment of the President</u> whose responsibilities include executing "bonds, mortgages and other contracts of the University" (Exhibit 71).  Therefore, though the Board of Trustees may not be directly responsible for the merger with LGH and the conspiracy against Dr. Uppal to

VERIFIED COMPLAINT - 58

carry that merger through, they certainly were aware of it in intimate detail as well as the unlawful means that were employed to accomplish it as revealed by RFUMS' counsel's aggressive efforts to quash the phone report subpoenas. This knowledge of and interest of RFUMS to conceal the evidence of the conspiracy against Dr. Uppal was further emphasized even after Dr. Uppal's federal case against RFUMS was dismissed on statutory grounds.

122.    Dr. Uppal had continued to press Mr. Kaplan to file for leave to file a second amended complaint and include the additional claims brought in this Verified Complaint. On August 25, 2015, Dr. Uppal and her parents spoke with Mr. Kaplan regarding the filing of the new claims and he said that he didn't want to be involved in anything "political." Dr. Uppal then decided to bring the new claims herself but on August 26, 2015, Dr. Uppal's federal complaint for breach of a fiduciary duty was dismissed on statutory grounds. In spite of the case being dismissed, on August 27, 2015, William McErlean, filed a motion for a protective order on the phone reports including that they be destroyed within 63 days (Exhibit 72).

123.    RFUMS benefited from the scheme to merge with LGH given that if the plans, as then expected, to demolish Mt. Sinai Hospital had gone through prior to a merger with LGH, RFUMS would have lost its accreditation. Therefore, invoking the doctrine of *respondeat superior*, RFUMS and the Board of Trustees as employer of Defendant Welch should also be held liable for the actions against and injuries inflicted on Dr. Uppal as described herein and in particular the Chair of the Board of Trustees, Gail Warden, who clearly was intimately involved in the conspiracy if not directing it himself since joining RFUMS in 2003.

124.    Though Dr. Uppal was ultimately able to successfully subpoena the records in question and motions to quash were soundly defeated, the Defendants succeeded in their continuing criminal conspiracy against her by acting to permanently destroy the evidence of the

criminal acts and prevent Dr. Uppal from accessing the only evidence needed to both exonerate herself and bring the relevant civil claims against them with evidence in a form admissible to a court proceeding in compliance with Rule 901 Federal Rules of Evidence. Given that the incoming call from Defendant Meczyk's Verizon phone number at 8:49 pm is represented on the call detail report by a PBX line/trunk line for which Verizon did not find any records, the only way to authenticate this incoming call is through a call detail record for Meczyk's phone number on January 20, 2009 (Exhibit 32).

125. According to Verizon, they only keep call detail records for a period of <u>seven years</u> (Exhibit 73). In June 2015 when these records were subpoenaed, they were already 6.5 years old. Within two or three months from the filing of this Verified Complaint, those records will be permanently out of the reach of Dr. Uppal unless the Court intervenes. Finally, Mr. Kaplan relayed threats issued by William McErlean, directed not only at Dr. Uppal but to her family that she would be fined for nuisance and they would cause other harm to Dr. Uppal and her family if she attempted to file any more complaints in federal court. Nevertheless.

**FIRST CAUSE OF ACTION**
**(Conspiracy - Against ALL Defendants)**

**COUNT I – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**
**CIVIL ACTION FOR DEPRIVATION OF RIGHTS**
**ACTION FOR NEGLECT TO PREVENT**
**(42 USC § 1985, §1986, § 1983)**

126. Plaintiff Uppal re-alleges and reincorporates all the paragraphs in this Verified Complaint as if fully set forth herein.

VERIFIED COMPLAINT - 60

127.  This Count is brought against Defendants Welch, Meczyk and Trustee Defendants, alleging a cause of action under 42 U.S.C. § 1983, § 1985 and §1986, by means in violation of 18 U.S.C § 1510, §1513, § 1512, § 1503, § 1505 and § 241.

128.  At all relevant times, the Defendants were private persons, jointly engaged with state officials, acting "under color" of state law for purposes of 42 U.S.C. § 1983, 1985 and were "persons" for purposes of 42 U.S.C. § 1986 actions.[2]

129.  Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to obstruct Dr. Uppal from bringing suit against Advocate Lutheran General Hospital for Title VII Civil Rights Acts of 1964 violations under the Equal Employment Opportunity Commission by the deadline she was given of November 14, 2009 and in violation of Plaintiff's constitutional rights as well as state and federal criminal laws, as described above.

130.  In this manner, the Defendants, acting in concert with other known and unknown co-conspirators, conspired to accomplish a lawful purpose, a merger between Rosalind Franklin University of Medicine & Science and Advocate Lutheran General Hospital, by an unlawful means.

131.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful and reckless indifference to Plaintiff's rights under U.S. Federal law. At no point did any of the Defendants take any actions to prevent the wrongs

---

[2] "Private persons, jointly engaged with state officials in the challenged actions, are acting "under color" of law for purposes of § 1983 actions. Judicial immunity does not insulate from damages liability those private persons who corruptly conspire with a Judge. *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980).

conspired from being done having power to prevent or aid in preventing the commission of the same.

132.     In furtherance of the conspiracy, each of the Defendants with other known and not yet known co-conspirators, committed overt acts and was an otherwise willing participant in joint activity to maliciously oppress, threaten, injure and otherwise harm Dr. Uppal as well as fraudulently conceal and/or destroy material facts regarding their actions. The Defendants also conspired to cover-up their unlawful acts by introducing false, fictitious and questionable documents to Court proceedings and corruptly persuade a federal court to conceal and/or destroy the material evidence of their unlawful acts in violation of 18 U.S.C. § 1512.

133.     As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and she suffered and continues to suffer and it is foreseeable that she will forever suffer substantial and irreparable harm, including lost income, the loss of her career in medicine, out of pocket expenses, legal expenses, loss of enjoyment in life and severe personal and economic devastation.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

## COUNT II – SPOLIATION OF EVIDENCE (NEGLIGENCE)

134.     Plaintiff Uppal re-alleges and incorporates all of the paragraphs in this Verified Complaint as if fully set forth herein.

135.     From January 2013 through 2015, Defendant Meczyk received multiple written and other notices of pending or probable litigation involving the Plaintiff and the criminal case of 2009.

136.     The material evidence of her 2009 criminal case were in the possession of Defendant Meczyk since January 2009.

137.    After repeated notices that triggered Defendant Meczyk's duty to preserve the material evidence of the 2009 criminal case, Defendant Meczyk intentionally, wantonly, maliciously and willfully destroyed the relevant material evidence in his possession.

138.    Defendant Meczyk's actions disrupted and ultimately prevented Dr. Uppal from having her felony conviction vacated and bringing relevant claims against him and his co-conspirators.

139.    In 2015, all above named Defendants intentionally, maliciously, willfully and corruptly persuaded the Court to destroy the same material evidence referenced above, in violation of 18 U.S.C. §1512, thereby preventing Plaintiff from bringing actions for relevant claims against them and clearly foreseeing the harm and injury it would cause Plaintiff specifically to prevent the Plaintiff from being able to prove an underlying lawsuit.

140.    As a direct and proximate result of the Defendants' spoliation of evidence, Dr. Uppal was irreparably harmed, including the loss of income, the loss of her career in medicine, out of pocket expenses, legal expenses, loss of enjoyment in life, severe personal and economic devastation and was deprived of her rights under Federal law.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

## COUNT III – ABUSE OF PROCESS

141.    Plaintiff re-alleges and incorporates all the paragraphs in this Verified Complaint as if fully set forth herein.

142.    Defendants have abused the process of two official court proceedings in a wrongful manner, not proper in the regular conduct of the proceedings, *The People of the State of Illinois v. Prabhjot Uppal*, No. 09 C2 20073 (Ill. 2d 2010) and in *Uppal v. Rosalind Franklin*

*University of Medicine & Science*, No. 15 Civ. 3806 (N.D.I.L. August 26, 2015), in ways the courts were not designed, specifically, for the suppression of evidence, the obstruction of justice, and the furtherance of a conspiracy to deprive Plaintiff of her rights under Federal laws.

143.    Defendants, and each of them, acted with ulterior motives to cause irreparable harm and injury to Plaintiff including the loss of her career in medicine, legal expenses, loss of income, damage to her reputation and employability, loss of enjoyment of life, personal and economic devastation and loss of emotional tranquility.

144.    Defendants, and each of them, acted willfully and maliciously to harm, oppress and injure Plaintiff through the improper use of the courts in the above references cases.

145.    That said damage, loss and harm was the proximate and legal result of the use of such legal processes by the Defendants.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

### COUNT IV – FALSE IMPRISONMENT

146.    Plaintiff re-alleges and incorporates all the paragraphs in this Verified Complaint as though set forth herein.

147.    Through actions described herein, between November 3, 2009 and January 19, 2010, Defendants intentionally confined Plaintiff without legal justification.

148.    Plaintiff did not consent to such confinement.

149.    As a proximate result of the acts herein Plaintiff is entitled to damages in an amount to be proven at trial.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

## COUNT V – PRESERVATION OF EVIDENCE PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

### Relief Requested and Applicable Standard

This Court must issue a preliminary and permanent injunction to prevent the destruction of all telephone metadata or 'call detail,' records in the possession of the Defendants, their agents, representatives, servants, employees and attorneys as well as Justin D. Kaplan that is relevant to the claims at issue in this Verified Complaint pursuant to Fed. Civil Rule 65(B). Specifically, the very same reports for which a protective order was requested and entered in on August 27, 2015 by William McErlean, representing the Defendants in *Uppal v. Rosalind Franklin University of Medicine & Science*, No. 15 Civ. 3806 (N.D.I.L. August 26, 2015), for incoming call to Plaintiff's phone, 312-951-0275, on January 20, 2009.

Defendants' duty to preserve evidence arose when there existed a potential for litigation and the party knew or reasonably should have known of that potential.[3] Also, the duty to preserve relevant evidence may arise before the commencement of a lawsuit if it is reasonably foreseeable that a lawsuit will be filed. The common law duty to preserve evidence arises at "the moment that litigation is reasonably anticipated."[4] This moment began when Plaintiff issued four subpoenas to AT&T and Verizon for the incoming phone numbers that called her home phone number on January 20, 2009 as described in this Verified Complaint. RFUMS acted to place a protective order on those phone reports on June 26, 2015 so that those reports would be for

---

[3] *Chrysler Realty Co., LLC v. Design Forum Architects, Inc.*, No. 06-CV-121785, 2009 U.S. Dist. LEXIS 121411, *7-8 (E.D. Mich. Dec. 31, 2009) "[T]he first step in the [sanctions] analysis is determine the 'trigger date,' or 'the date a party is put on notice that it has a duty to preserve evidence . . . Any destruction of potentially relevant evidence that occurs after the trigger date, however, is not allowed.")
[4] *Hynix Semiconductor, Inc.*, 645 F.3d 1336; *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311 (Fed. Cir. 2011); *Victor Stanley*, 269 F.R.D. at 521.

"attorneys' eyes only" and later successfully motioned for permanent protective orders to destroy those phone reports on August 27, 2015 within 63 days of the order.

Such pre-litigation requests for documents arising out of similar events or circumstances triggers a duty to preserve relevant evidence.[5] When a party may be deemed to be on notice is a function of the variable chronologies along which issues develop in a lawsuit. Thus, in one case it may be a discovery request, in another the complaint, in still another correspondence prior to the filing of a complaint, that puts a party on notice that material in its custody is, or reasonably should be considered, admissible evidence which the party has a legal duty to preserve.[6] Other courts have held that once a party knows that information may be relevant to a reasonably foreseeable claim, a duty to preserve such evidence arises. For instance, in the oft-cited Zubalake decision, the court found that an employer had a duty to preserve certain electronic records destroyed before an employee ever filed a charge of discrimination which would have triggered a statutory duty to preserve evidence. Consequently, the court held that the duty to preserve attached at the time that litigation was "reasonably anticipated," and that the relevant people at the employer anticipated litigation months before the employee filed her charge of discrimination.

To grant a preliminary injunction, the court examines four factors: (1) whether there is a substantial likelihood that plaintiff will prevail on the merits; (2) whether the plaintiff will suffer irreparable injury if the injunction is not granted; (3) whether no third parties will be unjustifiably harmed if the injunction is granted; and (4) whether the public interest will be

---

[5] *EEOC v. JP Morgan Chase Bank, N.A.,* 2013 U.S. Dist. LEXIS 27499 (S.D. Ohio Feb. 28, 2013) (focusing on the pre-lawsuit events that triggered a bank's duty to preserve data and suspend its automatic purging process, including notice from the EEOC that it was investigating class allegations and a request for information from the commission).
[6] *Abramowitz v. Inta-Bores Acres, Inc.,* No. 98-CV-4139 (ILG), 1999 U.S. Dist. LEXIS 20005, *7-8 (E.D.N.Y. Nov. 16, 1999) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)

VERIFIED COMPLAINT - 66

served by the injunction.

I. **Plaintiff is likely to succeed on the merits of her Complaint especially if the records in question are not permanently destroyed**

It is already known based on the facts, circumstances and evidence of the 2009 criminal case what the phone reports that this preliminary injunction is intended to preserve contain. What is being requested for this Court to preserve is the evidence simply in an authenticated form that satisfies the requirements to be admissible in a court proceeding in accordance with Rule 901 of Federal Rules of Evidence. These reports are evidence that overwhelmingly support the claims as described in this Verified Complaint as well as evidence of the Defendants' criminal acts and conspiracy against Plaintiff. The entire purpose and intent of the Defendants' desire to destroy and or permanently conceal the telephone records in question from the Plaintiff is to ensure that she is unable to prove an underlying lawsuit, specifically the claims brought herein. Given that these phone reports really are the only missing piece of evidence, once secured it is extremely likely that the Plaintiff will succeed on the merits of this Verified Complaint. The multiple overt acts by the Defendants continuing to date have been specifically targeted at the incoming phone records to 312-951-0275 on January 20, 2009 to conceal and/or destroy them from being used in multiple causes of action against them. In addition, all Defendants have acted fraudulently and corruptly to obstruct, hinder and delay Plaintiff from accessing this evidence in the hopes that she will never be able to secure do so. The repeated actions of the Defendants on their own initiative to go to extreme lengths to conceal and destroy the phone reports indicates strongly that the Plaintiff is highly likely to prevail on the merits of her claims.

II. **Plaintiff has already suffered irreparable harm due to the destruction and concealment of these telephone records and it is therefore foreseeable that the Plaintiff will continue to suffer irreparable harm**

The Defendants have repeatedly acted overtly to destroy and/or conceal the telephone

VERIFIED COMPLAINT - 67

reports that are the subject of and reason for this preliminary injunction as well as to repeatedly obstruct Plaintiff's attempts to secure these records including corruptly persuading the Court to place a Protective Order on them and allow for them to be destroyed. These acts have already caused significant irreparable injury to Plaintiff. It is clearly foreseeable that concealment and destruction of these records will continue if the Court does not intervene and will continue to cause irreparable harm and injury to Plaintiff. Furthermore, telephone companies do not keep phone reports indefinitely and one of the reports requested from Verizon is only kept for a period of <u>seven years</u>. One specific call detail report for Defendant Ralph Meczyk's incoming call to Plaintiff on January 20, 2009 from (312) 636-6360, a Verizon phone number, was already <u>six-and-a-half years</u> old when it was subpoenaed by Plaintiff in June of 2015. If this report, which is in the possession of the Defendants' attorneys as well as Justin D. Kaplan, is destroyed and Plaintiff is further hindered from subpoenaing it within the next two or three months, it is guaranteed that the report will be permanently lost forever and the injuries to Plaintiff will be permanent and completed. Not only will failing to preserve the evidence prevent Plaintiff from having a complete record to support causes of actions against the Defendants in this Complaint, but it will also prevent her from potentially having her felony conviction vacated and being able to practice medicine.

**III.     No third parties will be unjustifiably harmed if the injunction is granted**

The Plaintiff already knows what is in the reports for which this motion for a preliminary injunction to preserve has been filed. The true intent of the Defendants' actions to conceal this evidence is not because the evidence would present unjustifiable harm to any third parties but because they want to prevent Plaintiff from securing evidence in a form admissible to Court proceedings against them with the relevant claims in this Verified Complaint and for no other

reason; such "harm" is not unjustifiable. Furthermore, everyone has the right to know the identities of who is calling them on their own home phone just as much as everyone has the right to know who is knocking outside on the front door of their house. If this were not the case, front door peep holes, caller IDs, and windows on private property would be illegal and considered obtrusive into the right to privacy of others. People who do not want their identities revealed when they call someone on the phone or go to their house are usually criminals like thieves and stalkers. Or as in this case, criminals who are trying to conceal their criminal acts and commission of multiple torts against Plaintiff. The reports from the subpoenas at matter here are in many ways like rodenticide; if you're a rat, it's toxic. If you're not a rat, there is nothing enticing about it and if accidentally ingested will cause no harm.

**IV.** **The public interest is always served when justice is served and Civil and Constitutional rights are not unlawfully violated with impunity**

Plaintiff's Constitutional and Civil Rights have been violated by the Defendants' concealment and/or destruction of the phone records for which this preliminary and permanent injunction is being requested at the cost of her career in medicine and other personal and monetary devastation. The Defendants' concealment and spoliation of the records in question have in fact ruined her life, all while she remains burdened with a $250,000+ in medical school debt. The Defendants have continued to cause Plaintiff irreparable harm and incur significant injuries by obstructing her efforts to secure the evidence as well as maliciously and oppressively hinder and delay proceedings to make it increasingly imminent that Plaintiff will never be able to secure the necessary evidence in a form admissible in an official court proceeding before it is destroyed permanently all whilst depleting her of substantial financial resources. The Defendants have unlawfully obstructed a federal proceeding and have defrauded Plaintiff over hundreds of thousands of dollars in the process and have repeatedly acted overtly to obstruct Plaintiff's

VERIFIED COMPLAINT - 69

access to these records to prevent her from using the records against them in and to her own benefit in any official court proceeding. Additionally, the Defendants have threatened her and her family to discourage her from accessing the courts, one of the highest and most essential privileges of citizenship, as a means of furthering concealing and/or destroying any attempts by Plaintiff to secure the records for which this preliminary and permanent injunctive relief is being respectfully requested.

## V. Conclusion

A preliminary and permanent injunction should be issued because:

1) Plaintiff is likely to succeed on the merits of her Verified Complaint

2) An injunction is necessary to provide the Plaintiff with evidence already in her possession but in a form that satisfies Rule 901 of the Federal Rules of Evidence for authentication so that the evidence is admissible in a Court proceeding.

3) Plaintiff has already suffered irreparable harm and injury as a result of concealment and/or destruction of these records and in the effort to secure them and will continue to suffer permanent injury if the preliminary and permanent injunction is not ordered given that the destruction and lack of future availability of these records is imminent and at least one of the records from its original source is imminently vulnerable to being permanently perished.

4) Granting the Plaintiff injunctive relief is the appropriate way to serve the public interest in the matter.

## COUNT VI - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

150. Plaintiff re-alleges and incorporates all paragraphs in this Verified Complaint as though fully set forth.

151. All Defendants, and each of them, knew or reasonably should have known that the conduct described herein would and did proximately result in physical and emotional distress to Plaintiff.

152. At all relevant times, all Defendants, and each of them, had the power, ability, authority, and duty to stop engaging in the conduct described herein and/or to intervene to prevent or prohibit said conduct.

153. Despite said knowledge, power, and duty, Defendants negligently failed to act so as to stop engaging in the conduct described herein and/or to prevent or prohibit such conduct or otherwise protect Plaintiff. To the extent that said negligent conduct was perpetrated by certain Defendants, the remaining Defendants confirmed and ratified said conduct with the knowledge that Plaintiff's emotional and physical distress would thereby increase, and with a wanton and reckless disregard for the deleterious consequences to Plaintiff.

154. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer serious emotional distress, humiliation, anguish, emotional and physical injuries, as well as economic losses, all to her damage in amounts to be proven at trial.'

## SECOND CAUSE OF ACTION
### (Legal Malpractice - Against Defendant Meczyk)

## COUNT I – BREACH OF FIDUCIARY DUTY

155. Plaintiff re-alleges and incorporates all the paragraphs in this Verified Complaint as if fully set forth herein.

156.    From 2008 through January 19, 2010, Defendant Meczyk was retained by Dr. Uppal as her criminal defense counsel and thereby owed Dr. Uppal a fiduciary duty. As a result of that attorney-client confidential relationship, Meczyk assumed a position of trust and influence and had a duty, among other things, to perform the services for which he was retained with reasonable care and skill, to act in Plaintiff's highest and best interests at all times, and to not expose Plaintiff to unnecessary risk or peril. This fiduciary and confidential relationship was never repudiated by the Defendant at any time herein mentioned.

157.    Defendant Meczyk, breached his fiduciary duties and obligations to Plaintiff by doing all of the acts and omissions as herein alleged. Among other things, Defendant Meczyk breached his duty by failing to properly counsel and advise Plaintiff in regards to a 2009 criminal case by deceiving and inducing Plaintiff to plead guilty to a felony crime that he knew she did not commit while he possessed and fraudulently concealed the material facts of her factual innocence from Plaintiff.

158.    Defendant Meczyk, in doing all of the above described acts and omissions constituting Defendant's breach of his fiduciary duties owed to Plaintiff, Plaintiff has sustained damages, including but not limited to, loss of her career in medicine, loss of earnings, loss of enjoyment of life, loss of liberties, and substantial other personal and economic devastation and damages to be presented at trial, all according to proof.

159.    The acts and omissions constituting breach of Defendant Meczyk's fiduciary duties were committed with oppression, fraud and malice. As a result, Plaintiff, in addition to actual damages, may recover exemplary damages for the sake of example and by way of punishing Defendant Meczyk.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

## COUNT II – FRAUDULENT CONCEALMENT

160.    Plaintiff re-alleges and incorporates all the paragraphs in this Verified Complaint as if fully set forth herein.

161.    From 2008 through January 19, 2010, Defendant Meczyk was retained by Dr. Uppal as her criminal defense counsel and thereby owed Dr. Uppal a fiduciary duty. As a result of that attorney-client confidential relationship, Meczyk assumed a position of trust and influence and owed her the duty of loyalty.

162.    From January 20, 2009 through January 19, 2010, Defendant Meczyk willfully and wantonly with the intent to maliciously oppress and injure Plaintiff, concealed material facts and his knowledge of those material facts regarding her arrest on January 20, 2009 that she was factually innocent of the crime she was charged with and that the criminal charges were the result of perjury committed by the complaining witness who was the subject of a then ongoing EEOC investigation brought by the Plaintiff against Advocate Lutheran General Hospital.

163.    From 2010 through the present date, Plaintiff has repeatedly attempted to discover all the material facts of the 2009 criminal case. Two times between 2011 and the present time, attorneys representing Plaintiff requested Defendant Meczyk to turn over his case files for the 2009 case, both times Defendant did not and concealed the material facts of the case.

164.    Since 2010 and continuing to the present time, every and all efforts employed by Plaintiff through and by her attorneys seeking the material facts and evidence in the 2009 case has been met with Defendant Meczyk issuing threats to injure Plaintiff, attempts to have Plaintiff falsely arrested and otherwise harm Plaintiff as well as her mother, refusals to adhere to court orders, and in 2015 corruptly and through deception persuading a federal court to destroy and

conceal the material facts and evidence of the 2009 case so as to prevent the Plaintiff from its discovery.

165. As a direct and proximate result of Defendant Meczyk's fraudulent concealment referenced above, Plaintiff was induced to plead guilty to a criminal act she did not perform, has suffered and continues to suffer and it is foreseeable that she will forever suffer substantial and irreparable harm, including lost income, the loss of her career in medicine, out of pocket expenses, legal expenses, loss of enjoyment in life and severe personal and economic devastation. WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

## COUNT III – FRAUDULENT MISREPRESENTATION

166. Plaintiff re-alleges and incorporates all the paragraphs in this Verified Complaint as if fully set forth herein.

167. From 2008 through January 19, 2010, Defendant Meczyk was retained by Dr. Uppal as her criminal defense counsel and thereby owed Dr. Uppal a fiduciary duty. As a result of that attorney-client confidential relationship, Meczyk assumed a position of trust and influence and owed her the duty of loyalty.

168. Between January 20, 2009 and January 19, 2010, Defendant Meczyk told Dr. Uppal in regards to the 2009 criminal case brought against her, that she was "guilty as sin," was "guaranteed to lose at trial," when in fact, Meczyk knew that Dr. Uppal was innocent and that her case was easily proven by the phone reports of the incoming calls to her number on January 20, 2009 that were in his possession as well as the police reports and sworn affidavit also in his possession.

169.    At the end of October 2009, Defendant Meczyk told Dr. Uppal that the charges against her would be dismissed and that there would be no trial on November 3, 2009 when in fact a trial was scheduled to take place on November 3, 2009 and that the charges against her had not been dismissed.

170.    On November 3, 2009, Defendant Meczyk, did not inform Dr. Uppal when it was time for her to return to the Courtroom in Skokie where a hearing was taking place and mislead the Court to believe that he was unable to reach her by phone when in fact he could have and did not attempt to and in fact had instructed Dr. Uppal to wait for him to call her. As a result of Meczyk's fraudulent misrepresentations by omission, a warrant was issued for Dr. Uppal's arrest and she was remanded into custody.

171.    Defendant Meczyk's fraudulent misrepresentations to Dr. Uppal were intended to induce her to plead guilty to a felony crime.

172.    Plaintiff justifiably, reasonably and detrimentally relied upon the false statements made by Defendant Meczyk and plead guilty to a felony crime she did not commit.

173.    As a direct and proximate result of Defendant Meczyk's fraudulent misrepresentations, Dr. Uppal was irreparably harmed, including the loss of income, the loss of her career in medicine, out of pocket expenses, legal expenses, loss of enjoyment in life, severe personal and economic devastation and was deprived of her rights under Federal law.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.


## COUNT IV – AIDING AND ABETTING

174.    Plaintiff re-alleges and incorporates all the paragraphs in this Verified Complaint as if fully set forth herein.

175.    At all times relevant hereto, the Defendant Meczyk owed certain fiduciary obligations to Plaintiff having entered into a confidential attorney-client relationship with her in 2008. As such Defendant Meczyk owed Plaintiff the following duties:

a.    the duty of undivided loyalty and the duty to refrain from engaging in unfair dealings or self-dealings;

b.    the duty to fully disclose all material facts germane to the fiduciary relationship;

c.    the duty to refrain from acting on behalf of any party having an interest adverse to Plaintiff;

d.    the duty to act in the highest good faith to Plaintiff and to refrain from obtaining or accepting any advantage over her in the Plaintiff's affairs by the slightest misrepresentations or concealment.

176.    Additionally, Plaintiff reposed trust and confidence in Defendant Meczyk to handle her affairs. And in turn, Defendant accepted that trust and confidence including a retainer of $70,000, thereby creating a fiduciary relationship.

177.    Defendant Meczyk breached his fiduciary obligations to Plaintiff and caused damages to Plaintiff in an amount to be proven at trial through his specific actions and inactions.

178.    Defendant Meczyk acted with complicity and knowledge of those breaches.

179.    Defendant aided and abetted, encouraged, and rendered substantial assistance to George Bovis in evading exposure to criminal charges for his criminal act on January 20, 2009 against Plaintiff.

180.    Defendant Meczyk foresaw, realized and intended that his conduct would substantially assist the accomplishment of the wrongful and criminal conduct and scheme alleged herein.

181.    As a result of the substantial assistance of Defendant Mecyzk to George Bovis, Plaintiff has suffered and continues to suffer substantial personal and monetary devastation, all in an amount to be determined according to proof at trial.

182.    Defendant Meczyk's individual and collective acts and omissions were substantial contributing factors and causes of violations of the duties as set forth in this Count and to Plaintiff's harm and damages, rendering Defendant Meczyk liable to Plaintiff.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

## COUNT V – UNJUST ENRICHMENT

183.    Plaintiff re-alleges and incorporates all the paragraphs in this Verified Complaint as if fully set forth herein.

184.    Plaintiff reposed trust and confidence in Defendant Meczyk to handle her affairs. And in turn, Defendant accepted that trust and confidence including the benefit to him of a retainer of $70,000, thereby creating a fiduciary relationship.

185.    Defendant Meczyk breached his fiduciary obligations to Plaintiff and caused damages to Plaintiff in an amount to be proven at trial through his specific actions and inactions.

186.    Defendant Meczyk acted with complicity and knowledge of those breaches.

187.    It would be inequitable and unconscionable for Defendant Meczyk to be permitted to retain the $70,000 retainer after having had breached his fiduciary obligations to her.

WHEREFORE, for the reasons set forth above, Plaintiff respectfully request that this Court find in her favor and against Defendant Meczyk, order Meczyk to compensate Plaintiff for all damages to be proven at trial and any other relief the Court deems equitable and just.

### THIRD CAUSE OF ACTION
**(Personal Injury Against Defendants Welch, RFUMS & Board of Trustees)**

### COUNT I – TRESPASS OF CHATTELS

188.     Plaintiff re-alleges and incorporates all the paragraphs in this Verified Complaint as if fully set forth herein.

189.     On August 2, 2013, Defendants reset the server of Rosalind Franklin University of Medicine & Science to recognize and reject emails from Plaintiff and create a malicious email loops resulting in a denial of service attack. As a result, on August 2, 2013 Plaintiff's private email account was flooded with emails preventing Plaintiff from using the email account.

190.     On September 10, 2013, Defendants, without the consent or authority and against the will of the Plaintiff, committed computer fraud by gaining unauthorized access to Plaintiff's private email account, changed the password resulting in the complete exclusion of Plaintiff from her property including preventing both her ingress and egress, sent emails from her private account triggering a malicious denial of service attack resulting in 2,050 seven page emails (13,000+).

191.     On November 5, 2013, Defendants again attempted to gain access to Plaintiff's private email account against Plaintiff's will and without Plaintiff's consent.

192.     The effect of Defendants' conduct, as described above, has been to inflict emotional distress on Plaintiff.  In addition to damage already caused there is the damage unknown to Plaintiff and the foreseeability that the Defendants will continue to access her private email accounts to commit criminal acts while impersonating her, gain access to privileged and confidential communications in the property of Plaintiff, destroy evidence and other mayhem with the intent to maliciously harm, oppress and intimidate Plaintiff.

193.   As a direct and proximate result of Defendant Welch, Defendant RFUMS and Defendants Board of Trustees, jointly and severably, actions described above, Plaintiff was irreparably harmed and suffered infliction of emotional distress.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

## COUNT II – FALSE LIGHT

194.   Plaintiff re-alleges and incorporates all the paragraphs in this Verified Complaint as if fully set forth herein.

195.   On June 26, 2015, Defendants Welch, RFUMS and the Board of Trustees, through and by their attorney William McErlean made public by filing several documents with the federal court and thereby giving publicity to matters concerning Plaintiff that placed Plaintiff before the public in a false light.

196.   The false light in which the Defendants placed Plaintiff was intended to corruptly persuade the Court to become unwittingly complicit in furtherance of criminal conspiracy by withholding records, documents or others objects, from an official proceeding and to destroy and/or conceal records, documents and other objects with intent to impair the object's integrity or availability for use in an official proceeding in violation of 18 U.S.C. 1512 as well as to maliciously injure and oppress Plaintiff.

197.   The false light in which the Defendants placed Plaintiff before the public would be highly offensive to a reasonable person.

198.   Defendants had knowledge of and acted with reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed.

199.   Plaintiff has suffered damages including infliction of emotional distress, loss of reputation, vulnerability to discrimination and prejudice, threatening Plaintiff's constitutional

right to access the courts in the future and loss of access to records, documents and objects that are evidence of criminal acts committed against Plaintiff by the Defendants thereby preventing her from using these records, documents or objects in a form admissible in an official court proceedings in accordance with Rule 901 of Federal Rules of Evidence in claims against the Defendants.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

### COUNT III – UNJUST ENRICHMENT

200.    The Plaintiff re-alleges and incorporates all of the paragraphs in this Verified Complaint as if fully set forth herein.

201.    Plaintiff provided a benefit to Defendants RFUMS and Board of Trustees by making tuition payments totaling in excess of $250,000.

202.    In return, upon graduating from RFUMS, Plaintiff expected to be able to practice medicine which would avail her to the income necessary to make payments towards her medical school debt (Exhibit 75)

203.    The Defendants have acted, as described in this Verified Complaint, in various ways to ensure that Plaintiff can never practice medicine. This is tantamount to refusing to provide Plaintiff her medical degree despite Plaintiff having successfully completed the Doctorate of Medicine program and having been conferred her Doctorate of Medicine in June 2005.

204.    It would be inequitable and unconscionable for RFUMS and the Board of Trustees to be permitted to retain Plaintiff's tuition payments in lieu of their actions to prevent her from ever securing employment as a physician all whilst maliciously and intentionally taking actions against Plaintiff to deplete her of existing independent resources.

1  WHEREFORE, for the reasons set forth above, Plaintiff respectfully requests that this Court find

2  in her favor against RFUMS and the Board of Trustees, order RFUMS and the Board of Trustees

3  to compensate Plaintiff for all damages to be proven at trial and any other relief the Court deems

4

5  equitable and just.

6  **FOURTH CAUSE OF ACTION**
   **(Respondeat Superior - Against RFUMS and Board of Trustees)**

7

8  **COUNT I – RESPONDEAT SUPERIOR**

9  205.    Plaintiff Uppal re-alleges and reincorporates all the paragraphs in this Verified

10  Complaint as if fully set forth herein.

11  206.    At all times relevant hereto, Defendant Welch was employed by, and was an

12  agent, servant and/or employee of RFUMS under the authority of RFUMS Board of Trustees.

13  207.    The above-described acts of Defendant Welch were committed in the scope of his

14  employment with RFUMS, namely to execute contracts with other corporations.

15

16  208.    Acting within the scope of his employment with RFUMS, Defendant Welch

17  conspired with other co-conspirators known and not yet known, to obstruct justice and deprive

18  Dr. Uppal of rights under Federal laws of the United States.

19

20  209.    RFUMS under the authority of the Board of Trustees, was knowledgeable of the

21  acts of Defendant Welch, participated in furtherance of Defendant Welch's actions and benefited

22  from Defendant Welch's actions.

23  210.    Defendant Welch's conduct caused and continues to cause substantial harm and

24  injury to Plaintiff Uppal.

25

26  211.    Said conduct was intended to cause harm and injury to Plaintiff Uppal.

27  212.    Plaintiff did, in fact, suffer injury as a direct and indirect result of Defendant

28  Welch's actions.

213.    In doing the acts alleged herein, Defendant Welch used the power and authority conferred upon him by RFUMS under the authority of the Board of Trustees to cause injury to Plaintiff Uppal. It is predictable and foreseeable, that someone in Defendant Welch's position would abuse the power and authority conferred upon him based on his past actions. As such, Defendant Welch's conduct is incident to his agency with RFUMS under the authority of the Board of Trustees, so as to be fairly attributable to RFUMS and the Board of Trustees.

214.    As Defendant Welch's employer, Defendant RFUMS and the Board of Trustees, are responsible for all the acts committed by Defendant Welch as detailed in this Verified Complaint.

215.    As a direct and proximate result of the Defendant's actions, Dr. Uppal was irreparably harmed, including the loss of income, the loss of her career in medicine, out of pocket expenses, legal expenses, loss of enjoyment in life, severe personal and economic devastation and was deprived of her rights under Federal law.

WHEREFORE, the Plaintiff seeks relief as is hereinafter pleaded.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

216.    Assume jurisdiction of this case;

217.    General, exemplary, declaratory, compensatory, special and any other and all damages, according to proof;

218.    Punitive Damages, according to proof;

219.    Pursuant to 28 U.S.C. § 1343, damages for injury to Plaintiff because of her deprivation of any right or privilege as a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in 42 U.S.C. § 1985; failure to prevent or to aid in

preventing any wrongs mentioned in 42 U.S.C. § 1985; to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, or any right, privilege, or immunity secured by the Constitution of the United States providing for equal rights of citizens or of all persons within the jurisdiction of the United States; to recover from damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

220. Legal costs and fees;

221. A preliminary and permanent injunction ordering restraining the Defendants, their agents, representatives, servants, employees and attorneys and Justin D. Kaplan all telephone metadata or 'call detail,' records in their possession that is relevant to the claims at issue in this Verified Complaint for the incoming phone calls to Plaintiff's phone number 312-951-0275 on January 20, 2009.

222. Plaintiff also seeks a jury trial on all issues triable by jury;

223. Such other and further relief as the Court deems just and proper.

DATED: September 11, 2015

Respectfully submitted,

By: _____

PRABHJOT UPPAL, MD.
Plaintiff, Pro Se
650 W. Olive Avenue
Merced, California 95348
Phone: 312-576-4000
Email: jodyuppal@hotmail.com

VERIFIED COMPLAINT  - 83

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ MERCED _____ )

On _____ SEPTEMBER 11TH 2015 _____ before me, _____ LISA AVILA, NOTARY PUBLIC _____
                                                          (insert name and title of the officer)

personally appeared _____ PRABHJOT UPPAL _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ _Lisa Avila_ _____        (Seal)

LISA AVILA
Commission # 1956047
Notary Public - California
Merced County
My Comm. Expires Oct 10, 2015

1
2
3
**VERIFICATION**
4
     I have read the foregoing complaint and hereby verify that the matters alleged herein are
true, except as to matters alleged on information and belief, and, as to those, I believe them to be
5
true. I declare under the penalty of perjury that the foregoing is true and correct and that this
6
declaration was executed at Merced, California.

7
DATED: September *11*, 2015

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VERIFIED COMPLAINT  - 84

# LIST OF EXHIBITS

| | BINDER VOLUME ONE |
|---|---|
| 1 | Resident physician unionization at Lutheran General Hospital |
| 2 | Background of K. Michael Welch, President of RFUMS (2002 – present) |
| 3 | Background of Patricia Bergeson, general counsel at RFUMS (2003 – 2011) |
| 4 | RFUMS announces merger and placed on probation by LCME in 2004 |
| 5 | *Doctors Are People Too* book by Uppal and Luther Christman review |
| 6 | Prabhjot Uppal, MD's undergraduate and graduate level diplomas |
| 7 | July 27, 2015 restrictions on training at Lutheran General Hospital |
| 8 | Prabhjot Uppal, MD resident schedule at Lutheran General Hospital |
| 9 | ACGME graduate medical education requirement for internal medicine |
| 10 | Advocate Health Care Medical Staff ByLaws |
| 11 | AMA Opinion 9.045 – Physicians with Disruptive Behavior |
| 12 | National Labor Relations Board proceeding against Lutheran General |
| 13 | Prabhjot Uppal U.S. Passport and World Congress of Neurology in Sydney |
| 14 | Lutheran General Hospital termination letter |
| 15 | ACGME Institutional Requirements |
| 16 | Natalie Correia, DO letter of support for Prabhjot Uppal, MD |
| 17 | Prabhjot Uppal's EEOC complaint in 2006 |
| 18 | Uppal emails regarding *White Coat Tales* book and accreditation at RFUMS |
| 19 | *White Coat Tales* book by Uppal reviewed by Melvin Konner, MD, PhD |
| 20 | 2006 and 2009 Northbrook Police Department reports |
| 21 | Uppal emails with David Ansell, MD |
| 22 | Uppal and RFUMS emails regarding *White Coat Tales* book |
| 23 | Uppal emails with Patricia Bergeson 2006 – 2007 |
| 24 | Melvin Konner controversy at Emory University |
| 25 | Patricia Bergeson email regarding Arnold Gold Foundation inquiries |
| | BINDER VOLUME TWO |
| 26 | Art Levine, MD email to Uppal |
| 27 | Residency interview invitation requests 2007 – 2008 for Uppal |
| 28 | 2007 attempted merger of RFUMS with LGH |
| 29 | Resignations of Bruce Campbell and Glen Solomon in June 2008 from LGH |
| 30 | Letter from Cathy Lazarus in 2008 |
| 31 | EMTALA and CMS on call policies and legal requirements |
| 32 | January 20, 2009 phone record, caller ID and phone number information |
| 33 | January 2013 first post-conviction petition for Uppal's 2009 case |
| 34 | EEOC Right to Sue Notice August 14, 2009 |
| 35 | Email to Darryl Goldberg with Right to Sue Notice |
| 36 | Court schedule switch in judge from Chambers to Axelrood |
| 37 | November 3, 2009 court transcripts |
| 38 | January 19, 2010 guilty plea transcript |
| 39 | Email from Detective Jeff Peterson, Northbrook Police Department |
| 40 | Eric Gall, MD confirmation of departure from RFUMS in December 2009 |

| 41 | RFUMS Department of Surgery Department Head history |
| 42 | LCME Affiliation RFUMS-LGH Agreement on March 31, 2010 |
| 43 | Timeline of Cook County Health Board |
| 44 | Valerie Jarrett bid for Olympics/Michael Reese demolition |
| 45 | Valerie Jarrett meeting with CCHB on April 6, 2010 |
| 46 | 2006 closure of Bethany units by Advocate Health Care |
| 47 | 2010 arrest of Uppal |
| 48 | *La Pajarita Que Se Encontro A Si Misma* illustrated by Uppal |
| 49 | *War on Whistleblowers* (2013) documentary film |
| 50 | 2011 Cook County Health Board shake up |
| **BINDER VOLUME THREE** | |
| 51 | Columbia University interview emails |
| 52 | September 2011 Meczyk attempt to arrest Uppal after record request |
| 53 | Court orders and contempt against Meczyk in 2013 for not turning over file |
| 54 | Resignation of ASA Cathy Crowley in 2013 |
| 55 | Phone reports turned over by Meczyk in 2013 |
| 56 | October 18, 2013 court transcript |
| 57 | Motion to admit caller ID evidence on October 9, 2013 |
| 58 | Similarity between Vanecko case corruption |
| 59 | Nishay K. Sanan June 2014 "amended" petition and fake phone report |
| 60 | State's answer to "mobile" landline hospital phone |
| 61 | George Bovis place of residence documentation |
| 62 | Call detail record given to Meczyk in February 2009 |
| 63 | Uppal pro se motion to authenticate incoming calls/ineffective assistance |
| 64 | Douglas Reifler, MD email 2013 |
| 65 | 2013 email hacking and double DOS attacks by RFUMS |
| 66 | DOE complaint regarding DOS attacks and email hacking |
| 67 | LCME 2013 RFUMS site review |
| 68 | RFUMS motion to quash phone record evidence subpoeanas |
| 69 | RFUMS initial disclosures in federal case |
| 70 | RFUMS 2014 and 2015 Just Cause for Termination in Faculty ByLaws |
| 71 | RFUMS organization chart and University ByLaws |
| 72 | RFUMS motion to place protective order on and destroy phone reports |
| 73 | Verizon storage of call details for seven years |
| 74 | Anthony Armada, Gail Warden involvement in conspiracy/merger |
| 75 | Uppal Navient outstanding medical school debt |