**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PRABHJOT UPPAL, M.D. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:15-cv-8077 |
| | ) | |
| K. MICHAEL WELCH; ROSALIND | ) | |
| FRANKLIN UNIVERSITY OF MEDICINE | ) | Honorable Charles P. Kocoras |
| AND SCIENCE; RALPH E. MECZYK; | ) | |
| ANTHONY A. ARMADA; JAMES H. | ) | |
| SKOGSBERGH; ADVOCATE HEALTH | ) | |
| AND HOSPITALS CORPORATION dba | ) | |
| ADVOCATE LUTHERAN GENERAL, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## HER OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN
## THE ALTERNATIVE FOR LEAVE TO FILE AMENDED COMPLAINT

COME NOW, Prabhjot Uppal, MD, Plaintiff *pro se*, pursuant to the Federal Rules of

Civil Procedure and in support of her Opposition to Defendants Rosalind Franklin University of

Medicine & Science ("RFUMS"), K. Michael Welch ("Welch"), Advocate Lutheran General

Hospital ("LGH"), Anthony A. Armada ("Armada") and James A. Skogsbergh ("Skogsbergh")

Motion to Dismiss or in the alternative for Leave to File a Second Amended Complaint,

respectfully submits this memorandum:

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ------------------------------------------------------------------------------- 1

**INTRODUCTION**------------------------------------------------------------------------------------------ 8

**FACTUAL BACKGROUND**----------------------------------------------------------------------------- 10

   I.    Brief History of Chicago Medical School------------------------------------------------------- 10

   II.   Rosalind Franklin University of Medicine & Science ---------------------------------------- 11

   III.  Plan to Replace Jewish History of Chicago Medical School ------------------------------- 12

   IV.  Termination from Advocate Lutheran General Hospital ------------------------------------- 14

   V.   Replacement of Mt. Sinai Hospital with Lutheran General Hospital ------------------------ 17

   VI.  Conspiracy to Conceal Individual A's Crime and Obstruction of EEOC Case ------------------- 18

   VII.  De Paul University – Rosalind Franklin University of Medicine & Science Alliance------------ 21

   VIII. Continuing Criminal Conspiracy to Conceal Individual A's Crime------------------------------ 22

**LAW AND ARGUMENT** ------------------------------------------------------------------------------ 25

   **I.**    **LEGAL STANDARD**------------------------------------------------------------------------------- 25

   **II.**   **RES JUDICATA DOES NOT BAR CLAIMS** ---------------------------------------------- 29

   **III.**  **§1983 CONSPIRACY SUFFICIENTLY ALLEGED** ------------------------------------- 31

     **A.**   **Defendants Are Pervasively Entwined with the State** ------------------------------------ 31

     **B.**   **Defendants Violated Plaintiff's Constitutional Rights**------------------------------- 34

       1.   Due Process ------------------------------------------------------------------------------- 34

       2.   Access to the Courts ------------------------------------------------------------------- 36

       3.   False Imprisonment------------------------------------------------------------------- 40

       4.   Establishment Clause------------------------------------------------------------------ 41

          a.   **Religion Clauses Contrary to Catholic Doctrine**------------------------------- 43

          b.   **Catholic Hegemony in State and Federal Government** --------------------------- 44

          c.   **Defendants Subverted Constitution to Establish Catholic Religion** ------------------- 45

**IV.  §1985(2) AND (3) CLAIMS SUFFICIENTLY ALLEGED** ------------------------------------ 46

   **A.  42 U.S.C. §1985(2)** ------------------------------------------------------- 46

      1.  §1985(2) is not Duplicative of Title VII Retaliation Claim------------------------ 48

      2.  Class-Based Animus not required for §1985(2) Claims----------------------------- 50

      3.  Intracorporate Conspiracy Doctrine Does Not Apply--------------------------------- 51

         **a.  Defendants' Criminal Conspiracy to Conceal a Crime** ----------------------- 51

         **b.  Establishing Catholic Religion not part of Employment** ------------------------ 54

   **B.  42 U.S.C. § 1985(3)** ------------------------------------------------------ 55

      1.  Catholic Animus Towards Jews-------------------------------------------------- 57

      2.  Defendants' Class Animus Against Plaintiff ------------------------------------- 61

**V.  SPOLIATION OF EVIDENCE**------------------------------------------------- 64

**VI.  ABUSE OF PROCESS** ------------------------------------------------------ 66

**VII.  TORTIOUS INTERFERENCE WITH A CONTRACT** ------------------------------ 69

**VIII.  UNJUST ENRICHMENT**------------------------------------------------------ 72

**IX.  TRESPASS OF CHATTELS** ------------------------------------------------- 75

**X.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS** ------------------------------ 82

**CONCLUSION** ------------------------------------------------------------------- 87

**TABLE OF EXHIBITS**------------------------------------------------------------- 89

# TABLE OF AUTHORITIES

## Cases

*Abramowitz v. Inta-Bores Acres, Inc.,* No. 98-CV-4139 (ILG), 1999 U.S. Dist. LEXIS 20005, *7-8 (E.D.N.Y. Nov. 16, 1999) ........................................................................................................ 65

*Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64, 645 N.E.2d 888, 894 (1994) ......................... 27, 28

*Adickes v. S.H. Kress & Co*., 398 U.S. 144, 150 (1970) ...................................................... 31, 32

*Alliance Acceptance Co. v. Yale Insurance Agency, Inc*., 271 Ill. App. 3d 483, 492, 648 N.E.2d 971, 977 (1995) ............................................................................................................................ 74

*America Online, Inc. v. IMS*, 24 F. Supp. 2d 548 (E.D. Va. 1998) ............................................ 81

*America Online, Inc. v. Prime Data Systems, Inc*., 1998 WL 34016692 (E.D.Va. Nov. 20, 1998) ........... 81

*Baird & Warner, Inc. v. Addison Industrial Park*, Inc., 70 Ill. App. 3d 59, 64 (1979) .............. 30

*Barrie v. Grand County, Utah,* 119 F. 3d 862, 867 (10th Cir. 1997) ........................................ 35

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ...................................................... 26

*Bell v. City of Milwaukee*, 746, F. 2d 1205, 1261 (7th Cir. 1984) ....................................... 38, 39

*Bonney v. King,* 201 Ill. 47, 50-51 (1903) ............................................................................... 67

*Bounds v. Smith*, 430 U.S. 817, 822 (1977) ........................................................................ 37, 39

*Bowie v. Maddox*, 642 F.3d 1122 (D.C. Cir. 2011). ................................................................ 48

*Breen v. Texas A&M Univ.*, 485 F. 3d 325, 332 (5th Cir. 2007) .............................................. 35

*Brentwood Academy v Tennessee Secondary School Athletic Association*, 531 US 288, 295 (2001) . 32, 33, 34

*Cameron v. Brock,* 473 F.2d at 610 ......................................................................................... 61

*Candalaus Chicago, Inc. v. Evans Mill Supply Co*., 51 Ill. App. 3d 38, 47, 366 N.E.2d 319, 326 (1st Dist. 1977) ................................................................................................................................ 69

*Capogrosso v. Supreme Court of the State of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009) ............... 27

*Carchman v. Korman Corp.*, 594 F.2d 354, 356 (3d Cir.).........................................................57

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ................................................................75

*Chambers*, 207 US at 148, 28 S. Ct. at 35 ...............................................................................37

*Colombrito v. Kelly*, 764 F.2d 122, 130 (2d Cir. 1985) ...........................................................55

*Committee for Pub. Educ. v. Nyquist*, 413 U.S. 756, 772-73 (1973) ................................42, 43

*CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015,1022 (S.D. Ohio 1997)..................81, 82

*CompuServe*, 962 F. Supp. 1015 ...............................................................................................82

*Conley v. Gibson*, 355 U.S. 41, 47 (1957) ...............................................................................26

*Corgan,* 143 Ill. 2d at 306 .......................................................................................................83

*Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990) ...............................................27

*Crowder v. Sin yard*, 884 F. 2d 804 (5th Cir. 1989) ...........................................................38, 39

*Diversified Financial Systems, Inc. v. Boyd*, 286 Ill. App. 3d 911, 914-15 (1997) ...................29

*Douglas Theater Corp. v. Chicago Title & Trust Co.*, 288 Ill. App. 3d 880, 888-89 (1997) ...................69

*EEOC v. JP Morgan Chase Bank, N.A.,* 2013 U.S. Dist. LEXIS 27499 (S.D. Ohio Feb. 28, 2013) .........65

*Epperson v. Arkansas,* 393 U.S. 97, 107 (1968) ......................................................................42

*Erlich v. Lopin-Erlich*, 195 Ill. App. 3d 537, 539 (1990) .........................................................67

*Evans* v. *Newton,* 382 U.S. 296, 299, 301...............................................................................33

*Everson v. Board of Education*, 330 US 1 (1947) ......................................................9, 41, 42, 43

*Farwell v. Senior Services Associates, Inc.*, 2012 IL App (2d) 110669 .....................................66

*Fowler*, 578 F.3d at 211 ...........................................................................................................29

*Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004) ........................................27

*Gerstein v. Pugh*, 420 US 114 ..................................................................................................35

*Gilfillan v. City of Philadelphia*, 637 F.2d 924, 930 (3d Cir. 1980) ..........................................43

*Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 1797-98, 29 L. Ed. 2d 338 (1971)..................55

*Grunewald v. United States*, 353 U.S. 391, 413 (1957)............................................................51

*Haddle v. Garrison* (97-1472) 525 U.S. 121 (1998) 132 F.3d 46.............................................50

*Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983).........................................................27

*Hall v. Bradshaw*, 630 F.2d 1018, 1020 (4th Cir. 1980)..............................................................43

*Hammond v. Creative Fin. Planning Org.*, 800 F. Supp. 1244, 1249 (E.D. Pa. 1992)..............28

*Hanna v. Marshall Field & Co.*, 279 Ill. App. 3d 784 (1st Dist. 1996).......................................40

*Hannigan v. Sears, Roebuck & Co.*, 410 F.2d 285, 291 (7th Cir.), cert. denied, 396 U.S. 902 (1969) ......69

*Harrison v. Brooks,* 519 F.2d at 1360........................................................................................61

*Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) .................................................56

*Hotmail Corp. v. Van Money Pie Inc.*, 1998 WL 388389 (N.D.Cal. Apr. 16, 1998)...........81, 82

*Howerton v. Gabica*, 708 F.2d 380,383 n.3 (9th Cir.1983) .......................................................34

*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679

   (1989)........................................................................................................................................74

*Hynix Semiconductor, Inc. v. Rambus, Inc.*, 645 F.3d 1336 (Fed. Cir. 2011) ............................64

*Ingraham v. Wright,* 430 U.S. 651, 673-74 (1976)......................................................................35

*Iqbal*, 129 S. Ct. at 1950 .............................................................................................................29

*Irizarry v. Quiros*, 722 F.2d 869, 872 (1st Cir. 1983)................................................................49

*J. Eck & Sons, Inc. v. Reuban H. Donnelley Corp.*, 213 Ill. App. 3d 510, 513 (1991)...............69

*Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)...........................................................34

*Jackson v. Shell Oil Co.*, 272 Ill. App. 3d 542, 650 N.E.2d 652 (1st Dist. 1995)......................83

*Johnson v. Avery,* 393 U.S. 483, 485-86 (1969) ........................................................................37

*Karas v. Strevell*, 227 Ill. 2d 440, 451, 884 N.E.2d 122 (2008) ...............................................83

*Kia P. v. McIntyre*, 235 F.3d 749, 755 (2d Cir. 2000)................................................................34

*Kimble v. D.J. McDuffy*, 623 F. 2d 1060, 1068 (5th Cir. 1980)..................................................48

*Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 526 (Ill. 1987)..................84

*Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)....................................................65

*Kumar*, 354 Ill. App. 3d at 165 ............................................................................................66, 67

*Kush v. Rutledge*, 460 U.S. 719, 725 (1983)........................................................................50, 51

*Lake v. Arnold* 112 F.3d 682, 687 (3d Cir. 1997) ........................................................ 57

*Landau v. Schneider*, 154 Ill. App. 3d 875, 878 (1987).............................................. 67

*Largosa v. Ford Motor Company*, 303 Ill. App. 3d 751, 754 (1st Dist. 1999)............ 84

*Larkin v. Grendel's Den, Inc.* 459 U.S. 116, 127 (1982)............................................ 42

*Larson v. Valente*, 456 U.S. 228, 254-55 (1982) ...................................................... 43

*Lebron v. Nat'l. R.R. Passenger Corp.*, 513 U.S. 374 (1995).................................... 33

*Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d,745 (1971) ........... 41, 42, 43

*Lewis v. Casey*, 518 U.S. 343, 404-05 (1996)..................................................... 37, 40

*Lopez v. Arrowhead Ranches*, 523 F.2d 924 at 928....................................................... 61

*Lugar v. Edmondson Oil Col*, 457 U.S. 922 930-31 (1982) .......................................... 31

*Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004) ...................................... 26

*Lynch v. Donnelly*, 465 U.S. 668, 684 (1984)............................................................. 43

*Maine v. Thiboutou*, 1980, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed. 2d 555. ................ 48

*Marshall v. Burger King Corp.*, 355 Ill. App. 3d 685, 688 (2d Dist. 2005) ................ 83

*Martinez v. California*, 444 U.S. 277, 284 (1980) ...................................................... 35

*Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1024, 905 N.E.2d 920, 928 (2009) .. 74

*McAndrew v. Lockheed Martin Corp* ........................................................................... 52

*McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133-34, 720 N.E.2d 242, 258 (1999) .. 27, 28

*McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258................................................... 27

*Means v. Wilson*, 522 F.2d at 840. ............................................................................. 61

*Meek v. Pittenger*, 421 U.S. 349, 372 (1975).............................................................. 43

*Morris v. Dillard's Department Stores, Inc.*,277 F.3d 743,748-750 (5th Cir.2001).................. 34

*National Collegiate Athletic Assn.* v. *Tarkanian*, 488 U.S. 179 .................................. 33

*Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 86, 199 N.E.2d 769, 779 (1964) ................ 86

*Neurosurgery & Spine Surgery, Service Corp. v. Goldman*, 339 Ill. App. 3d 177, 183 (2003) ........ 66

*Panayotides v. Rabenold*, 35 F. Supp. 2d 411, 419 (E.D. Pa. 1999) ......................... 29

4

*Parks v. Kowancki*, 193 Ill. 2d 164 (2000) ........................................................................ 83

*Perez v. Citicorp Mortgage*, Inc., 301 Ill. App. 3d 413, 425, 703 N.E.2d 518, 526 (1998) ...................... 74

*Pfeiffer v. William Wrigley Jr. Co.*, 139 Ill. App. 3d 320, 323 (1985) ........................................... 30

*Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008 ............................................... 26

*Pilgrim v. Littlefield*, 92 F. 3d 413, 416 (6th Cir. 1996) ...................................................... 40

*Portman v. County of Santa Clara*, 995 F. 2d 898, 909–910 (CA9 1993) ........................................... 49

*Rawlings*, 920 F. Supp. 2d at 104 ................................................................................ 54

*Reed v. Doctor's Associates, Inc.,* 355 Ill. App. 3d 865, 875 (2005) ..................................... 66, 67

*Reynolds v. Menard, Inc*., 365 Ill. App. 3d 812 (1st Dist. 2006) ................................................ 40

*Richmond ex rel Liberty Inst. Trust v. Nat'l Inst. of Certified Estate Planners*, 2006 WL2375454, at *6

    (N.D. 111. Aug. 15, 2006) ................................................................................ 76

*River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998) .................................. 29, 30

*Riverdale Industries, Inc. v. Malloy*, 307 Ill. App. 3d 183, 185 (1999) ........................................ 29

*Rodgers v. St. Mary's Hospital*, 149 Ill. 2d 302, 312 (1992) ................................................... 30

*Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) ............................................................... 29

*Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 531 N.E.2d 1358 (1988) ........................................ 83

*Ryland v. Shapiro*, 708 F. 2d 967, 972 (5th Cir. 1983) ................................................. 37, 38, 39

*See Stone v. Graham*, 449 U.S. 39, 39 (1980) .................................................................... 42

*Sershon*, 2008 U.S. LEXIS 15678, AT *7-8 ....................................................................... 32

*Shelley v. Kraemer*, 334 U. S. 1, 334 U. S. 13 ................................................................. 56

*Silkwood v. Kerr-McGee Corp*., 637 F.2d 743, 748 (10th Cir. 1980) .............................................. 55

*Smith v. City of Chicago*, 820 F.2d 916 (7th Cir. 1987) ........................................................ 31

*Sotelo v. Directrevenue*, 384 F. Supp.2d 1219 (N.D. Ill. 2005) ......................................... 80, 81, 82

*Stone v. Graham,* 449 U.S. 39, 40-41 (1980) .................................................................... 42

*Swekel v. City of River Rouge*, 199 F. 3d 1259, 1263-54 (6th Cir. 1997) ........................................ 38

*Taylor v. Gilmartin*, 686 F.2d 1346, 1357-58 (10th Cir. 1982) .................................................. 55

*Toothman v. Hardee's Food Sys.*, 304 Ill. App. 3d 521 (5th Dist. 1999) ..................................... 40

*Truax v. Raich*, 239 U. S. 33 (1915) ................................................................................... 50

*Twombly*, 550 U.S. at 570 ............................................................................................... 27

*United States v. Bornman*, 559 F.3d 150, 153 (3d Cir. 2009) ............................................. 51

*United States v. Esacove*, 943 F.2d 3, 5 (5th Cir.1991) ..................................................... 51

*United States v. Goldberg,* 105 F.3d 770, 774 (1st Cir.1997) .............................................. 51

*United States v. Price*, 383 U.S. 787, 794 (1966) .............................................................. 32

*United States v. Turner,* 548 F.3d 1094, 1097 (D.C. Cir. 2008) .......................................... 51

*United States v. Upton*, 559 F.3d 3, 10 (1st Cir. 2009) ...................................................... 52

*United States v. Wantuch*, 525 F.3d 505, 519 (7th Cir. 2008) ............................................ 28

*United States v. Weaver*, 507 F.3d 178, 185-86 (3d cir. 2007) ........................................... 52

*Uppal v. Rosalind Franklin University of Medicine & Science,* No.15-3806, (N.D.I.L. August 26, 2015)

.................................................................................................................................. 71, 75

*Victor Stanley v. Creative Pipe*, 269 F.R.D. at 521 (D. Md. Sept. 9, 2010) ............................ 65

*Virginia v. Paul*, 148 US 107, 148 US 119 (1983) ............................................................. 35

*Ward v. Connor*, 657 F.2d 45, 48 (4th Cir. 1981), cert. denied, 455 U.S. 907, 102 S. Ct. 1253, 71 L. Ed.

2d 445 (1982). .......................................................................................................... 55

*Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) ........................................................... 27

*Williams v. Manchester*, 228 Ill. 2d 404, 417, 888 N.E.2d 1, 9 (2008) ................................. 28

*Wolff v. McDonnell,* 418 U.S. 539 (1974) ....................................................................... 37

*Wolman v. Walter*, 433 U.S. 229, 235-36 (1977) .............................................................. 42

*Yick Wo v. Hopkins*, 118 U. S. 356 ................................................................................ 56

*Zaimes v. Cammerino*, No. 09-1964, 2010 U.S. Dist. LEXIS 31887, at *15-16 (M.D. Pa. Apr. 1, 2010). 28

*Ziemba v. Mierzwa*, 142 Ill. 2d 42, 47 (Ill. 1991) ............................................................. 83

*Zubalke v. UBS Warburg, LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) .................................... 65

**Statutes**

18 U.S.C. § 371 ...................................................................................................................... 51, 52

18 U.S.C. §1512 ............................................................................................................................ 52

42 U.S.C. § 1983 .................................................................................................................... passim

42 U.S.C. §1985(2) ................................................................................................................. passim

42 U.S.C. §1985(3) ................................................................................................... 50, 54, 57, 62

720 ILCS 5/17-51 ........................................................................................................................ 78

720 ILCS 5/31-4 .......................................................................................................................... 52

720 ILCS Sec. 5/8-2 .................................................................................................................... 53

735 ILCS 5/2-1005(c) (West 2010) ............................................................................................ 28

ILLINOIS LAW PRACTICE, §3 .............................................................................................. 80

Labor Management Relations Act, 1935, section 8(a)(1) ........................................................... 48

Migrant and Seasonal Agricultural Worker Protection Act, ante, 29 U.S.C. § 1855................ 48

Restatement (Second) of Torts § 432(2) ...................................................................................... 86

Restatement (Second) of Torts §431 (1965) ............................................................................... 84

RESTATEMENT (SECOND) OF TORTS, §217 ..................................................................... 80

RESTATEMENT (SECOND) OF TORTS, §218(b)................................................................. 80

Restatement (Third) of Torts § 6, cmt. d (2010) ........................................................................ 87

Restatement (Third) of Torts § 7........................................................................................... 83

Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)............................................... 48

**Other Authorities**

*Comment, A Construction of Section 1985(c) in Light of Its Original Purpose*, 46 U. Chi. L. Rev. 402,

    405 (1979)................................................................................................................................ 46

*Developments in the Law-Competitive Torts*, 77 HARV. L. REV. 888, 959-69 (1964). .......... 69

*Dignitatis humanae* ..................................................................................................................... 43

*Gregory D. Malaska, American Manufacturers Mutual Insurance Company v. Sullivan*, J. CONTEMP.

    HEALTH L. & POL'Y 619, 651 (2001). ............................................................................ 33

*Nostra aetate* .................................................................................................................... 59

*Prosser*, Torts sec. 53, at 325-26 (4th ed. 1971) .............................................................. 83

*Reporter's Note*, at 85 (2010) ........................................................................................... 83

*W. Prosser W. Keeton, Torts* § 14, 85-86 (5th ed. 1984) ................................................. 81

# INTRODUCTION

There is no more effective and relied upon means in the United States of assuring balance between pluralism and religious liberty than its Constitutional order. The rights of individual citizens enshrined by the Constitution are inalienable, they cannot be taken away or denied. Though the original settlers of America were Europeans escaping laws compelling them to support and attend government favored churches, the confluence of singular groups saw the colonization of America "filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy . . . In efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed" *Everson v. Board of Education*, 330 US 1 (1947).

The Framers of the Constitution concluded that such cruel persecution not only invaded the inherent and natural freedoms of individuals but was the inevitable result of government-established religion. Enshrined in the Constitution is the prohibition to Congress from establishing or inhibiting religious practices.[1] The experiences with religious intolerance compelled the

---

[1] U.S. CONST. amend. I. The Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof...."

creation of a "wall of separation" [2] between the church and the state embodied through the two religion clauses contained in the First Amendment: the Establishment Clause and the Free Exercise Clause. Although the two clauses often overlap in theory, the Supreme Court traditionally has reviewed laws *burdening* the practice of religion under the free exercise clause, and laws *aiding* a particular religion under the establishment clause. [3]

In this case brought before this Honorable Court, the Defendants for more than ten years have threatened and repeatedly trespassed upon these bedrock principles of the U.S. Constitution in pursuit of their inimical and extreme religious convictions to forcibly establish the Catholic

---

[2] THE WRITINGS OF THOMAS JEFFERSON 281-82 (Library ed. 1904) (describing ideal church-state relations). In his letter to the Danbury Baptist Association, Thomas Jefferson used a "wall of separation" as a metaphor to describe the relationship between church and state. *Id.* The Supreme Court subsequently adopted this metaphor. *See* Everson v. Board of Educ., 330 U.S. 1, 18 (1947) (stating that first amendment has erected "wall" between church and state).

[3] Although the Supreme Court has developed distinct analyses for each clause, the free exercise and establishment clauses often overlap. *See* Abington School Dist. v. Schempp,374 U.S. 203, 222 (1963) (describing overlap of two clauses); L. TRIBE, *supra* note 23, § 14-2, at 813-15 (detailing relationship of two clauses). *See generally,* Moore, *The Supreme Court and the Relationship Between the "Establishment" and "Free Exercise" Clauses,* 42 TEX. L. REV. 142 (1963) (two clauses are not entirely independent); Pfeffer, *Freedom and/or Separation: The Constitutional Dilemma of the First Amendment,* 64 MINN. L. REV. 561 (1980) (discussing relationship between two clauses); Comment,A *Non-Conflict Approach to the First Amendment Religion Clauses,* 131 U. PA. L. REV. 1175 (1983) (discussing Supreme Court's analyses of conflict between clauses). Despite the possible overlap between the two clauses, the Supreme Court has generally addressed cases in terms of either the establishment clause or the free exercise clause. *Compare* Wisconsin v. Yoder, 406 U.S. 205, 233-34 (1972) (free exercise clause prohibits penalty on Amish for refusing to send children to school) *and* Sherbert v. Verner, 374 U.S. 398, 409-10 (1963) (free exercise clause bars denial of unemployment benefits for woman who refused to work on Sabbath although establishment clause not offended) *with* Larkin v. Grendel's Den, Inc., 459 U.S. 116, 126-27 (1982) (establishment clause invalidates law giving church right to control liquor licensing) *and* Levitt v. Committee for Pub. Educ. & Religious Liberty, 413 U.S. 472,479-82 (1973) (establishment clause prohibits state reimbursement of parochial schools).

The Supreme Court generally applies a free exercise analysis to state laws that burden the practice of religion. The Court balances the state's compelling interest in the law burdening religion against the individual's interest in the free exercise of his religion. *See, e.g.,* Wisconsin v. Yoder, 406 U.S. 205, 221 (1972) (religious beliefs of Amish outweigh state interest in education); Braunfeld v. Brown, 366 U.S. 599, 607 (1961) (state's interest in Sunday closing law outweighs OrthodoxJew's desire to work on Sunday); *cf.* Cantwell v. Connecticut, 310 U.S. 296, 311 (1940) (restrictions on freedom of religion permissible only to prevent grave and immediate danger); L. PEFFER, *supra* note 23, at 617 (interest of community only supersedes free exercise if interest cannot be protected without incursion into religion). 27. *See supra* notes 1-3 and accompanying text (discussing implications of publicly

religion and the Church's doctrine on an unsuspecting university and members of its community in the northern suburbs of Chicago; an endeavor that they have succeeded at through unlawful and seditious means. Driven by a zealous adherence to Vatican edicts that in 2005 reverted to extreme traditionalism and pre-1965 positions particularly in relation to Judaism and the Jewish people as well as intoxicated with a hegemonic presence in the State, the Defendants not only trampled upon the Plaintiff's civil and constitutional rights but have caused irreparable harm and injury curtailing the Plaintiff's liberties and freedoms and permanently ending her ability to practice medicine or any profession.

## FACTUAL BACKGROUND

I.     Brief History of Chicago Medical School

Founded in 1912, the Chicago Medical School received its accreditation by the American Medical Association ("AMA") in 1948. Already active in the years preceding the Civil Rights movement of the 1960s, the Chicago Medical School was prescient and unique in its extension of admission to meritorious candidates for the Doctor of Medicine regardless of their race, religion or gender; notably Jews, African-Americans and women who were denied admission by other institutions of higher learning due to quotas or outright discrimination. The school's efforts to support equality and non-discrimination in education were most memorably commended by then First Lady of the United States Eleanor Roosevelt who stated the following about Chicago Medical School in 1949: "One wishes that more schools and colleges and universities throughout the

country would have the courage to set their standards high, but to eliminate two questions that all too often one finds on a request for admission: what is your race and what is your religion?"[4]

The Plaintiff, who received admission to and matriculated into the Chicago Medical School after completing her Masters in Science in Applied Physiology there in 2001, was one of the many recipients of merit-based admission to the medical school and in 2005 was conferred her Doctorate of Medicine. During this time and throughout the history of the medical school, the primary clinical teaching hospital for Chicago Medical School was Mt. Sinai Hospital, a historic Jewish hospital in the near west side of Chicago. The medical school also maintained affiliations with many other hospitals without regard to their religious or nonreligious affiliation including those under the auspices of Advocate Health Care, Swedish Covenant and John H. Stroger, Jr. Hospital of Cook County.

II.      Rosalind Franklin University of Medicine & Science

In 2003, a new administration took over the school and renamed it to Rosalind Franklin University of Medicine & Science ("RFUMS"). In 2004 the Plaintiff was approached by faculty and alumni of the Chicago Medical School to bring to publication a book documenting the school's historic relationship between Mt. Sinai Hospital and the hospital's long history of providing care to the residents of Chicago without regard to their race, religion or ability to pay. The book titled *White Coat Tales: Becoming and Being Urban Doctors,* began as a compilation of narratives by alumni and documented the history of Mt. Sinai Hospital's contributions to the medical school and the training of generations of clinicians. The universal impact of the Holocaust on medical ethics,

---

[4] Roosevelt, E. (1949). *My Day*. A Comprehensive Electronic Edition of Eleanor Roosevelt's "My Day" Newspaper Columns. "My Day" Project, George Washington University. Retrieved at: https://www.gwu.edu/~erpapers/myday/displaydoc.cfm?_y=1949&_f=md001468

disparities in health care along racial lines, discrimination towards minority and poor patients and health policy reforms in contemporary society were amongst the subjects covered in the book (Exhibit 1). Published in 2006, the Plaintiff's book was critically reviewed as a "must read" by medical ethicist and anthropologist Dr. Melvin Konner of Emory University and included esteemed academics as contributors including Dr. Art Levine, alumni and Dean of the University of Pittsburgh school of medicine, Dr. Joseph Sanfilippo an alumni and editor-in-chief of the Journal of Pediatrics and Adolescent Gynecology as well as reproductive health specialist at the University of Pittsburgh, and Dr. Thomas Vargish, then chairman of the school's Department of Surgery and Chief of Surgery at Mt. Sinai Hospital. The Plaintiff, herself a graduate of a Jesuit undergraduate school in northern California, did not anticipate that there would be any issues with a book documenting the history of a Jewish hospital and the contributions of the Jewish people to public health, science and the medical profession. It was not until after the book was published in 2006 and shockingly banned by the school's administration that the extreme historical negationism entrenched within the traditionalist views of the administration began to be unveiled.

III.    Plan to Replace Jewish History of Chicago Medical School

In 2004, the former Mayor of Chicago, Richard Daley, and others including Rev. Dennis Holtschneider who was appointed President of De Paul University in 2004, decided to demolish all Jewish hospitals in Chicago: Mt. Sinai Hospital ("Sinai") in the west side and Michael Reese in the south side. Holtschneider was one of a select group of individuals who sat on the board for the failed 2016 Olympics bid that was the means by which Michael Reese Hospital was demolished in 2009. The same year, Defendant Welch announced his decision for a "change in affiliation from MSH to Advocate system" and intention to "move on without MSH" (Exhibit 2). The plan was part of a greater scheme to erase the Jewish history of the school, eliminate Sinai as the school's

major teaching hospital and form an alliance with De Paul University, the largest Catholic university in the country. The first phase was to secure approval of a merger with Advocate Lutheran General Hospital ("LGH") as the school's primary teaching hospital so as not jeopardize the school's accreditation. The Liaison Committee for Medical Education ("LCME") which governs medical school accreditation and is largely supported by the American Medical Association ("AMA") immediately placed RFUMS on probation. One of the requirements of the LCME to approve new affiliations is that there is no "[discrimination] against any employee, applicant or student enrolled in their respective programs because of age, creed, gender identity, national origin, race, sex, sexual orientation or any other basis protected by law" (Exhibit 3). Secondly, in order for LGH to be the school's primary teaching hospital, the positions of the Department Heads for Surgery and Medicine needed to be held by the clinical chief's at LGH. In 2004, those positions were held by Dr. Eric Gall and Dr. Thomas Vargish, who were on staff at Mt. Sinai Hospital.

One of the concerns for the LCME was that the school's decision to change affiliation was motivated by discrimination against the staff and faculty at Sinai because of their Jewish identity. The new President of the school, Defendant Welch, who initiated these changes and his newly appointed general counsel Patricia Bergeson (until 2011) and currently William McErlean are Catholics.[5] Patricia Bergeson, like McErlean, was a lead city hall counsel under Daley whose primary focus was in real estate. Since 2003 the school has been run by city hall lawyers with no background in or knowledge of undergraduate or graduate medical education and whose primary

---

[5] Affiliation with the Catholic Church has been verified through family records, school records and other public records and documents.
Patricia Bergeson comes from a Catholic family: "Tom Bergeson Obituary." *Lansing State Journal*.
William McErlean: 2012 Catholic Charities Annual Report.

purpose has been to push forward the affiliation with LGH so that Mt. Sinai Hospital could be demolished by the City and the history of the school's affiliation with a Jewish hospital erased to pave way for an alliance with and eventual acquisition by De Paul University.

IV.     Termination from Advocate Lutheran General Hospital

On July 1, 2005, the Plaintiff began a one year residency training at LGH as a prerequisite for her advanced standing in a Neurology residency program. At the inception of her training she was called in to meet with the Vice Chairman of Medicine of RFUMS, Glen Solomon, MD, her program advisor Natalie Correia, DO and the human resources vice president Penny Pilarcyzk. At this meeting during the second week of July, the Plaintiff was told that she had been "spotted" by a staff member with the surgery department ("Individual A") who had demanded restrictions on her training. These restrictions were typical of the same interference with the training of residents that had resulted in the residents at LGH becoming the first in the nation to successfully unionize with the support of the AMA and the NLRB. The restrictions substantially interfered with patient care and in September 2005 recklessly endangered the life of patient. The Plaintiff violated the restrictions to avoid a wrongful death suit or malpractice by providing care to the patient in an medical emergency along with Dr. Correia and one of Individual A's colleagues. No actions were taken against the Plaintiff as the restrictions were unlawful, unethical and in violation of the medical staff by-laws. In November 2005, Individual A discovered the patient incident and falsely accused the Plaintiff of "telephone harassment" while the Plaintiff was attending a medical conference abroad. Upon her return, the Plaintiff was fired without the mandatory due process and notice of intent in violation of the Accreditation Council for Graduate Medical Education ("ACGME") policies. In 2006, Individual A falsely told police that he did not know the Plaintiff was working at the hospital until sometime in August and didn't file any complaints against her

14

until the end of October 2005 in a transparent attempt to cover up his misconduct in the hospital that put patients' safety at risk.

Also in 2004, Pope Benedict XVI, formerly Joseph Ratzinger, was selected as the next Pope and officially elected in 2005. The relevance to this action will be explained in what follows but a return to pre-1965 traditional views in the Catholic Church were revitalized including anti-Jewish positions, conversion of the Jewish people and most notably a return to the controversial "supersessionism" or "replacement theology" that asserts the Catholic Church replaces Judaism; that the Sinai Covenant is replaced by the New Covenant of the Church and therefore Judaism and the Jewish people are obsolete (Exhibit 4). Pope Benedict XVI also brought known hate groups like St. Pius X Society back into the mainstream in spite of their overt anti-Semitism that has characterized the Catholic Church for over two millennia (Exhibits 5).

After the Plaintiff's termination from her residency training continuing to the present date, RFUMS began discriminating against, bullying, harassing and threatening the Plaintiff. They refused to question the Vice Chairman of Medicine over his decision to terminate the Plaintiff in the middle of her one year training thereby ending her career in medicine. The Plaintiff met with the Department Heads at Mt. Sinai Hospital and learned that the school's actions were motivated by the fact that they didn't want the book for the alumni completed because of concerns "that positive stories about past experiences may raise issues with alumni about the decision to move on without MSH" (Exhibit 2). The Plaintiff, not believing this nonsense went ahead and completed the book which was published in 2006. Denied any assistance from RFUMS to address her training, she had no choice but to seek third party help and filed a complaint with the EEOC against LGH for sex discrimination/harassment.

15

RFUMS continued to discriminate against the Plaintiff during this time. Patricia Bergeson routinely destroyed letters of reference sent to the school on the Plaintiff's behalf and obstructed her efforts to apply to alternative residency programs. After the book was published in 2006, it was immediately banned from the school. The school's attitude towards the Plaintiff was to relentlessly attack her and essentially "blame the victim" in order to absolve LGH and the Vice Chairman of any wrong doing in the Plaintiff's termination in spite of evidence to the contrary and glaring violations of ACGME policies. RFUMS was only interested in ensuring approval of the affiliation switch and didn't want the LCME to be aware of any discrimination taking place at the hospital. Obviously a hospital that is discriminating against and ending the careers of graduates of a school should not have approval to affiliate with that school. Where RFUMS leadership, driven by religious zealotry, failed to act the way a medical school normally would to ensure that their students and graduates are safe and actually go on to practice medicine, the LCME has had to repeatedly intervene.

Meanwhile, the book had garnered attention throughout the medical community. Inquiries from third parties to RFUMS regarding the Plaintiff resulted in threats and harassment directed at the Plaintiff but pressure from third parties in 2007 resulted in the Plaintiff ultimately being able to apply for residency programs. From 2007-2008, the Plaintiff interviewed throughout the country. Through the intervention of these physicians who were with the AMA, in June 2008 the CEO of LGH, Bruce Campbell, the Vice Chairman of Medicine at RFUMS, Glen Solomon, MD and the Program Advisor, Natalie Correia, DO all resigned their positions. As a result RFUMS' plans to replace Gall and Vargish with Solomon and another LGH staff member were halted and the LCME learning of the Plaintiff's pending EEOC with LGH required that it be resolved before an affiliation with LGH would be considered (Exhibit 12).

16

V.      Replacement of Mt. Sinai Hospital with Lutheran General Hospital

Following the resignation of the leadership at LGH, it was clear that Protestant and Jewish administrators were unwilling to participate in any scheme to expel the Jewish doctors from RFUMS and convert the school to Catholicism. In retaliation the school issued a letter to the Plaintiff stating that she "was no longer endorsed by Chicago Medical School" barring her from access to her academic transcripts, in effect and in intent tearing her Doctorate in Medicine degree into pieces (Exhibit 5).

In order to push the scheme through COO Bill Santulli of Advocate, a Catholic,[6] hired hospital administrator David Stark from Iowa. Stark is a member of a Catholic congregation known for its ties to the St. Pius X Society; an extremist right wing anti-Semitic Catholic traditionalist group (Exhibit 6).[7]

The Plaintiff hired Defendant Meczyk to resolve false pending criminal charges brought against her by Individual A in 2006 shortly after she had filed her EEOC complaint. Individual A had made numerous false statements to the police and Meczyk instructed the Plaintiff to contact physicians she had worked with to corroborate the actual events at LGH, specifically the physicians who were involved in the September 2005 patient incident. On January 20, 2009 after confirming with the Chairman of Surgery that Individual A was not scheduled to be on-call, the Plaintiff paged the physician who she had worked with and requested that he contact her or her

---

[6] Affiliation with the Catholic Church has been verified through family records, school records and other public records and documents.
Bill Santulli is a parishioner at Holy Name Cathedral (Roman Catholic) in Chicago where his daughter Kendall Santulli and husband Maloney wed.

[7] Affiliation with the Catholic Church has been verified through family records, school records and other public records and documents.
David Stark is a member of St Pius X Church in Urbandale, Iowa where is daughter underwent confirmation.

attorney. The Plaintiff then called Meczyk as he had instructed her. That evening, Individual A went to the Northbrook Police Department and claimed that he had received a page from the Plaintiff to her home number at 8:19 pm even though he was not on-call and at home in Northbrook, Illinois and that he called her number and spoke to her. Individual A then swore to the facts of his complaint and signed it (Exhibits 7). As a result the Plaintiff was arrested on January 23, 2009 and charged with witness and telephone harassment as felony crimes.

The Plaintiff bonded out ten days later and from that point on Meczyk refused to meet with her or discuss the case with her or her family. The record shows that on February 23, 2009, Meczyk and the State received the Plaintiff's subpoenaed call detail for the night in question. That record in their possession showed only two phones calls after 8:19 pm, one at 8:23 pm from (847) 823-2050 and one at 8:49 pm from a 224 number. The call at 8:23 pm immediately followed a page sent from the Plaintiff and the call at 8:49 pm immediately followed the Plaintiff's call to Meczyk's office (Exhibits 8). In 2015, these calls were confirmed as coming from a landline hospital line in Park Ridge, Illinois and Meczyk's cell phone. By February 2009, the State and Meczyk knew that none of the phone calls came or could have come from Individual A's home in Northbrook, Illinois and consistent with his very lengthy documented history of lying to authorities, Individual A not only lied to the police but did so under oath committing a felony crime of moral turpitude.

VI. Conspiracy to Conceal Individual A's Crime and Obstruction of EEOC Case

It was later learned in 2010, that the State's Attorney Anita Alvarez had been in constant communication with Patricia Bergeson by her own admission. The Defendants RFUMS and Welch as well as Advocate and Skogsbergh knew that Individual A had again lied claiming that he was being telephone harassed by the Plaintiff as he had done at the hospital and was caught. The Defendants knew that they would not be able to absolve LGH of wrongdoing given Individual A's

continued victimization of the Plaintiff and that she would likely win her EEOC complaint against LGH thereby permanently ending any approval by the LCME of an affiliation with LGH.

From this point on, the Defendants conspired with the State to conceal Individual A's crimes by destroying his sworn affidavit, phone records and police reports in the case. CEO David Stark who had taken on the helm at LGH in January 2009 was informed of Individual A's criminal act, Stark now a witness to a crime then abruptly resigned and left the state on August 14, 2009 (Exhibit 9). Santulli took over as interim CEO. Also on August 14, 2009 the Plaintiff suddenly received her 90 day "Right to Sue Notice" from the EEOC which she faxed and emailed to Meczyk's office. In October 2009, Santulli hired Anthony Armada, another Catholic with extensive ties to the Chairman of the Board of Trustees at RFUMS, as CEO at LGH (Exhibit 10).[8] It appears that Advocate, a Protestant faith-based health care system, was being used to push forward the anti-Judaization and subsequent Catholicization of a medical school by Catholics acting clandestinely in leadership positions within Advocate's health care system.

At the end of October 2009, Meczyk told the Plaintiff and her mother that he had spoken to Alvarez and the charges were dropped and for the Plaintiff to appear in court on November 3, 2009. When the Plaintiff appeared, much to her shock Meczyk told her that she had to plead guilty to felony, that she was "guaranteed to lose." The Plaintiff refused and demanded to see the evidence in the case. Instead, Meczyk told the court falsely that the Plaintiff had absented herself to secure a warrant for her arrest and then called the Plaintiff to enter the court room. When she

---

[8] Affiliation with the Catholic Church has been verified through family records, school records and other public records and documents.
Armada, Anthony (@Taarmada). (12 December 2015). Attended Simbang Gabi mass today to commemorate a Filipino Christmas tradition of consecutive masses to celebrate. [Twitter post].

did, she was forcefully handcuffed and placed in Maximum Security in the Cook County Jail with no bail (Exhibit 11).

On November 14, 2009, the Plaintiff was unlawfully prevented from filing her EEOC case in federal court. In December 2009 Dr. Eric Gall was forced out of his position as Chairman and replaced with William Rhoades, DO from LGH and Dr. Thomas Vargish was forced out and replaced by John White, MD from LGH (Exhibits 12 & 14). Meczyk lied to the Plaintiff and her family and told her that the phone reports showed a phone call registered to Individual A, that he was the on-call physician and she wouldn't be able to prove otherwise. Meczyk told the Plaintiff and her family that she would be sentenced to seven years in prison unless she plead guilty and he would get her two years' probation. Terrified in jail and realizing that the Judge was not going to let her out unless she plead guilty and trusting her attorney Meczyk, the Plaintiff capitulated to a guilty plea to a crime she was factually innocent of on January 19, 2010. Since LGH staff were now the Department Heads at RFUMS, on March 31 2010 the LCME approved of the affiliation (Exhibit 13).

In October 2010, the Plaintiff then working as a health care fellow for Congressman Danny Davis reviewed the police reports for the first time that she had secured via FOIA request. The Plaintiff saw that Meczyk had lied, that Individual A was not on-call and given the hospital's routine habits and practices the requisite intent was not met. The Congressman's District Deputy confronted Alvarez and she admitted to being instructed by Patricia Bergeson to prosecute the Plaintiff because "the university [told her] [the plaintiff] was crazy" and that she believed that she was supposed to secure a conviction on the Plaintiff as well as have the Plaintiff's medical license revoked.

20

The Plaintiff then "blew the whistle" to the White House that the scheme to demolish Sinai had been undertaken through unlawful means. As a direct result of the Plaintiff's actions, the White House intervened and prevented the low income Hispanic and Black communities in the near Westside of Chicago from being deprived of a major safety-net provider and a Trauma Level I for adults and pediatrics.

VII. De Paul University – Rosalind Franklin University of Medicine & Science Alliance

In 2011 the transitioning of Dr. Gall and Dr. Vargish to LGH staff was complete and RFUMS announced their official affiliation with LGH as their primary teaching hospital (Exhibit 14). The long legacy of partnership between Chicago Medical School and Mt. Sinai Hospital as its main teaching hospital had come to its end (Exhibit 14). Not surprisingly at the same time in 2011, De Paul University announced the new College of Science and Health Professions and its partnership with RFUMS as De Paul's graduate health professional school (Exhibit 14). Outrageously the Defendants attempt, as part of their ongoing effort to cover up their culpability for the claims in this action, to deny any affiliation with LGH ever took place. (*See* Mtn. to Dismiss, Dkt. #31, "claimed merger between the University and Advocate Lutheran General. Never mind the merger never took place.") Not only is this well documented by the LCME and faculty but the school's own website states "In 2011, the Medical School entered into and [sic] agreement with Advocate Lutheran General Hospital to become its principal clinical affiliate" (Exhibit 14). In April 2011 the Plaintiff filed a discovery motion for the phone records in her case and got no response (Exhibit 15). The Plaintiff's attorneys in California also contacted Meczyk for her case file and in response Meczyk and the State's Attorney Alvarez attempted to have the Plaintiff taken into custody on false charges that were summarily dropped (Exhibit 15).

On October 3, 2012, RFUMS officially announced its alliance with De Paul University (Exhibit 16). Not surprisingly, this was accompanied with long-time Associate Dean Dr. John Tomwokiak being forced out of the school (Exhibit 16) Given continued discrimination at RFUMS the LCME placed the school back on probation in 2013 and this was lifted when Dr. Tomwokiak returned as Dean and Armada, who from 2009 onwards was still pushing the Catholic agenda, resigned (Exhibit 10).

VIII. Continuing Criminal Conspiracy to Conceal Individual A's Crime

Meanwhile, on January 19, 2013 the Plaintiff had filed for post-conviction relief on the grounds of ineffective assistance of counsel and alternative defenses. Shortly afterwards the Assistant State's Attorney in the 2009 criminal case, Cathy Crowley, also a Catholic like Anita Alvarez, abruptly retired (Exhibit 17).[9] Meczyk continued to refuse to turn over any phone records or reports or sworn affidavit from the 2009 case in spite of Court Orders and initiation of contempt proceedings. In October 2013, after being confronted by the presiding Judge, the State admitted that they could not locate the Plaintiff's case file anywhere, even after searching the warehouse (Exhibit 18). The Judge then ordered that the relevant call detail be subpoenaed which the Plaintiff received in April 2014. This was the first time the Plaintiff saw the records and saw clearly that there were only two incoming calls.  A search for the first number on-line confirmed repeatedly that it was a landline in Park Ridge. Soon afterwards her appellate counsel received the call detail record from Meczyk that he had concealed until learning that the records had already been successfully subpoenaed. Meczyk's 2009 copy is identical to the call detail subpoenaed in 2014 however someone has attempted to falsify the 2009 copy by writing a different phone number on

---

[9] Cathy Crowley's husband, Terry Hake, self-described as "dumb Catholic kid from the suburbs," (Keegan, A. "Inside Greylord." Chicago Tribune, Chicago, Illinois. 17 December 1989.)

it in an effort likely to claim that the phone records relevant to the 2009 case were actually for some different number than the one Individual A swore he had called (Exhibit 8).

The appellate counsel for the Plaintiff only needed to authenticate the two incoming calls, instead he filed an "amended" petition without notifying the Plaintiff no different from the original petition except including a clearly questionable document claiming that the phone call from the hospital landline was actually a mobile phone. This fraud was clearly intended to continue the ongoing effort to conceal Individual A's criminal acts and as a result the Plaintiff's post-conviction petition was dismissed and any legal relief or remedy for her wrongful conviction permanently foreclosed.

In April 2015, the Plaintiff filed in federal court against RFUMS as it was clear that there was an ongoing cover up and the university was involved. On May 14, 2015 the faculty at the school passed new by-laws to remove Welch from his position because of his involvement in the Plaintiff's wrongful arrest and conviction and subsequent criminal conspiracy to conceal the crime committed by Individual A:

>Terminations for just cause may occur upon the determination that the faculty member has exhibited behavior such as major violations of the University's Code of Conduct, willful material concealment or misrepresentation during the application for employment process, gross incompetence in the performance of duties, substantial neglect of duty, flagrant unprofessional or abusive conduct towards a member of the University community or within the University environment, willful violation of policy resulting in a significant loss of resources or risk of harm to a person, commission of a crime against the University or against any member of the University community, or commission of a felony. (Exhibit 19)

On June 24, 2015 the Plaintiff directed her counsel to subpoena the phone reports and to bring the claims brought now in this action against RFUMS and the other Defendants. Defendants RFUMS and Welch however through William McErlean attempted to quash the phone reports. When that

failed Meczyk appeared to quash them and demand that they be kept from the Plaintiff. *See* Dkt.#24, *Uppal v. Rosalind Franklin University of Medicine & Science,* No. 15-3806 (N.D.I.L. August 26, 2015). The phone reports were not quashed but McErlean then arranged for the Plaintiff's attorney to secure a higher paying position at a different law firm in exchange for abandoning the Plaintiff and entering into an unopposed protective order to have the reports destroyed and permanently kept from the Plaintiff. (*Id.* at Dkt #42). As a result the case was dismissed and on August 27, 2015 Defendants Welch and RFUMS believed they had permanently destroyed the phone reports and permanently covered up the crimes committed against the Plaintiff.

Dr. John Tomwokiak and the faculty's <u>efforts to remove Welch were defeated by the destruction of the evidence of Individual A's crimes by William McErlean on August 27, 2015.</u> Dr. John Tomwokiak subsequently was forced out of RFUMS again (Exhibit 20). Welch exposed his culpability by protecting himself against the allegations brought by the faculty for his involvement in the Plaintiff's wrongful arrest and conviction by acting to destroy the phone reports. <u>Welch knew that the phone reports would prove that the Plaintiff was innocent in the 2009 case because he was participant in the cover up and constitutional and civil right violations against the Plaintiff in joint action with the government in 2009 and 2010 to secure approval of the affiliation with LGH by unlawful means.</u>

In 2004 the anticipation of the first Catholic Vice President and already extant hegemony in the government ignited an emergence of extreme fundamentalism and ascendency in the Catholic Church. There was a confluence in ideology and coordination between new administrators at De Paul and RFUMS and Catholic politicians that year and escalated in 2009. De Paul University, a prestigious school over a century old, has no history of conflict with Chicago

Medical School prior to 2004 and the actions attributed to De Paul clearly began in 2004 with the appointment of Holtschneider as President. Likewise with RFUMS, the problems began in 2004 with the new administration under President Welch. The unlawful means they resorted to and extremism to achieve their objectives ultimately initiated a denouement. By 2013 Pope Benedict XVI resigned and the following and current Pope has reaffirmed the Church's commitment to Vatican II. For the Plaintiff, the damage is done. When PBS interviewed Robert Mickens about Pope Benedict XVI's controversial papal reign, he could have been referring specifically to the Plaintiff's life when he answered, "There was a mess that Benedict XVI left" (Exhibit 5). Shortly after September 14, 2015 when the Plaintiff filed the original complaint in this action, Arne Duncan, whose Chicago branch office failed to investigate and dismissed the Plaintiff's 2009 complaint against RFUMS for retaliation against her EEOC case, resigned as Secretary for the U.S. Department of Education. The threat to the solicitude of the U.S. Constitution and laws by the religious extremism that has victimized the Plaintiff for the past ten years has been grave and worsened yet by the efforts of the Defendants to conceal their actions causing justice to elude the Plaintiff.

## LAW AND ARGUMENT

### I.   LEGAL STANDARD

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal citation omitted). The notice pleading standard of Federal Rule of Civil Procedure 8(a)(2) – which governs all allegations in this case except the predicate racketeering acts of fraud

– does not require "detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It requires only that a plaintiff plead sufficient facts to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

The pleading standard requires only that the complaint "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 570)*.* "The 'plausibility determination' will be a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1950). The court must deny a motion to dismiss "'if, in view of what is alleged, it can reasonably be conceived that the plaintiffs . . . could, upon a trial, establish a case which would entitle them to . . . relief.'" *Phillips*, 515 F.3d at 233 (quoting *Twombly*, 550 U.S. at 563 n.8).

In deciding motions to dismiss, a court may consider the allegations in the complaint, exhibits attached to the complaint, matters of public record, and other documents that form the basis of a claim. *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004); *see also Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (affirming the district court's consideration of certain facts set out in public documents plaintiffs attached to their opposition to a motion to dismiss and treating those documents as part of the pleadings).

As an initial matter, while Plaintiffs must plead enough facts to state a claim that is plausible on its face to satisfy the federal pleading standard, *Twombly*, 550 U.S. at 570, the Third Circuit is "'mindful that direct evidence of a conspiracy is rarely available and that the existence of a conspiracy must usually be inferred from the circumstances." *Capogrosso v. Supreme Court of the State of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009) (quoting *Crabtree v. Muchmore*, 904 F.2d

1475, 1481 (10th Cir. 1990). Civil conspiracy in Illinois consists of "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). This requires more than "[a]ccidental, inadvertent, or negligent participation in a common scheme . . . ." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133-34, 720 N.E.2d 242, 258 (1999). The plaintiff must prove that the defendant "knowingly and voluntarily participated in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64, 645 N.E.2d 888, 894 (1994). "A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do [his] part to further those objectives, however, is liable as a conspirator." *Id.* at 64, 645 N.E.2d at 894; see also *McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258. "[A] conspirator need not participate actively in or benefit from the wrongful action in order to be found liable." *Adcock*, 164 Ill. 2d at 65, 645 N.E.2d at 895 (citing *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983)). Indeed, all members of a conspiracy "are liable for injuries caused by any unlawful acts performed pursuant to and in furtherance of the conspiracy," regardless of whether the conspirator planned or knew about the wrongful act. *Id.* at 64, 645 N.E.2d at 895. Because it is difficult to obtain direct proof, conspiracy is generally established "from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Id.* at 66, 645 N.E.2d at 895; see also *United States v. Wantuch*, 525 F.3d 505, 519 (7th Cir. 2008) (a jury may find an agreement to conspire "based on circumstantial evidence and reasonable inferences drawn from the relationship of the parties, their overt acts, and the totality of their conduct."). Under Illinois law, to prove

conspiracy from circumstantial evidence, "that evidence must be clear and convincing." *McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258.

A triable issue exists "where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Williams v. Manchester*, 228 Ill. 2d 404, 417, 888 N.E.2d 1, 9 (2008). Summary judgment should be granted when the moving party's right to judgment is "clear and free from doubt" (*id*.)—when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (735 ILCS 5/2-1005(c) (West 2010)).

To properly plead a conspiracy under 42 U.S.C. § 1983, a plaintiff must simply make "'factual allegations of combination, agreement, or understanding among all or between any of the defendants [or co-conspirators] to plot, plan, or conspire to carry out the alleged chain of events.'" *Zaimes v. Cammerino*, No. 09-1964, 2010 U.S. Dist. LEXIS 31887, at *15-16 (M.D. Pa. Apr. 1, 2010) (quoting *Hammond v. Creative Fin. Planning Org.*, 800 F. Supp. 1244, 1249 (E.D. Pa. 1992)). The "plausibility determination" required at this stage is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 129 S. Ct. at 1950). Plaintiffs' allegations exceed this standard; they are "'particularized'" and address "'the period of the conspiracy, the object of the conspiracy, and certain other actions of the alleged conspirators taken to achieve that purpose.'" *Panayotides v. Rabenold*, 35 F. Supp. 2d 411, 419 (E.D. Pa. 1999) (quoting *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989)).

28

## II.    RES JUDICATA DOES NOT BAR CLAIMS

Three requirements must be met for application of the doctrine of *res judicata*: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction; (2) there was an identity of cause of action; and (3) there was an identity of parties or their privies." *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998). Federal law governs the res judicata effect of cases litigated in federal court. *Peregrine Financial Group, Inc. v. Trademaven, L.L. C.*, 391 Ill. App. 3d 309, 313 (2009). The elements of res judicata are the same under federal and Illinois law, requiring: (1) a final judgment on merits rendered by court of competent jurisdiction; (2) identity of cause of action; and (3) identity of parties or their privies. *Diversified Financial Systems, Inc. v. Boyd*, 286 Ill. App. 3d 911, 914-15 (1997).

The doctrine of res judicata mandates that a final judgment on the merits of a case rendered by a court of competent jurisdiction is an absolute bar to future suits between the same parties regarding the same "claim, demand or cause of action." *Riverdale Industries, Inc. v. Malloy*, 307 Ill. App. 3d 183, 185 (1999). In *River Park*, the Illinois Supreme Court explicitly adopted the Second Restatement of Judgments test (see Restatement (Second) of Judgments § 24, Comment a, at 197 (1982)), commonly known as the "transactional test," for determining whether a second suit constitutes the same cause of action for *res judicata* purposes. To determine whether a second suit constitutes the same cause of action as a previous suit for *res judicata* purposes, we look to the "transactional test," which asks whether the subsequent action arises from the same set of operative facts as the original action. *River Park*, 184 Ill. 2d at 309. " '[T]he assertion of different kinds or theories of relief still constitutes a single cause of action if a <u>single group of operative facts</u> give rise to the assertion of relief.' " *River Park*, 184 Ill. 2d at 307 (quoting *Rodgers v. St. Mary's Hospital*, 149 Ill. 2d 302, 312 (1992), quoting *Pfeiffer v. William Wrigley Jr. Co.*, 139 Ill. App. 3d

29

320, 323 (1985), quoting *Baird & Warner, Inc. v. Addison Industrial Park*, Inc., 70 Ill. App. 3d 59, 64 (1979).

The history and background of the Plaintiff and her relationship with the Defendants will remain the same because unlike the Defendants the Plaintiff does not engage in historical revisionism. The claim brought in April 2015 that was dismissed "with prejudice" is entirely different and based on an entirely different set of operative facts than the current case. To apply *res judicata* in this case would be the equivalent of two individuals feuding for an extended period of time and then one steals the car of other. The individual whose car is stolen then sues the other but loses the case. Following the lawsuit, the car thief murders the family of the individual who sued who then brings a wrongful death suit against the car thief but the Judge dismisses it on *res judicata* because both cases involved the same historic dispute between the same two individuals. There is no comparison between the old case and the new case other than the enduring animosity between the Plaintiff and the Defendants. Additionally, the claims in the current action couldn't be brought previously because the Defendants caused the Plaintiff's attorney to abandon her.

The phone reports that the Plaintiff subpoenaed in the older case are not just essential to this case but requisite to the claims being brought now and the Defendants themselves repeatedly describe these phone reports as being "irrelevant" to the claim brought in the older case: "the information . . . has nothing to do with the defendant's charged wrongdoing beginning in August 2008" (Mtn. to Dismiss, Dkt. #31, p. 4); "Plaintiff . . . [issued] irrelevant discovery in a case before Judge Guzman" *Id.* at p. 10; "In the lawsuit before Judge Guzman, Plaintiff made two separate attempts to obtain nonparty discovery she claimed was relevant to her claim against the University. Both Judge Guzman and Magistrate Judge Cole disagreed . . ." *Id.* at p. 5; "Plaintiff who initiated the prior lawsuit for the improper purpose of obtaining irrelevant information" *Id.* at p. 11.

30

The indispensable phone reports that comprise the vital operative facts to the claims in this current case were found to be totally irrelevant to the claim brought in the older case. There are entirely different operative facts and claims. The second requirement of *res judicata* states that the cause of action must be the same in both cases. One method of determining the similarity of causes of action is to examine the facts of each case. If the same set of facts provide the basis for both claims, then the cause of action is the same. *Smith v. City of Chicago*, 820 F.2d 916 (7th Cir. 1987). The only operative fact in the older case was the 2008 letter issued by RFUMS that informed the Plaintiff she was "no longer endorsed by Chicago Medical School," (Exhibit 5). It's not possible to bring the current claims of civil and criminal conspiracies to conceal a crime, constitutional and civil rights violations, tortious interference of contracts, abuse of process etc. based on a letter barring the Plaintiff from accessing and utilizing her academic record. *Res judicata* does not bar the current action.

## III.    §1983 CONSPIRACY SUFFICIENTLY ALLEGED

### A.    Defendants Are Pervasively Entwined with the State

To state a cause under §1983, plaintiff must assert the deprivation of a federally protected right by someone acting "under color" of state law.  See *Lugar v. Edmondson Oil Col*, 457 U.S. 922 930-31 (1982) (citing *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 150 (1970). Defendants contend that the Plaintiff fails to establish that the Defendants were acting "under color" of state law.

For 42 U.S.C. §1983 conspiracy purposes, the defendants need not be an officer of the State. A private entity may be deemed a state actor if that "private acted in a conspiracy with state officials" because this would "satisfy several of [the] tests traditionally used for Fourteenth Amendment state action." *Sershon*, 2008 U.S. LEXIS 15678, AT *7-8 (listing state action tests

including public function, entanglement, state coercion, and joint action). "[I]t is enough [for §1983 conspiracy purposes] that [the defendant] is a willful participant in joint activity with the State or its agents." *Adickes*, 398 U.S. 152 (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). *Brentwood Academy v Tennessee Secondary School Athletic Association*, 531 US 288, 295 (2001).

In 2004, the former Mayor of Chicago, Richard Daley, and others decided to demolish Defendant RFUMS' long-time clinical partner Mt. Sinai Hospital ("Sinai") as well as the only other Jewish hospital in Chicago, Michael Reese. This de-Judaization was part of a larger plan for RFUMS to forge an alliance and acquisition by De Paul, a Catholic University. The same year, Defendant Welch announced his decision to "move forward without Sinai" and switch affiliations to Advocate Lutheran General Hospital" (Exhibit 2). Since that time all of the school's general counsel have been lead city hall corporation lawyers from Patricia Bergeson (2003 to 2011) to current counsel William McErlean. None of these lawyers have any background or knowledge in graduate medical education and their primary purpose has been to represent former Mayor Daley's interests to push forward an affiliation with LGH for the since defeated objective to demolish Mt. Sinai Hospital and to facilitate De Paul's acquisition of the medical school. The affiliation with LGH was accomplished in 2010 by unlawful means with substantial assistance and joint participation from the Cook County State's Attorney Anita Alvarez which Alvarez admitted to in October 2010. The school has with the State destroyed all files and evidence for the 2009 criminal case rendering futile the Plaintiff's access to the courts to prove her innocence and the unlawful means by which the affiliation with LGH was approved. There is no question that the government has been pervasively entwined with the school since the school's management is under the control of city hall lawyers who represented the government's interests. *Brentwood Acad. v. Tenn.*

*Secondary Sch. Athletic Ass'n.,* 531 U.S. 288, 296 (2001). *See Lebron v. Nat'l. R.R. Passenger Corp.*, 513 U.S. 374 (1995) (holding that, despite the federal government's characterization of Amtrak as private, it was a state actor under the Fifth Amendment because, inter alia, its board of directors consisted entirely of federal officials); *Evans* v. *Newton,* 382 U.S. 296, 299, 301. In *National Collegiate Athletic Assn.* v. *Tarkanian,* 488 U.S. 179, the Court anticipated that state action could be found when there is public entwinement in the management or control of an organization whose member public schools are all within a single State. Pp. 6-9. The relationship between the State and the RFUMS is one where the State so closely encourages the school's activity that it can be said to be "cloaked with the authority of the state." *Gregory D. Malaska, American Manufacturers Mutual Insurance Company v. Sullivan*, J. CONTEMP. HEALTH L. & POL'Y 619, 651 (2001).

  The State's Attorney Anita Alvarez and Assistant State's Attorney Cathy Crowley did not function as expected in their official capacity. They knowingly and intentionally destroyed and concealed exculpatory evidence to cover up Individual A's criminal acts and continued to prosecute the factually innocent Plaintiff. Subsequently, to cover up their actions the 2009 criminal case file was removed including the sworn affidavit, police reports, and phone records from the State's Attorney government warehouse in an overt act in furtherance of the conspiracy to conceal Individual A's crime (Exhibit 18). As none of the Defendants who are private entities could have accessed these files, the coordination of the Defendants with the State is clear and convincing. "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action.'" *Brentwood Acad,* 531 U.S. at 295 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) *Morris v. Dillard's Department Stores, Inc.*,277 F.3d 743,748-750 (5th Cir.2001) (court used "nexus-type test" when determining whether merchant

engaged in coordinated conduct with police is a state actor); *Howerton v. Gabica*, 708 F.2d 380,383 n.3 (9th Cir.1983) (using form of nexus test when landlord coordinated with police officer to evict tenant). What motive would the State have in obstructing justice? If the State wanted a conviction by hook-or-by-crook they could have secured one easily for Individual A who actually committed a crime, but it was the Plaintiff specifically who the State was pursuing because of their involvement with the Defendants and willingness to use the government repressively to advance the Catholic religion's preeminence.

### B.    Defendants Violated Plaintiff's Constitutional Rights

Title 42 U.S.C. §1983 imposes liability on every person who, under the color of a statute, ordinance, or regulation, causes the deprivation of another's federally protected right. Intended as a damage remedy for those whose civil rights are violated, §1983 applies only where deprivations occur under the color of state law. More specifically, for the statute to apply, a §1983 defendant must act with the authority of the state. *Kia P. v. McIntyre*, 235 F.3d 749, 755 (2d Cir. 2000)) A plaintiff must also show that a state agent's actions proximately caused the damages in question.

### 1.    Due Process

The Sixth Amendment to the United States Constitution guarantees that a criminal defendant shall "be informed of the nature and cause of the accusation" against him; in turn, the Fifth Amendment ensures that no one "shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. VI. A core purpose of the Due Process Clause of the Fourteenth Amendment is to protect individuals from being arbitrarily deprived of their lives. *Martinez v. California*, 444 U.S. 277, 284 (1980); *Breen v. Texas A&M Univ.*, 485 F. 3d 325, 332 (5th Cir. 2007). "Among the historic liberties protected by [the civil rights statutes] was a right to be free from, and to obtain judicial relief, for unjustified intrusions on personal security . . . It is

fundamental that the state cannot hold and physically punish an individual except in accordance with due process of law." *Ingraham v. Wright,* 430 U.S. 651, 673-74 (1976).

A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Gerstein v. Pugh*, 420 US 114; see *Virginia v. Paul*, 148 US 107, 148 US 119 (1983). Where a state actor is deliberately indifferent to the consequences of his conduct, he can be held to have acted in an unconstitutionally arbitrary manner. *See Barrie v. Grand County, Utah,* 119 F. 3d 862, 867 (10th Cir. 1997).

On January 20, 2009, Individual A told the police and swore under oath that he had called the Plaintiff's home number from his home in Northbrook, Illinois. The State and the Defendants had the phone record for the Plaintiff's phone on the night in question by February 23, 2009. This record shows no phone calls that could have been placed by Individual A as one call is from a landline in Park Ridge, Illinois and the other from Defendant Meczyk's cell phone (Exhibit 8). Nearly nine months prior to the Plaintiff being taken into custody on November 3, 2009, it was already known to the State and the Defendants that the she was factually innocent. Nevertheless, they conspired to conceal this evidence and have the Plaintiff seized and placed into custody without probable cause, without legal excuse, and for the dual purpose of coercing a guilty plea and preventing her from filing an EEOC case in federal court on time. The Defendants with the State have since engaged in an ongoing criminal and civil conspiracy to conceal and destroy the evidence of the crime committed by Individual A for which the Plaintiff was wrongfully arrested, imprisoned and convicted.

### 2. Access to the Courts

From 2010 through 2015, the Defendants and the State have continued to act jointly for the common scheme of concealing Individual A's crime and the evidence of the Plaintiff's actual innocence. In April 2011, discovery motions for the phone reports were unanswered by the State (Exhibit 15). Requests by the Plaintiff's lawyers to Meczyk for her file resulted in the State's Attorney attempting to have her taken into custody on false charges (Exhibit 15). In 2013 the Plaintiff had filed for post-conviction relief and after Court Orders and initiation of contempt proceedings, Meczyk refused to turn over any exonerating phone records that he should have had in his possession. In 2013 the State upon questioning admitted that the entire case including the sworn affidavit and exonerating phone records and reports had been removed from the state's warehouse and could not be located (Exhibit 18).

The actions of the Defendants and the State permanently foreclosed on the Plaintiff's post-conviction relief proceedings thus barring her from ever using evidence of actual innocence to clear her record. In June 2015, when the Plaintiff subpoenaed these phone reports, the Defendants acted without good cause and in bad faith to have the reports kept from the Plaintiff and destroyed; thereby not only exposing their culpability but in an attempt by Welch to evade accountability of allegations being leveled against him by faculty at the school for his role in the Plaintiff's false arrest and wrongful conviction. The Defendants' actions not only were intended to permanently conceal the crimes committed in 2009 but to maliciously frustrate and delay the Plaintiff's efforts at legal redress so that the time-sensitive and perishable phone reports would be permanently destroyed. The plaintiff's post-conviction matter was already foreclosed, but the Defendants knew that the claims brought forward now in this case as well as the removal of Welch from the school depends upon the phone report evidence of the Plaintiff's actual innocence in the 2009 criminal

case. The Defendants themselves admit their knowledge in June 2015 that the phone reports were perishable before they again proceeded to destroy them: "The Court . . . recognized that phone companies periodically destroy records" (*See* Mtn. to Dismiss, Dkt. #31). Maliciously, two months later the Defendants sought to have the only evidence of the Plaintiff's actual innocence destroyed and permanently barred from her knowing that doing so would make it likely she would wrongfully convicted for the rest of her life. As a direct and indirect result of the Defendants' actions jointly with the State, the Plaintiff is a wrongfully convicted felon and has lost opportunities for multiple legal claims for relief as well as her ability to practice medicine or any profession.

The right of access in its most formal manifestation protects a person's right to physically access the court system. Without more however, such an important right would ring hollow in the halls of justice. *See Chambers*, 207 US at 148, 28 S. Ct. at 35 ("In an organized society it is the right conservative of all other rights, and lies at the foundation of government. It is one of the highest and most essential privileges of citizenship.") The right to access to the courts is guaranteed both by the First Amendment and the Due Process Clause of the Fourteenth Amendment. *See Lewis v. Casey*, 518 U.S. 343, 404-05 (1996); *Wolff v. McDonnell,* 418 U.S. 539 (1974); *Johnson v. Avery,* 393 U.S. 483, 485-86 (1969). The Court has established that the access must be "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977). Interference with the right of access to the courts gives rise to a claim for relief under §1983. *Ryland v. Shapiro*, 708 F. 2d 967, 972 (5th Cir. 1983). A right of access to the courts claim is made on a showing of interference by a state actor that either prevents the plaintiff from filing suit or renders ineffective any available remedies. *Swekel v. City of River Rouge*, 199 F. 3d 1259, 1263-54 (6th Cir. 1997), cert. denied, 522 U.S. 1047 (1998). A party can be liable for destroying evidence, covering up

crucial facts, and for causing delays that cause evidence to become stale or the memories of witnesses to fade. *Stump v. Gates*, 777 F. Supp. 808, 817 (D. Colo. 1991) (destroying evidence).

Therefore, as in this case, if a party engages in actions that effectively cover-up evidence and these actions render a plaintiff's state court remedy ineffective, they have violated her right of access to the courts. *See Bell v. City of Milwaukee*, 746, F. 2d 1205, 1261 (7th Cir. 1984) ("To deny such access defendants need not literally bar the courthouse door or attack plaintiff's witnesses."). Otherwise, to what avail would it be to arm a person with such a constitutional right, when the courtroom door can be sealed by a functionary who destroyed the evidence crucial to the case. A contrary interpretation of this right would encourage "officials to conceal the circumstances relating to unlawful billing committed under color of state law and other deprivations of federal rights §1983 was designed to remedy." *Id*.

Several Courts have found that a state official's actions in covering-up evidence amounted to a denial of access to courts. For examples, in *Bell*, supra, the police covered up a murder by one of their officers by concealing key facts from the family of the murder victim *Id*. at 1215-17. The court found that "a conspiracy to cover up a killing, thereby obstructing legitimate efforts to vindicate the killing through judicial redress, interferes with the due process right of access to courts." *Id* at 1261. The court reasoned that the "constitutional right [of access to the courts] is lost where, as here, police officials shield from the public and the victim's family key facts which would form the basis of the family's claims for redress." *Id*.  In another denial of access case, *Crowder v. Sin yard*, 884 F. 2d 804 (5th Cir. 1989), cert. denied, 496 US 924, 110 S. Ct. 2617, 110 L.Ed. 2d 638 (1990), the Fifth Circuit summarized *Ryland* as follows: *Ryland* standards for the proposition that if state officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that

right, and that concealment and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled, they may have committed a constitutional violation.

A court must analyze several factors before deciding whether a person's fundamental right of access to the courts has been violated. First, a court must ascertain whether the abuse occurred pre- or post- filing. When the abuse transpires post-filing, the aggrieved party is already in court and that court usually can address the abuse, and thus, an access to courts claim typically will not be viable. If the abuse occurs pre-filing, then the plaintiff must establish that such abuse denied her "effective" and "meaningful" access to the courts. *Bounds*, 430 US at 822, 97 S.Ct. at 1495. The plaintiff can do this only by showing that the defendants' actions foreclosed her from filing suit in state court or rendered ineffective any state court remedy she previously may have had. *See Crowder*, 884 F. 2d at 812-13; *Bell*, 747 F. 2d at 1261; *Ryland*, 708 F.2d at 974-75.

All of the evidence in the 2009 criminal case was removed and/or destroyed prior to April 2011. A discovery motion filed in 2011 for the phone records and other reports including Individual A's sworn affidavit and the police reports resulted in nothing being turned over by the State (Exhibit 15). In 2013 after the post-conviction relief case was filed, the state admitted that they could not locate the case file that had been missing before April 2011 (Exhibit 18).

The denial of access to necessary materials contributed to the Plaintiff's inability to successfully challenge her conviction in post-conviction relief proceedings. As a result of the State's and Defendants' actions to conceal and destroy the phone record, the phone reports, the police reports and the sworn affidavit – the entire case file, and interfere with her appellate counsel, the Plaintiff was so prejudiced that her claim failed. In order to bring a §1983 claim for violation of right to access the courts, the plaintiff must "plead and prove prejudice stemming from the

asserted violation." *Pilgrim v. Littlefield*, 92 F. 3d 413, 416 (6th Cir. 1996). By showing that the underlying claim was not frivolous, actual injury is demonstrated. *Lewis v Casey*, 518 US 343, 351-53 (1996) (reasoning that the "actual injury" is sufficient. *Id*. at 353 n.3. Plaintiff has alleged that she was denied both access to counsel and access to the rudimentary forms to challenge her wrongful conviction.

### 3.      False Imprisonment

The tort of false imprisonment is defined as "an unlawful restraint of an individual's personal liberty or freedom of locomotion." *Toothman v. Hardee's Food Sys*., 304 Ill. App. 3d 521 (5th Dist. 1999). The essential elements of a cause of action for false imprisonment are that: (1) The plaintiff was restrained by the defendant; and (2) The defendant acted without having reasonable grounds to believe that the plaintiff committed an offense. *Reynolds v. Menard, Inc*., 365 Ill. App. 3d 812 (1st Dist. 2006); *Toothman v. Hardee's Food Sys*., 304 Ill. App. 3d 521 (5th Dist. 1999). The individual must be aware of the confinement and mere incidental confinement without intent does not cause false imprisonment. *Hanna v. Marshall Field & Co*., 279 Ill. App. 3d 784 (1st Dist. 1996).

On November 3, 2009, the Defendants in joint action with the State intentionally confined the Plaintiff by seizing her and locking her in Maximum Security in the Cook County Jail until January 19, 2010 as part of the conspiracy to prevent the Plaintiff from filing her EEOC case in federal court in time and to coerce her through threat and oppression to plead guilty to a criminal act months after they had in their possession evidence that she was factually innocent. The Defendants, through deception and artifice, deceived the Plaintiff and her family that the charges in the 2009 case had been dropped and that she only needed to appear in court as a final adjudication when in fact a trial was to take place and the Defendants planned on forcing her to

plead guilty. When the Plaintiff refused and demanded to see the evidence against her, Defendant Meczyk led the Court to believe that the Plaintiff, who was sitting in the court building outside the courtroom per his instructions, had absented herself in order to have a warrant issued for her arrest. When the Court questioned whether or not Meczyk had tried to contact the Plaintiff his answer was "Okay" knowing that he in fact did not call her to summon her back to court until after he ensured a warrant for her arrest had been executed (Exhibit 11). The Defendants assured that the Plaintiff did not have a bond and as a result she was confined against her will with no means of escaping her confinement and they imprisoned her knowing there was no reason or cause to believe that she had committed a criminal offense.

### 4. Establishment Clause

To withstand an Establishment Clause challenge, a state statute, policy or action must have a secular purpose; (2) must, as its primary effect, neither advance nor inhibit religion; and (3) must not foster an excessive government entanglement with religions. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d,745 (1971). There is no question that the purpose of the criminal justice system is a strictly secular purpose. All of the Defendants conspired to use the justice system as a means of strategically and unlawfully detaining the Plaintiff in order to aid the de-Judaization of Chicago Medical School and establishment of the Catholic religion at the university. The Supreme Court made the Establishment Clause applicable to the states through the due process clause of the Fourteenth Amendment. *Everson v. Board of Educ.,* 330 U.S. 1, 15 (1947) (incorporating establishment clause into the fourteenth amendment). The First Amendment's Establishment Clause prohibits the government from making any law "respecting an establishment of a religion." This clause not only forbids government from establishing an official religion, but also prohibits government actions that unduly favors one religion. Under the

41

Religion Clauses, government must guard against activity that impinges on religious freedom, and must take pains not to compel people to act in the name of any religion. In setting the appropriate boundaries in Establishment Clause cases, the government must not foster an excessive entanglement with religion and its primary effect must not be to advance or inhibit religion.

The Supreme Court has held that it must be strictly neutral towards religion. In subsequent cases, the Court used the historical analysis it had developed in *Everson* to strengthen the establishment clause test by holding that the government cannot aid religion either directly or indirectly. The Court crystallized the doctrine into a tripartite test. *Lemon v. Kurtzman* 403 U.S. 602, 613 (1971). The Court ruled that state actions must not have the purpose of advancing religion, the primary effect of advancing religion, or excessively entangle the government in religious matters. *Id.* Conversely, religious groups cannot exercise control over government. *Larkin v. Grendel's Den, Inc.* 459 U.S. 116, 127 (1982). If a state action violates any of the three prongs in the *Lemon* analysis, that action is unconstitutional. *See Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 123 (1982) (to withstand establishment clause scrutiny, all three criteria must be met); *Stone v. Graham,* 449 U.S. 39, 40-41 (1980) (per curiam) (violation of any prong requires invalidation); *Wolman v. Walter*, 433 U.S. 229, 235-36 (1977) (each prong must be met); *Committee for Pub. Educ. v. Nyquist*, 413 U.S. 756, 772-73 (1973) (mandatory to pass each prong). The government must have a secular purpose to justify its actions, if a court does not believe the secular purpose proposed by the state, it will attempt to discern for itself the state's "actual" intent. *See Stone v. Graham*, 449 U.S. 39, 39 (1980) (per curiam) (looking beyond avowed secular purpose of state action to action's "plainly" religious purpose); *Epperson v. Arkansas,* 393 U.S. 97, 107 (1968) (finding religious purpose for state prohibition on evolution instruction); *Gilfillan v. City of Philadelphia*, 637 F.2d 924, 930 (3d Cir. 1980) (characterizing city's stated secular purpose

as suspect and finding its action to be religiously motivated), *cert. denied,* 451 U.S. 987 (1981);

*Hall v. Bradshaw*, 630 F.2d 1018, 1020 (4th Cir. 1980) (rejecting state's argument that prayer on

state map had secular purpose and finding religious purpose).

To determine if the state has excessively tangled with religion, the Court must look at the

character and purposes of the institutions' benefits, the nature of the aid, and the resulting

relationship between church and state. The Supreme Court has delineated two types of

entanglement: administrative and political. *See Lynch v. Donnelly*, 465 U.S. 668, 684 (1984)

(distinguishing between administrative and political entanglement). Relevant to this case is

political entanglement which concerns the divisiveness engendered in communities affected by the

church-state relations in addition to the political hegemony of Catholics in the government relevant

to this case. *See Larson v. Valente*, 456 U.S. 228, 254-55 (1982) (noting that discriminatory

administration of religious solicitation engenders religious politicization); *Meek v. Pittenger*, 421

U.S. 349, 372 (1975) (discussing political fragmentation); *Committee for Pub. Educ. & Religious*

*Liberty v. Nyquist*, 413 U.S. 756, 797 (1973) (discussing divisive political consequences of state

assistance to parochial schools); *Lemon v. Kurtzman*, 403 U.S. 602, 622 (1971) (noting that first

amendment was written to prevent political divisiveness along religious lines); *Everson v. Board*

*of Educ.*, 330 U.S. 1, 8-9 (1947) (discussing political conflicts arising from religion).

### a.     Religion Clauses Contrary to Catholic Doctrine

In 1965 a Roman Catholic document on religious freedom *Dignitatis humanae* emphasized

that people must not be coerced in matters of religion. Though intended to address support for

religious freedom, it does not reflect the Lockean concept of "inalienable rights" to religious

freedom, or rights inherent to the individual. Rather, the source of the "civil right" resides with the

Church itself. In other words, religious freedom is only embraced by the Catholic Church when it

furthers its own interests. When the "political winds" change and the Church has secured a hegemonic domination in the government of a society, religious freedom is "granted" to citizens based on the rights the Church decides to afford as opposed to those enshrined in the Constitution.[10] In other words, in a society where the Church dominates the state, citizens are under the coercion of the Church but may be granted "immunity from coercion."[5]

### b. Catholic Hegemony in State and Federal Government

In 2005, not only did a return to pre-1965 positions towards the Jewish people occur abruptly with the selection of Pope Benedict XVI, but the anticipation of the first Catholic Vice President was already almost assured. In 2009 when the Plaintiff was arrested repeatedly on false charges and denied her Constitutional rights, the Catholic Church had achieved a complete dominance in all branches of the government at the federal, state and local levels. At the federal level, the Church was represented by the Vice President, by five out of nine Supreme Court Justices and with a plural majority and Speaker of House in the legislation. At the Illinois State level, the Church was represented at the executive level by Governor Pat Quinn, the judicial level by State Attorney General Lisa Madigan and by her father as Speaker of the House in the legislation. At the local level, Richard Daley controlled the executive branch of a nearly continuous half-century of his own family's domination Chicago, Todd Stroger, a Catholic[11] and alumnus of the historic Black Catholic Xavier University in New Orleans was President of Cook County. Catholic minion Anita Alvarez[12] had just been elected as State's Attorney and even the Assistant State's Attorney,

---

[10] Pope Paul VI. (1965). *Dignitatis humanae.* Declaration on Religious Freedom. Retrieved from: http://www.vatican.va

[11] John H. Stroger. In Wikipedia: *The Free Encyclopedia. Wikimedia Foundation, Inc*. Encyclopedia on-line. Available from: https://en.wikipedia.org/wiki/John_Stroger#Board_president. Retrieved January 19, 2016.

[12] Anita Alvarez self-described Catholic who attended "Catholic grammar school, Catholic high school [Maria, since closed], Loyola University for undergrad," (Felsenthal, C. (2016). "Anita Alvarez: I've done nothing wrong." Chicago Magazine/Chicago Tribune. Chicago, Il.)

Cathy Crowley, saw nothing corrupt about putting her Catholic faith ahead of the Constitution and only resigned in March 2013 after the Plaintiff filed for post-conviction relief at the end of January 2013 [13] (Exhibit 17).

The line that separates the Church and State through the Religious Clauses of the Constitution that protect freedom of and from religion were entirely obliterated by the joint conspiracy of the State and the Defendants in 2009 to achieve the de-Judaization of RFUMS as requisite for an alliance with and planned acquisition by De Paul University. The Defendants and the State acted in close concert with the central aim to further the predominance of the Catholic religion in education and health care; to establish the Catholic religion at RFUMS and erase all vestiges of the school's Jewish history. This was not the only objective, the other though partially defeated, was to also demolish all Jewish hospitals in Chicago which had the White House not intervened in 2010, the Defendants would have successfully used the courts to not only advance the interests of the Catholic religion at RFUMS but to destroy historical representations of Judaism in society.

### c. Defendants Subverted Constitution to Establish Catholic Religion

For the past ten years, the Plaintiff has no longer been subject to or protected by the laws of the United States but placed at the mercy of the Catholic Church. The seriousness and indeed seditiousness of these events is only further betrayed by the actions of the Defendants along with the State to habitually destroy and conceal all evidence from the 2009 criminal case. It should be of no surprise given the Plaintiff's communication of her concerns and case filings with the current White House administration that immediately following the filing of the original complaint in this

---

[13] Cathy Crowley's husband, Terry Hake, self-described as "dumb Catholic kid from the suburbs," (Keegan, A. "Inside Greylord." Chicago Tribune, Chicago, Illinois. 17 December 1989.)

case on September 14, 2015, which included the Defendants' most recent action to destroy the exonerating phone reports and attempt to keep them permanently from the Plaintiff, Arne Duncan, whose local branch in the Department of Education dismissed the Plaintiff's complaint against the school in 2009 for retaliation against her because of the EEOC case just as they were arresting her on false charges to prevent her from filing the EEOC case on time, stepped down as Secretary of the U.S. Department of Education. Catholic hegemony in the government has annihilated the line separating Church and State without even the slightest hesitation and not for any benign reason that did not injure or harm anyone. The threat to the solicitude of the U.S. Constitution and laws in a country that is becoming increasingly plural and diverse is too grave compared to the minor and perhaps rightly earned potential of anti-Catholic sentiment in the political establishment to ensure that all Americans are represented equally under the laws and to prevent any one religious organization from asserting its supremacy through oppressive means.

## IV.   §1985(2) AND (3) CLAIMS SUFFICIENTLY ALLEGED

### A.   42 U.S.C. §1985(2)

42 U.S.C. § 1985(2) forbids two or more persons from conspiring to "injure (a) party or witness in his person or property on account of his having attended or testified" in a court of the United States. Passage of the Ku Klux Klan Act was "motivated by a desire to prevent and punish acts of terror or intimidation that threatened the attempt to create a political environment hospitable to equality." *Comment, A Construction of Section 1985(c) in Light of Its Original Purpose*, 46 U. Chi. L. Rev. 402, 405 (1979). In light of the acts of violence that threatened the sanctity of federal courts, Congress meant Section 1985(2) to protect a party based on his physical presence while attending or testifying in court; it was intended to protect against direct violations of a party or witness's right to attend or testify in federal court.

46

The longest thread of continuously abhorrent behavior by the Defendants has been their repressive conduct towards the Plaintiff to silence her in order to prevent any third parties from discovering misconduct or any civil rights violations involving the Plaintiff at LGH. In 2009, as Individual A's victimization of the Plaintiff escalated to criminal acts, so did the efforts and activities of the Defendants to cover it up.

Acting in concert with the State and other co-conspirators, the Defendants conspired to have the Plaintiff's bond revoked and have her arrested without legal excuse or probable cause on charges they had confirmed months in advance that she was factually innocent of as evident by the phone records they had in their possession on February 23 2009 (Exhibit 8). On August 14, 2009, the Plaintiff received her "Right to Sue Notice" from the EEOC and faxed and emailed this to Defendant Meczyk's office (Exhibit 21). On November 3, 2009, the Plaintiff while at court was forcibly grabbed and handcuffed and locked in Maximum Security with no bail to prevent her from filing her EEOC claim against LGH by the filing date of November 14, 2009. As a direct result the Plaintiff was prevented from testifying against LGH in federal court for the EEOC case against them that had been pending since 2006 and which required resolution before any approval of an affiliation between RFUMS and LGH. Immediately after November 14, 2009 while the Plaintiff was still in custody, the Defendants forced out the Department Heads from Sinai, replaced them with LGH clinical chiefs and summarily secured the approval of the long intended affiliation with LGH on March 31, 2010 (Exhibit 3). The Defendants first attempt to deny that any affiliation ever took place, "Never mind that the merger never took place," (*See* Mtn. to Dismiss, Dkt.#31) even though this is well documented (Exhibit 14). On January 5, 2016, after being confronted by the facts of the Plaintiff's wrongful arrest and conviction, Defendants' counsel William McErlean boasted "Well, we got the affiliation approved." (Tr. January 5, 2016).

47

For the purposes of a § 1985(2), a person is deemed to have attended court from the time a complaint is filed. *Kimble v. D.J. McDuffy*, 623 F. 2d 1060, 1068 (5th Cir. 1980). The Court has rejected the narrow reading of the phrase "attended or testified" that required actual physical presence in a courtroom. According to the Court, Congress enacted § 1985(2) clause one "in order to protect the sanctity of federal court proceedings and prevent miscarriages of justice" The court concluded that "Congress undoubtedly intended to protect the whole course of justice" beginning with the moment a party files. *Id.*

### 1.    §1985(2) is not Duplicative of Title VII Retaliation Claim

We are not concerned that certain federal statutes already provide remedies for such injuries incurred by retaliation against Title VII claims. *See*, e.g., Labor Management Relations Act, 1935, section 8(a)(1) (unfair labor practice to interfere with exercise of section 7 rights); Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) (unlawful employment practice to discriminate against someone for participating in enforcement proceedings); Migrant and Seasonal Agricultural Worker Protection Act, ante, 29 U.S.C. § 1855 (prohibiting discrimination for filing suit under the act). Passing any question of double recovery, this case is not improper duplication. First, subsection §1985(2) applied to "conspiracies," not to individual actions, and second, the Civil Rights Acts often parallels federal statutory rights. *See Maine v. Thiboutou*, 1980, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed. 2d 555.

In *Bowie* the Court found that the plaintiff's §1985(2) claim for "knowingly and willfully conspire[d]" to "obstruct [his] testimony before a Federal Court" involving an EEOC Title VII claim was not foreclosed because it would be covered by Title VII. *See Bowie v. Maddox*, 642 F.3d 1122 (D.C. Cir. 2011). The reasoning of the lower court that was reverse in Bowie was that, like the Plaintiff in this case, an at-will employee does not have a right to continued employment

but only the right "'to not be retaliated against, which is covered by the Title [VII].'" *Id.* §1985(2) is not coterminous with retaliation claims that are based on racial, ethnic or other discrimination cognizable under Title VII, or claims of retaliation for the invocation of Title VII rights. As in Bowie, this §1985(2) claim "specifically allege[s] a conspiracy to deter [plaintiff] from testifying . . . in federal court. The corresponding right is created by §1985(2), not Title VII." *Id. See Irizarry v. Quiros*, 722 F.2d 869, 872 (1st Cir. 1983) ("The instant facts fall within section 1985(2)'s prohibitions. Plaintiffs have proved that they were denied reemployment because they previously had instituted legal actions to vindicate their federal rights. Defendants' conduct was obviously designed to intimidate and deter, and plaintiffs clearly were 'injured' in their 'person or property'") and *Portman v. County of Santa Clara*, 995 F. 2d 898, 909–910 (CA9 1993).

In order for the Plaintiff to have filed under Title VII for retaliation she would have needed to have proven that she was actually innocent of the charges that were brought against her. Due to the Defendants' interference with her access to the courts and continued acts in furtherance of the conspiracy to conceal Individual A's crime, proving her innocence in court through a collateral attack on the conviction has been foreclosed on and thereby the means to be able to vindicate her Title VII rights as a retaliation claim.

Since RFUMS made the permanent decision to bar the Plaintiff from applying to residency programs, a requirement for medical licensure, the only way the Plaintiff would had been able to practice medicine in 2009 or ever would have been to be reinstated to LGH which would have been achieved and had already been offered by LGH counsel through the EEOC case which the Defendants unlawfully and through force obstructed. In 2015, the Plaintiff can neither be reinstated nor can she apply for other residency positions, both as a result of the direct actions of the Defendants. In many more ways than one the Defendants have caused permanent injury to the

Plaintiff. The sort of harm alleged by the plaintiff, "essentially third-party interference with at-will employment relationships— states a claim for relief under §1985(2). *Haddle v. Garrison* (97-1472) 525 U.S. 121 (1998) 132 F.3d 46. Such harm has long been a compensable injury under tort law, and recognized in *Truax v. Raich*, 239 U. S. 33 (1915) the Court concluded that: "The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others. The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of authority, the unjustified interference of third persons is actionable although the employment is at will." *Id.*, at 38.

### 2.    Class-Based Animus not required for §1985(2) Claims

The Defendants argue that the Plaintiff requires a class-based animus for a §1985 claim and suggest that she does not have one. While such an animus exists and will be established for 42 U.S.C. §1985(3), it does not apply to §1985(2). In *Kush*, the Supreme Court held that Congress did not intend to impose a requirement of class-based animus on persons seeking to prove a violation of their rights under section §1985(2) clause one. *Kush v. Rutledge*, 460 U.S. 719, 725 (1983). The Court first looked to the statute's language. The statutory provisions relating to the institutions and processes of the federal government did not contain any language requiring that the conspirators act with intent to deprive their victims of the "equal protection of the laws." Instead, this "equal protection of the laws" language was the textual basis for the class-based animus requirement promulgated in *Griffin*. The Court also found support for its holding in the legislative history behind section 1985(3). The "equal protection" language arose in response to objections that the "enormous sweep of the original language" vastly extended federal authority and displaced state control over private conduct. This legislative background, the Court argued, did not apply to section 1985(2) clause one because there was no doubt that the Constitution gave

Congress the power to prohibit intimidation of parties, witnesses, and jurors in federal courts. The Court concluded that "[p]rotection of the processes of the federal courts was an essential component of Congress' solution to disorder and anarchy in the southern States." *Kush v. Rutledge*, 460 U.S. 719, 725 (1983).

### 3.    Intracorporate Conspiracy Doctrine Does Not Apply

#### a.    Defendants' Criminal Conspiracy to Conceal a Crime

The Defendants have engaged in not only a civil but criminal conspiracy against the Plaintiff beginning in 2009 and continuing to date. The last overt act in furtherance of the criminal conspiracy to conceal a crime was in 2015 when Defendants Welch and RFUMS sought to destroy the phone reports from the 2009 case. To date, Individual A's sworn affidavit remains missing from the State's attorney's warehouse. When the substantive crime that is the object of the conspiracy has the intent to conceal as an element, the success of the conspiracy itself may depend on further concealment. Consequently, additional acts of concealment that facilitate the central aim of the conspiracy are in furtherance of the conspiracy. *See, e.g., United States v. Goldberg,* 105 F.3d 770, 774 (1st Cir.1997) (acts of tax evasion were "integral and self-evident part of" fraud conspiracy charged under 18 U.S.C. § 371); *United States v. Mann,* 161 F.3d 840, 859 (5th Cir.1998) (acts designed to frustrate regulatory oversight were "central" to conspiracy involving fraud within savings and loan institution); *United States v. Esacove,* 943 F.2d 3, 5 (5th Cir.1991) (acts designed to protect money laundering conspiracy against government investigation held "necessary" part of conspiracy). As a general rule, overt acts of concealment do not extend the life of the conspiracy beyond the date of the accomplishment of its main objectives. *United States v. Bornman*, 559 F.3d 150, 153 (3d Cir. 2009), citing *Grunewald v. United States*, 353 U.S. 391, 413 (1957); *United States v. Turner,* 548 F.3d 1094, 1097 (D.C. Cir. 2008).  On the other hand, the

rule does not apply when concealment, in this case of Individual A's commission of a felony crime of moral turpitude in 2009, is the main objectives of the conspiracy. *United States v. Upton*, 559 F.3d 3, 10 (1st Cir. 2009); *United States v. Weaver*, 507 F.3d 178, 185-86 (3d cir. 2007).

In *McAndrew v. Lockheed Martin Corp.,* the exception to the intracorporate conspiracy doctrine for "criminal conspiracies" was considered at length. 206 F. 3d at 1035-41. As in this case, *McAndrew* involved a federal law claim under §1985(2) "alleging a conspiracy to deter a person by force, intimidation, or threat from testifying in a federal court proceeding." *Id*. At 1035. "The only issue before [the court was] whether the intracorporate conspiracy doctrine applie[d] to and bar[red] a claim arising under Title 42 U.S.C. §1985(2)," given the "long-established conclusion that the intracorporate conspiracy doctrine does not apply to criminal conspiracies." *Id*. The court found that the plaintiff's civil law claim "necessarily alleges criminal activity in violation of 18 U.S.C. §1512 – the criminal statute prohibiting tampering with a witness – and a criminal conspiracy in violation of 18 U.S.C. §371." *Id*. At 1039. And because it could "discern no basis for drawing [a] distinction," *id*. at 1040, between a conspiracy under criminal law and a conspiracy alleging criminal activity under civil law, the court concluded that "the intracorporate conspiracy doctrine does not apply and . . . cannot shield the [d]efendants from civil liability." *id*. at 1036.

Here, like the claim of the plaintiff in *McAndrew,* Plaintiff's civil conspiracy claim "necessarily alleges criminal activity." *Id*. At 1039. Under Illinois State Law, it is a crime when a person "with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he knowingly commits any of the following acts: (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information; or (b) induces a witness having knowledge material to the subject at issue to leave the State or conceal himself; or (c)

possessing knowledge material to the subject at issue, he leaves the State or conceals himself." 720 ILCS 5/31-4 (from Ch. 38, par. 31-4. Obstructing Justice.) Illinois State Law criminalizes a person for the crime of conspiracy when "with intent that an offense be committed, he or she agrees with another to the commission of that offense . . . [and] an act in furtherance of that agreement is alleged and proved to have been committed by him or her or by a co-conspirator" as well as conspiracy against civil rights when "without legal justification, [a person], with the intent to interfere with the free exercise of any right or privilege secured by the Constitution of the United States, the Constitution of the State of Illinois, the laws of the United States, or the laws of the State of the Illinois by any person or persons, agrees with another to inflict physical harm on any other person or the threat of physical harm on any other person and either the accused or a co-conspirator has committed any act in furtherance of that agreement. (720 ILCS Sec. 5/8-2. Conspiracy and Conspiracy against civil rights).

The Plaintiff claims that the Defendants with co-conspirators both known and not yet known, obstructed justice by concealing evidence of a crime committed by Individual A, detained the Plaintiff without probable cause and continued to take actions to conceal the evidence of the crime for more than six years including removing the evidence from a government warehouse without authorization and placing protective orders with orders to destroy the evidence in bad faith. These actions of the Defendants squarely and unambiguously allege a criminal conspiracy.

The intracorporate conspiracy doctrine does not protect the Defendants here, where it is alleged that they conspired to commit criminal conduct. This conclusion is consistent with cases applying the intracorporate conspiracy doctrine to conspiracy claims arising under the federal civil rights laws. Courts in this district, for instance, have examined the doctrine extensively in relation to §1983 and §1985 conspiracies, and concluded that it does not apply when the underlying alleged

scheme involves conduct that is outside the scope of employment and at least arguably criminal. *Rawlings*, 920 F. Supp. 2d at 104 ("Where courts have recognized the doctrine, they have included an important caveat that is implicated here: for the doctrine to apply, the individual defendants must have been acting within the scope of their shared employment."). Similarly, here, the alleged conduct of the Defendants, including conspiracy to obstruct justice and conceal a crime, if accepted as true, cannot properly be characterized as a "routine business decision" or conduct within the "scope of employment" at a hospital or medical school. The intracorporate conspiracy doctrine is therefore not applicable.

### b.    Establishing Catholic Religion not part of Employment

The primary mission of RFUMS is to educate and train future health professions. The primary motive and aims of the Defendants Welch and RFUMS have not only been contrary to the priorities in health care including addressing disparities and health inequities but have been exclusively motivated by religion: to replace the Jewish history of the university and affiliation with a Jewish hospital with Catholicism. After the resignations of the CEO, Vice Chairman of Medicine/Program Director and Program Advisor from LGH in 2008, the Defendants brought in Catholic leaders to a Protestant hospital system in order to covertly push forward a Catholic agenda. It would be incredulous if the actions of Santulli, Stark and Armada were sanctioned by the United Church of Christ and Evangelical Lutheran Church which sponsor Advocate Health Care. The activities of Defendants Advocate, Armada and Skogsbergh were certainly not in the scope of their employment at Advocate which is to provide health care to patients and perhaps engage in Protestant missionary or charitable work. Certainly establishing the Catholic religion at a private university, kidnapping doctors and promoting Catholicism is not part of anyone's scope of employment at Advocate Health Care including representative legal counsel.

54

### B.    42 U.S.C. § 1985(3)

Title 42 U.S.C. § 1985(3) prohibits, in pertinent part, conspiracies undertaken "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws." As we have previously held, "an action will lie under § 1985(3) when a plaintiff is injured by a private conspiracy to interfere with his [or her] constitutional rights, so long as there is 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Colombrito v. Kelly*, 764 F.2d 122, 130 (2d Cir. 1985) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 1797-98, 29 L. Ed. 2d 338 (1971)). The Supreme Court added the "class-based animus" requirement in order to prevent § 1985(3) from being broadly--and erroneously--interpreted as providing a federal remedy for "all tortious, conspiratorial interferences with the rights of others." *Griffin,* 403 U.S. at 101, 91 S. Ct. at 1797-98; see also *Silkwood v. Kerr-McGee Corp*., 637 F.2d 743, 748 (10th Cir. 1980), cert. denied, 454 U.S. 833, 102 S. Ct. 132, 70 L. Ed. 2d 111 (1981). Several courts, including this one, have defined "class-based animus" to include discrimination based on religion. *See, e.g., Colombrito*, 764 F.2d at 130-31; *Taylor v. Gilmartin*, 686 F.2d 1346, 1357-58 (10th Cir. 1982), cert. denied, 459 U.S. 1147, 103 S. Ct. 788, 74 L. Ed. 2d 994 (1983); *Ward v. Connor*, 657 F.2d 45, 48 (4th Cir. 1981), cert. denied, 455 U.S. 907, 102 S. Ct. 1253, 71 L. Ed. 2d 445 (1982).

The Fourth Circuit has noted that "we have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Id*. Thus, Plaintiff has a "weighty burden to establish a civil rights conspiracy," and, although direct evidence of a meeting of the minds is not necessary, she "must come forward with specific circumstantial evidence that each member of the alleged conspiracy

shared the same conspiratorial objective." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (citations omitted); *Marshall v. Odom*, 156 F. Supp. 2d 525, 532 (D. Md. 2001) (citing *Hinkle,* 81 F.2d at 421).

The Defendants deprived the Plaintiff of exercising her rights enshrined in the Constitution and hindered the duty of the State through corruption from seeing that she may exercise her rights freely and protect her from violence while so doing. Instead the State with the Defendants, months after confirming that the State lacked probable cause and the Plaintiff was factually innocent of the charges against her, forcefully arrested and locked the Plaintiff in Maximum Security in the Cook County Jail after she refused to plead guilty and demanded to see the evidence against her on November 3, 2009. The Defendants knew that the Plaintiff had never been incarcerated before and purposefully had her placed in Maximum Security knowing that she would be subjected to and was subjected to repeated assaults by inmates for nearly three months. They denied her bail and threatened her with seven years' imprisonment unless she plead guilty all whilst lying to her and her family about the facts of the case to convince her she was guilty of a crime when she was not.

Privileges and immunities of citizenship such as the right to due process of law and the right to the equal protection of the laws are protected by the Constitution only against state action. *Shelley v. Kraemer,* 334 U. S. 1, 334 U. S. 13. If a state agency arbitrarily refuses to serve a class of persons -- Chinese-Americans, for example, *see Yick Wo v. Hopkins,* 118 U. S. 356 -- it violates the Fourteenth Amendment. Or if private persons take conspiratorial action that prevents or hinders the constituted authorities of any State from giving or securing equal treatment, the private persons would cause those authorities to violate the Fourteenth Amendment; the private persons would then have violated § 1985(3). In this case the Defendants conspired with the State

to deprive the Plaintiff of her rights protected by the Fourteenth Amendment as described throughout this memorandum and incorporated herein and did so out of an invidious animus to the Jewish people.

### 1.     Catholic Animus Towards Jews

42 U.S.C. § 1985(3) protects "victims of historically pervasive discrimination" and those with "immutable characteristics," see *Carchman v. Korman Corp*., 594 F.2d 354, 356 (3d Cir.), cert. denied, 444 U.S. 898, 100 S. Ct. 205, 62 L. Ed. 2d 133 (1979); *Lake v. Arnold* 112 F.3d 682, 687 (3d Cir. 1997). Theological animus of the Catholic Church towards the Jewish people has persisted for more than two millennia. The unique factor was that the Christians arrived early at the erroneous conclusion that the Jews were being divinely punished for not having come over to their way of belief. Even when religious difference had little or nothing to do with specific Christian antagonisms to Jews, it could always be alleged as the root rationale for Christian behavior.

Conflict between Jews and Christians "had a negative impact on the writers of certain parts of the New Testament . . . in several places John's gospel associates 'the Jews' with darkness and with the devil [laying the] groundwork for centuries of Christian characterization of Jews as agents of the devil, a characterization which found its way into medieval popular religion and eventually into passion plays."[14] Over the centuries the Church wrote of the Jews as "rejected people who were doomed to a life of marginality and misery . . . to wander around a despised people . . . An

---

[14] Pawlikowski, J.T. (n.d.) *Christian Persecution of Jews over the Centuries.* Catholic Theological Union, Chicago. Retrieved from: http://www.ushmm.org/research/the-center-for-advanced-holocaust-studies/programs-ethics-religion-the-holocaust/articles-and-resources/christian-persecution-of-jews-over-the-centuries

image [that has] persisted in Christian preaching, art and popular teaching for centuries to come [leading] to civil and political discrimination against Jews and in some instances to physical attacks on Jews which resulted in death."[5]  While there were some Popes of the Catholic Church who were lenient perhaps even somewhat gracious to the Jewish people, most like Pope Gregory I harbored intense animus towards them recognized by even Catholics as detestable and shocking:

> Pope Gregory employed the standard, formulaic clauses that spoke of Jews with theological animus. In those passages the terms "superstition", "vomit", "perfidia (faithlessness)", and "enemies of Christ" occur. The venom of these words is shocking. At   the same time, Tel Aviv historian Shlomo Simonsohn can write in his eight-volume collection of papal documents: "[Gregory's] practical treatment of problems connected with the presence of Jews in Christian society laid the foundations of papal Jewry policy in the Middle Ages" [15]

The "divine punishment" on the Jewish people came through a form of an endless litany of Papal Bulls issued throughout the centuries. The Papal Bulls not only revoked freedoms but placed religious and economic restrictions on Jews in Papal States including limitations or prohibitions on practicing medicine, hiring Christian nurses, restrictions to residences in ghettos and from ownership of property.  There were Papal Bulls  requiring Jews to identify themselves in their attire as with the *Cum nimis absurdum* issued by Pope Paul IV in 1555 mandating Jewish males to wear a pointed yellow hat and Jewish females a yellow badge and Papal Bulls ordering the Inquisition to torture and kill Jews suspecting of not genuinely converting to the Catholicism. Following the Holocaust during World War II, the long history of anti-Semitism in the Catholic Church appeared to enter into decline. The recognition that the madness, dehumanization, and hatred which led to the Holocaust, as with the issues brought forward by the Plaintiff against the Defendants in this case, did not occur overnight or within the span of a few years, but were the

---

[15] Shlomo Simonsohn, *The Apostolic See and the Jews: Documents, 1464–1521*. (Studies and Texts, 109.) Toronto: Pontifical Institute of Mediaeval Studies, 1990. Paper. Pp. vi, 492.

culmination of such Catholic theology, teaching and church-sanctioned action directed against the Jews simply because they were Jews. When the Nazis came on the scene in Germany they were able to draw upon the legacy of Christian anti-Judaism even arguing for the annihilation of the Jews rather than only for their misery and marginality. "Christian antisemitism provided an indispensable seedbed for the success of Nazism on the popular level."[5] It led some Christians to embrace the Nazi ideology and many others to stand on the sidelines as masses of Jews were exterminated.

In the years following the Nazi Germany Holocaust, a dispute emerged between two German Cardinals, Joseph Ratzinger and Walter Kasper, representing competing worldviews within the contemporary Roman Catholic Church with regard to Catholic-Jewish relations: "An ontological approach, represented by Ratzinger, which understands the truth to be eternal, unchanging and handed down from above, and a historical-phenomenological approach which understands human experience as dynamically shaping conceptions of the truth. These competing worldviews hold further theological implications (anthropological, Christological, soteriological, ecclesiological, and missiological) in terms of how Catholics approach and understand their relationship with Judaism."[16] In 1965, Pope Paul VI issued the *Nostra aetate* or "Declaration on the Relation of the Church with Non-Christian Religions" at the Second Vatican Council. Assuming the historical-phenomenological approach endorsed by Kasper, these documents asserted that all Jews (past or present) are not to be blamed for the death of Christ, affirms the Jewish roots of Jesus and Christianity, maintains that Jews still belong to God's Covenant, and that Jews are included in God's salvific plan. Beyond this, it also mandates Catholics to "renounce

---

[16]Pandolfo, N. (2014). Truth and Conflict in the Catholic Church: Catholic Jewish Dialogue. LMU/LLS Theses and Dissertations. Paper 143.

hatred and anti-Semitism"[17] and to engage in friendly dialogue and theological enquiry with Jews in order to "further mutual understanding and appreciation."[18] Pre-Vatican II positions of the Catholic Church endorsing "replacement theology" or "supersessionism" were tacitly repudiated. Further reforms included a revised liturgy removing the anti-Semitic language and intent of the "Tridentine Mass" or traditional Latin mass (Exhibit 6).

In 2005, the selection of Joseph Ratzinger long sympathetic to the traditionalist and right wing extremism in the Catholic community, rejuvenated and even sanctioned a return to pre-1965 positions of the Catholic Church towards the Jews; bringing extremism back into the mainstream of the Catholic community (Exhibit 6). Ratzinger's ontological perspective "does not allow him to be in anyway subject to historical events such as World War II or the Holocaust." [19] Benedict himself completely rewrote the prayer of the reformed liturgy of the Second Vatican Council with serious implications for Catholic-Jewish relations differing from Pope Paul VI's 1970 version of the prayer in that it removes positive language about the Jews. It also removes any indication of the ongoing validity of the Jewish Covenant or the inclusion of the Jews in God's salvific plan. Ratzinger has insisted that Christianity's claim to the truth is eternally valid and that the Christian faith tradition cannot, under any circumstances, be relegated to the status of one tradition among many. Pope Benedict XVI's papacy between 2005 to his abrupt resignation in 2013 was characterized by the rise in extremist right wing ultra-traditionalist dogma, the idealization of the past, and rejection of modernism and secularism (Exhibit 6). In particular, pluralism which the United States embraces, is a problem for the fundamentalist Catholic who accepts only their own one exclusive "truth." Similar to the rise of the French ultra-right wing National Front over this

---

[17] Nostra aetate #4, paragraph 7.
[18] Nostra aetate #4, paragraph 5.
[19] *See* supra 13. Pandolfo.

same time period, the Defendants' actions and decisions to de-Judaize health care and medical education in Chicago and establish the Catholic religion as the sole religious dogma of RFUMS is in many ways reactionary to the increasing diversity and changing demographics of society in America more sympathetic to anti-Jewish zealots, anti-immigrant nationalists and staunchly conservative Catholics than to mainstream views of co-religionists particularly ethnic minorities and immigrants like the Hispanic community.

## 2.     Defendants' Class Animus Against Plaintiff

The class of persons against which the conspirators' discriminatory bias is directed must be a clearly defined class. *Cameron v. Brock,* 473 F.2d at 610. A plaintiff must demonstrate a relationship between himself and the other members of the putative class in order to establish his own membership in that class. *Means v. Wilson,* 522 F.2d at 840. Further, the characteristics or attributes that define the class must (1) be the demonstrated relationship shared by the plaintiff and the other members of that class, and (2) be the motivating focus of the conspirators' discriminatory animus. *Harrison v. Brooks,* 519 F.2d at 1360. This will ensure that the class of person alleged to have been discriminated against is consistent with the specific type of injuries and wrongs which the plaintiff has alleged to have suffered. *Lopez v. Arrowhead Ranches,* 523 F.2d 924 at 928.

The Defendants primary aim was to de-Judaize the university and establish the Catholic religion as part of its exclusive alliance with De Paul. The Defendants have succeeded at this albeit through unlawful and indeed criminal means directed at injuring the Plaintiff. The Defendants' actions against the Plaintiff began as soon as she began putting together a compilation of alumni narratives to document the historic relationship between Mt. Sinai Hospital and the medical school, a narrative that the Defendants sought to erase and replace. From 2004 onwards, the obstacles to the Defendants' scheme were self-inflicted.  In 2004 after announcing decision to switch affiliation

they were placed on probation by the LCME. In 2005, their decision to terminate the Plaintiff and end her career in the middle of her residency in violation of the graduate medical education policies and in 2006 to censor a book she brought to publication with well-known Jewish alumni and academics, resulted in the resignations of the two Jewish program leaders at LGH and the CEO of the hospital in 2008. In 2009, the Defendants conspired to conceal a crime by Individual A, deny the Plaintiff due process and right to counsel, falsely imprison her and ultimately bar her access to the courts by destroying and concealing government files and evidence, as a result the White House intervened and their efforts to demolish Mt. Sinai Hospital defeated. However, the immediate results of their criminal and civil conspiracy was to secure approval of the affiliation with LGH and force out Sinai doctors which could not be undone once it was approved unless the Plaintiff was vindicated. In 2011 when the transition was complete, the affiliation with LGH was formalized and Sinai's decades in their teaching role at the medical school definitively ended (Exhibit 14). The same year of 2011, as soon as the Jewish presence was "cleansed" from the school, De Paul announced their College of Health Professions and the following year their alliance and early entry program with RFUMS was formalized (Exhibit 14). Again in 2012, RFUMS engaged in forcing out of Sinai faculty who remained at the school since the hospital was not demolished and in 2013 the school was again placed on probation until they rehired the Dean. In 2015, the Dean of the school representing the faculty who know of the Defendants' involvement in the wrongful arrest and conviction of the Plaintiff began taking steps to remove Welch from the office of the President. To protect Welch and his million dollar per year annual compensation, the Defendants corruptly persuaded a federal court judge that the exonerating evidence they knew would be proof of a crime committed by Individual A would pose a "public safety threat" if it fell into the hands of the Plaintiff. That action was sufficient exposure of their culpability that lead to

the subsequent resignation of Arne Duncan from the U.S. Department of Education for failing to investigate the school for retaliation against the Plaintiff in 2009 when she had filed a complaint with the DOE.

The invidious intent of the Defendants to deprive the Plaintiff of her rights under the laws of the United States is clear. §1985(3) provides a cause of action for damages against persons who conspire "for the purpose of depriving... [a] person or class of persons of the equal protection of the laws." The Court has long required a Section 1985(3) plaintiff to show "that some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action.'" The Defendants' hatred of the Jewish people is unquestionable as is their characteristic alignment with the extremist, traditionalist and racist fringe of the Catholic Church. All of the actions of the Defendants over the past decades have been entirely motivated by the zealous desire to erase, demolish and otherwise destroy the Jewish people with an animus and condescension so pervasive that they don't view Jews or those identified with the Jewish people as worthy of having the rights afforded to them by the Constitution and laws of the United States. These actions are consistent with more than two thousand years of history of the Catholic Church and certainly with the sudden rise in right wing extremism in the Catholic community since 2005.

Not surprisingly the CEO David Stark who was hired to push through the affiliation in 2009 attends St. Pius X congregation associated with the St. Pius X Society which is deemed a "hate group" in the United States and known for their racism, xenophobia and anti-semitism (Exhibit 6). The Defendants, as would be expected by religious extremists, have described the Plaintiff's guilty plea to a crime she was factually innocent of as "self-inflicted" even though they acted to deprive the Plaintiff of her Constitutional right to counsel, due process, access to the courts and even as recently as 2015 sought to destroy and permanently keep from the Plaintiff exculpatory

evidence guaranteeing that the Plaintiff would be a wrongfully convicted felon for the rest of her life. Perhaps in their minds the Plaintiff is being "divinely punished" and they, the Defendants, are the agents of the Almighty on this earth. Even if one were to assume this to be true, it still remains that in the United States the Plaintiff, perhaps even if forsaken by God, is still afforded a right to equal protection under the laws; including protection from "God" and "God's agents" in this case the self-designated Defendants perpetuating an animus within the Catholic Church against the Jewish people.

## V. SPOLIATION OF EVIDENCE

The Defendants have exposed their culpability repeatedly but most especially through their malevolent acts to protect themselves from the claims being brought in this claim by acting to destroy the exonerating phone reports in the Plaintiff's 2009 criminal case. Their actions, in conjunction with the State, to remove and keep from the Plaintiff evidence to clear her wrongful conviction has resulted in a permanent foreclosing that results in the Plaintiff being wrongfully convicted for the rest of her life. The consequences and damages to the Plaintiff from the Defendants' actions is incalculable.

Additionally, as intended by the Defendants, the phone reports prove that Individual A, a still practicing physician at LGH, has committed a felony crime of moral turpitude that places the safety of the students, residents and public at risk.

The duty to preserve evidence arose when there existed a potential for litigation and the party knew or reasonably should have known of that potential. The duty to preserve relevant evidence may arise before the commencement of a lawsuit if it is reasonably foreseeable that a lawsuit will be filed. The common law duty to preserve evidence arises at "the moment that litigation is reasonably anticipated." *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 645 F.3d 1336

(Fed. Cir. 2011). *Micron Tech., Inc. v. Rambus Inc.,* 645 F.3d 1311 (Fed. Cir. 2011). *Victor Stanley v. Creative Pipe*, 269 F.R.D. at 521 (D. Md. Sept. 9, 2010) (focusing on the pre-lawsuit events that triggered a bank's duty to preserve data and suspend its automatic purging process, including notice from the EEOC that it was investigating class allegations and a request for information from the commission). This moment began for the Defendants when the Plaintiff issued four third party subpoenas to AT&T and Verizon for the incoming phone numbers that called her home phone number. Such pre-litigation requests for documents arising out of similar events or circumstances triggers a duty to preserve relevant evidence. *EEOC v. JP Morgan Chase Bank, N.A.,* 2013 U.S. Dist. LEXIS 27499 (S.D. Ohio Feb. 28, 2013) When a party may be deemed to be on notice is a function of the variable chronologies along which issues develop in a lawsuit. Thus, in one case it may be a discovery request, in another the complaint, in still another correspondence prior to the filing of the complaint, that puts a party on notice that material in its custody is, or reasonably should be considered, admissible evidence which the party has a legal duty to preserve. *Abramowitz v. Inta-Bores Acres, Inc.,* No. 98-CV-4139 (ILG), 1999 U.S. Dist. LEXIS 20005, *7-8 (E.D.N.Y. Nov. 16, 1999) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)

Other courts have held that once a party knows that information may be relevant to a reasonably foreseeable claim, a duty to preserve such evidence arises. For instance, in the oft-cited *Zubalke* decision, the court found that an employer had a duty to preserve certain electronic records destroyed before an employee ever filed a charge of discrimination which would have triggered a statutory duty to preserve evidence. *Zubalke v. UBS Warburg, LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). Consequently, the court held that the duty to preserve attached at the time that litigation was "reasonably anticipated," and that the relevant people at the employer anticipated litigation months before the employee filed her charge of discrimination. In this case there was no

question that the Plaintiff fully intended to and indeed has brought the relevant claims against the Defendants.

What is more deeply concerning is that the Defendants by acting to destroy these reports took an overt act in furtherance of an ongoing criminal conspiracy to conceal Individual A's crimes and thereby exposing their culpability in all the claims being brought forward in this action as well as the allegations brought against Defendant Welch by the faculty in May 2015.

## VI.    ABUSE OF PROCESS

The Defendants contend that it is the Plaintiff who has abused process because she "initiated the prior lawsuit for the improper purpose of obtaining irrelevant information," referring to subpoenas sent for the phone reports (*See* Mtn. to Dismiss, Dkt #31).  Illinois law requires allegations of "some act in the use of legal process not proper" in order to sufficiently allege a cause of action for abuse of process and "any otherwise proper procedural act, including issuing subpoenas, cannot alone constitute an abuse of process." *Kumar*, 354 Ill. App. 3d at 165.

To state a claim for abuse of process in Illinois, a plaintiff must allege "(1) the existence of an ulterior purpose or motive and (2) the use of legal process not proper in the regular prosecution of the proceedings." *Reed v. Doctor's Associates, Inc.,* 355 Ill. App. 3d 865, 875 (2005). To satisfy the first element, a plaintiff must plead facts showing the defendant instituted proceedings against the plaintiff for an improper purpose, such as extortion, intimidation, or embarrassment. *Farwell v. Senior Services Associates, Inc.*, 2012 IL App (2d) 110669.  Under the second element, a plaintiff must show a misapplication of process or, in other words, that the process was used to accomplish some result beyond the process's purview. *Neurosurgery & Spine Surgery, Service Corp. v. Goldman*, 339 Ill. App. 3d 177, 183 (2003). When process is used only for its intended purpose, there can be no abuse of process, even if an ulterior purpose or motive is shown to exist.

66

*Id.*; *Reed*, 355 Ill. App. 3d at 875-76 (mere use of legal process, "even with a malicious intent or motive, does not alone constitute abuse of process"). To show abuse of process, the defendant must have intended to use the action to accomplish some result the suit itself could not accomplish. *Landau v. Schneider*, 154 Ill. App. 3d 875, 878 (1987). Abuse of process is not a favored tort. *Erlich v. Lopin-Erlich*, 195 Ill. App. 3d 537, 539 (1990). When analyzing whether allegations sufficiently establish an abuse of process claim, we must ignore conclusions of law or fact unsupported by allegations of specific facts. *Kumar*, 354 Ill. App. 3d at 164.

Abuse of process is defined as the misuse of legal process to accomplish some purpose outside the scope of the process itself. *Bonney v. King,* 201 Ill. 47, 50-51 (1903). The court defined abuse of process as the existence of an ulterior purpose and an act in the use of the process not proper in the regular prosecution of the proceeding. The court observed that regular and legitimate use of process, though with a bad intention, is not abuse of process. The court then pointed out that the "declaration does not aver either that the plaintiff was arrested or his property seized" and that the mere institution of civil suits does not constitute an abuse of process. *Bonney*, 201 Ill. at 51. The court further pointed out that abuse of process lies for the improper use of process after it has been issued, not for maliciously causing process to be issued. *Bonney*, 201 Ill. at 50.

The Defendants expressed their intent in 2004 to secure an approval of an affiliation with LGH. Due to long-standing controversy particularly regarding the Defendants' mistreatment of the Plaintiff including wrongfully terminating her in the middle of her one-year residency program, the LCME would not approve of the affiliation while allegations of discrimination were pending against LGH. Additionally, the Department Heads also alleged that the Plaintiff had been wrongly terminated in part because of her work on a book with them documenting the school's Jewish

history and partnership with Mt. Sinai Hospital. The Defendants instead insisted, and continue to do so, that the Plaintiff was terminated because she was harassing a member of the staff at LGH, Individual A, even though this was discredited by statements Individual A made to police in 2006 and evidence that the Plaintiff was out of country during this alleged "harassment." In 2008, the CEO, the Program Director and Program Advisor of LGH who terminated the Plaintiff from the residency position all resigned in part because of evidence that Individual A had lied to the hospital that the Plaintiff was harassing him by phone and also to cover up the endangerment of patients that resulted from his actions placing restrictions on the Plaintiff's training that substantially interfered with patient care.

On January 20, 2009 Individual A knowingly and intentionally lied to the police under oath alleging that he had received a page from and returned a call to the Plaintiff on her home landline phone while he was at his home in Northbrook, Illinois. Individual A also admitted that he was "not on-call" and at that point anyone familiar with the routine habits and procedures of hospital on-call policies would know that he was lying and at a minimum the requisite intent for charging the Plaintiff with witness harassment and telephone harassment was not met. Putting that aside, on February 23, 2009 the Defendants had the Plaintiff's call detail record for the date in question and knew that none of the phone calls were made or could have been made by Individual A because none of them were. One call was made by Defendant Meczyk, then the Plaintiff's criminal defense attorney, and the other by the physician scheduled to be on-call from an LGH landline phone that Defendants Advocate, Armada and Skogsbergh would recognize as a phone on the premises of their own hospital. Unlike the Plaintiff the Defendants did not need a subpoena to authenticate the incoming calls to come to the conclusion that Individual A had committed a serious crime consistent with his previous false allegations against the Plaintiff. Instead of dropping the charges

against the Plaintiff and bringing criminal charges against Individual A, the Defendants instead used the court's jurisdiction over the Plaintiff to have her physically seized on November 3, 2009 and detained without bail in Maximum Security to achieve two purposes not intended by the justice system: (1) to intimidate her and her family and coerce her to plead guilty to harassing a staff member at LGH thereby vindicating LGH and absolving LGH of wrongfully terminating her and (2) to prevent her from filing her EEOC case by November 14, 2009 thereby causing the case to be obstructed so that they could replace the Sinai Chairmen with LGH staff and secure approval of the affiliation with LGH. There is no more needed to say at this point in support of this claim.

## VII.    TORTIOUS INTERFERENCE WITH A CONTRACT

The elements of a cause of action for tortious interference with contract are: (1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) an intentional unjustified inducement to breach the contract; (4) a subsequent breach by the third party; and (5) damage to the plaintiff as a result of the breach. Additionally, the defendant's interference must be directed toward a third party. *Douglas Theater Corp. v. Chicago Title & Trust Co*., 288 Ill. App. 3d 880, 888-89 (1997). This cause of action is an intentional tort and plaintiff must show the defendant acted with the purpose of injuring plaintiff's expectancies. *J. Eck & Sons, Inc. v. Reuban H. Donnelley Corp*., 213 Ill. App. 3d 510, 513 (1991). See *Hannigan v. Sears, Roebuck & Co*., 410 F.2d 285, 291 (7th Cir.), cert. denied, 396 U.S. 902 (1969); *Candalaus Chicago, Inc. v. Evans Mill Supply Co*., 51 Ill. App. 3d 38, 47, 366 N.E.2d 319, 326 (1st Dist. 1977). See generally *Developments in the Law-Competitive Torts*, 77 HARV. L. REV. 888, 959-69 (1964).

Every lawyer the Plaintiff has hired since 2008 to work on the 2009 criminal case from Defendant Meczyk through to 2015 has been tortiously interfered with by the Defendants. By its

very nature, circumstantial evidence often involves linking what may be apparently insignificant and unrelated events to establish a pattern; and in this case a clear repetitive pattern has been established all directed towards ensuring that the authentication of the incoming calls to the Plaintiff's landline phone on January 20, 2009 remains out of the Plaintiff's reach permanently. Even though six years of these efforts by the Defendants have failed, the ongoing conspiracy to conceal Individual A's crime has substantially injured the Plaintiff with extraordinary financial and personal costs. The first contract interfered with was with Defendant Meczyk which is self-explanatory. Meczyk acted to protect Individual A from criminal charges and coerced the Plaintiff to plead guilty though he possessed evidence that she was innocent. With assistance from the State's Attorney Alvarez in 2011, Meczyk threatened and intimidated the Plaintiff with arrest when her lawyers attempted to get her case file from him and continued to conceal and destroy evidence in the 2009 case. In 2014, Nishay Sanan was hired to represent the Plaintiff in her post-conviction case. All he was required to do was authenticate the two incoming phone calls to her on January 20, 2009 which she had already secured by a subpoena for her call detail. These reports would show the only numbers that called her on January 20, 2009 were from a landline in Park Ridge and from Defendant Meczyk's cell phone; thereby exonerating her from the 2009 criminal case. Instead Mr. Sanan submitted a clearly forged questionable document to the court that the landline call was actually a hospital mobile phone to lead the presiding Judge to believe that Individual A's police reports were truthful, as a result, the Plaintiff's post-conviction relief petition was dismissed. In 2015 the Plaintiff filed in federal court against Defendant RFUMS and had her lawyer issue subpoenas for the phone reports for the 2009 criminal case. Defendant RFUMS moved to quash these subpoenas but was unsuccessful on July 1, 2015 ("Minute Order Entry," Dkt. #22, 15-cv-3806). On July 10, 2015, Defendant Meczyk appeared to quash but was unsuccessful (*See* Mtn to

Intervene, Dkt.#24, *Uppal v. Rosalind Franklin University of Medicine & Science,* No.15-3806, (N.D.I.L. August 26, 2015)). The Defendants had a protective order placed with orders to destroy the records, records that are exonerate the Plaintiff. The Plaintiff's attorney agreed to the protective order never discussing any of this with the Plaintiff and it was entered "unopposed" (*Id.* Dkt. #42). It was later revealed that in exchange for participating in a six year conspiracy to conceal Individual A's crime and obfuscating the Plaintiff from ever getting her hands on this exonerating evidence, William McErlean arranged for a higher paying job for Plaintiff's counsel which he accepted and notified the Plaintiff of in October 2015. The Plaintiff's lawyer, who had been with the previous law firm for several years, was bribed into abandoning his client and ensuring she would never be able to prove the facts supporting these claims against the Defendants as well as her actual innocence. Every lawyer has acted to conceal Individual A's crimes even though they were hired to exonerate the Plaintiff; every single lawyer. State's Attorney Anita Alvarez in 2010 admitted that then general counsel for RFUMS and long-time Daley city hall lead counsel Patricia Bergeson was in "continuous contact" with her directing her in the 2009 criminal case and undoubtedly since then. Defendant Meczyk was paid $70,000 for simply producing phone reports to clear the Plaintiff of all criminal charges and permanently shut the door on years of victimization and false allegations by Individual A and instead did the exact opposite. It is well documented that every lawyer has intentionally worked against the Plaintiff and in the interest of the Defendants without any known preexisting conflicts of interest. Nothing further is needed to support the claim of tortious interference.

The Defendants' actions have resulted in the Plaintiff being wrongfully convicted, have foreclosed on any legal remedies or relief for her wrongful conviction and have cost her hundreds of thousands of dollars in retainers she has paid to lawyers who are immediately "tapped on the

shoulder" by the Defendants and instructed or, as William McErlean has described, "guide[d]" to ensure that the facts and evidence of the claims being brought in this case against them which is inclusive of a criminal conspiracy to conceal a crime, remains concealed. *Id.*

The Defendants also contend that the claim for tortious interference of a contract should be barred by *res judicata*. It is not clear how such a permanent bar on a general contract tort would be possible as it would translate that the Defendants would be permanently immunized from accountability for their unending interference in the Plaintiff's legal cases. The Defendants have successfully exploited their far-reaching political clout to continuously corrupt the government processes, the Plaintiff's counsels and to protect, sustain and maintain their interests at the expense of the Plaintiff's career in medicine and indeed her entire life.

## VIII.   UNJUST ENRICHMENT

The Plaintiff was admitted to Chicago Medical School in 2001. At that time and for decades prior to then the school had functioned in partnership with Mt. Sinai Hospital with a clearly stated philosophy including a rejection of discrimination based on gender, race or religion. It was not possible for the Plaintiff to anticipate that the when she graduated four years later a new administration would take an entirely different direction and retroactively strip alumni of degrees because of their religion or because they published books that didn't comport with the traditionalist Catholic positions of the new administration. When medical students begin their studies there is an expectation that they will eventually be able to afford to pay off their large medical school debts based on the earning potential of practicing physicians. Had the Plaintiff foreseen the events that have occurred after she already accepted admission and enrolled at Chicago Medical School, she would not have accepted admission at Chicago Medical School and would have enrolled at a

different medical school and there is no question that she would be practicing medicine today had she not attended this school at the time she did to no fault of her own.

The retention of the Plaintiff's tuition fees that she paid the school given the malevolent, unconstitutional and criminal acts of the Defendants against the Plaintiff to ensure that she will never practice medicine or any profession violates fundamental principles of justice, equity and good conscience. That any educational institution would indebt a student so significantly and then act to ensure their degree would be worthless including falsely imprisoning them, wrongfully convicting them of a crime and then maliciously destroying all the exculpatory evidence, quite frankly shocks the conscience.

To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989). Unjust enrichment is not an independent cause of action. *Martis v. Grinnell Mutual Reinsurance Co.,* 388 Ill. App. 3d 1017, 1024, 905 N.E.2d 920, 928 (2009) (citing Mulligan v. QVC, Inc., 382 Ill. 2d 620, 631, 888 N.E.2d 1190, 1200 (1989)). Rather, "it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence" (internal quotation marks omitted) (*Alliance Acceptance Co. v. Yale Insurance Agency, Inc.,* 271 Ill. App. 3d 483, 492, 648 N.E.2d 971, 977 (1995)), or, alternatively, it may be based on contracts which are implied in law (*Perez v. Citicorp Mortgage,* Inc., 301 Ill. App. 3d 413, 425, 703 N.E.2d 518, 526 (1998)). This theory is inapplicable where an express contract, oral or written, governs the parties' relationship. *Id.*

73

The Defendants argue that this claim is barred by *res judicata* based on a prior case that was dismissed; however that case was based solely on a breach of fiduciary duty in the absence of any oral or written contracts with the Defendants and their decision in 2008 to no longer allow the Plaintiff to apply for residency programs which is a requisite for being able to practice medicine. For one, it is clear that not allowing the Plaintiff to apply for residency programs was not the only action the Defendants took to keep the Plaintiff from utilizing her medical degree and it is these other actions with entirely different operative facts that the current action is based. Even if the Plaintiff was not allowed to apply for residency, if she were not wrongfully convicted of a felony she could pursue a different profession and still be able to pay off her medical school debts. The actions of the Defendants have ensured that this option is also no longer possible by continuously and maliciously concealing and destroying exculpatory evidence the Plaintiff needed to clear her criminal record even after all legal relief and remedies were foreclosed.

Additionally, it is not clear that the unjust enrichment claim was ever addressed in the prior case (*See* Dkt. #40, *Uppal v. Rosalind Franklin University of Medicine & Science*, No. 15-3806, (N.D.I.L. August 26, 2015)). On review it does not appear that any unjust enrichment claim is even considered or mentioned or ruled upon by the court. *Id*. The reason is because the unjust enrichment claim appeared as Count II in the original complaint of the older case (*See Id.* at Dkt.#1). For some reason the unjust enrichment was not included in the amended complaint (*See Id*. Dkt. #12). Therefore the unjust enrichment claim was never dismissed with prejudice, is based on an entirely different set of operative facts in this case and is not barred by *res judicata*. This claim also could not have been raised in the other case as the Defendants acted corruptly to have the Plaintiff's counsel abandon her and accept employment arranged for by them.

## IX.    TRESPASS OF CHATTELS

The movant bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The Defendants' response to the allegation of unauthorized access, use, abuse and interference of the Plaintiff's computer and private email accounts by them is that the U.S. Department of Education ("DOE") dismissed the Plaintiff's complaint in 2013 and therefore they are absolved of the allegation. As will be explained in what follows this is just as an erroneous conclusion as the Defendants' attempt to claim that the Plaintiff was not wrongfully convicted because her post-conviction relief petition was dismissed before the exculpatory evidence which they themselves acted to destroy was available to her. Secondly, the Defendants state "Plaintiffs [sic] claim fails because she has not alleged that the University 'intentionally dispossessed [her] of [her] chattel and that the dispossession resulted in damages as necessary to state a claim,'" relying on only one case citation: *Richmond ex rel Liberty Inst. Trust v. Nat'l Inst. of Certified Estate Planners*, 2006 WL2375454, at *6 (N.D. 111. Aug. 15, 2006). The case the Defendants rely on is a trust case that has nothing at all to do with nor can be considered analogous to the claim involving computer technology being brought against them. Lawsuits involving computer technology are burgeoning and there is considerable case law in support of the Plaintiff.

The DOE's dismissal of the Plaintiff's complaint is insufficient to absolve the Defendants of wrongdoing for three main reasons: (1) the DOE did not address the computer tampering and subsequent denial of service attacks that took place in September and November 2013 ("We are only investigating the issue of the 'email bombs' and not any possible hacking of your email account," Exhibit 22). (2) the statements that a malicious denial of service attack was a "technical glitch" was a lie determined by a computer forensic evaluation of the Plaintiff's account as well as

subsequent denial of service of attacks caused by emails sent from the Plaintiff's email by two agents at RFUMS, information technology directors Ian Szekeres and Amanda Hodgson, that the DOE never investigated or considered. (3) Defendants depend continuously and heavily on previous decisions against the Plaintiff to shield themselves even though it is common knowledge that they themselves directly caused or influenced through political means and pressure these decisions including those of the State and Defendant Meczyk in the 2009 criminal case. These repeated references to government agencies that have failed the Plaintiff has only revealed the scope of their reach and extent to which they have acted to harm and injure the Plaintiff through various branches of the local state and federal government. It is also the reason why for nearly a year the Plaintiff has been in continuous communication with the White House administration to assist her in addressing the Defendants' corruption of local government agencies and branches. The Plaintiff forwarded the original complaint she filed on September 14, 2015 to White House advisors when she filed in federal court. A review of the evidentiary support for the claims against the Defendants including trespass of chattels bared the extraordinary negligence of the DOE's Chicago branch for failing to investigate and improperly dismissing complaints by the Plaintiff in 2009 and 2013. As a result of these revelations, Arne Duncan resigned his position as Secretary of the U.S. Department of Education.[20]

There is state law, the Illinois Electronic Mail Act, which bars spam. The Federal Computer Fraud and Abuse Act also makes illegal actions which interfere with the proper functioning of Internet service providers. Illinois Statute for Computer Tampering states "(a) A person commits computer tampering when he or she knowingly and without the authorization of

---

[20] Acosta, J., Liptak, K., & Scott, S. (2 Oct. 2015). "Education Secretary Arne Duncan stepping down." www.cnn.com. Retrieved from: http://www.cnn.com/2015/10/02/politics/arne-duncan-resigns-education-secretary-obama/

a computer's owner or in excess of the authority granted to him or her: (1) Accesses or causes to be accessed a computer or any part thereof, a computer network, or a program or data; (2) … obtains data or services; (3) …and damages or destroyed the computer or alters, deletes, or removes a computer program or data; . . . (5) Falsifies or forges electronic mail transmission information or other routing information in any manner in connection with the transmission of unsolicited bulk electronic mail through or into the computer network of an electronic mail service provider or its subscribers . . . (b) Sentence. (1) A person who commits computer tampering as set forth in subdivision (a)(1) or (a)(5) . . . is guilty of a Class B misdemeanor . . . (4) If an injury arises from the transmission of unsolicited bulk electronic mail, the injured person, other than an electronic mail service subscriber, may also recover attorney's fees and costs, and may elect, in lieu of actual damages, to recover the lesser of $10 for each unsolicited bulk electronic mail message transmitted in violation of Section, or $25,000 per day . . . (6) The provision of this Section shall not be construed to limit any person's right to pursue any additional civil remedy allowed by law" (720 ILCS 5/17-51).

The actions of the Defendants clearly violate the Computer Tampering statute of Illinois and trespass of chattels is an appropriate civil action. A denial-of-service ("DOS") attack is the intentional programming of an email receiver to create a loop which results in the sending of a large volume of spam e-mails. Although spammers try to mask their identities, including the origins of their emails to obscure their physical locations with "IP spoofing" as in this case, the allegations in this claim are not reliant on just information and belief. The Defendants, on two different occasions, sent over 14,000 pages of e-mails through the Plaintiff's private server. This began after a long and intentional suspension of communication with the school by the Plaintiff

ended when she learned there was a new Dean and attempted to discuss her long-standing concerns over her records with him.

On August 2, 2013, after sending an email regarding her transcripts to the then Dean Russell Robertson, MD, the Plaintiff was shocked to find that her email was flooded with hundreds of "denial of service" emails caused by a loop created by Ian Szekeres and Amanda Hodgson bouncing the Plaintiff's email back and forth repeatedly to send unsolicited bulk spam to the Plaintiff's account. The signatures for this loop creation were attributed to the RFUMS official email accounts ian.szekeres@rosalindfranklin.edu and amanda.hodgson@rosalindfranklin.edu. The Plaintiff filed a complaint with the DOE. While the complaint was still processing, the Plaintiff received notification from her Yahoo email server that her account had been logged into from a computer in Eastern Europe at 9:47 am on September 10, 2013. At 9:53 am the password to her yahoo email account was changed and subsequent investigation revealed that at 9:53 am an email was sent from the Plaintiff's illegally accessed account to ian.szekeres@rosalindfranklin.edu. Sending an email from the Plaintiff's account to the school triggered the same "denial of service" attack that was set up previously with the email amanda.hodgson@rosalindfranklin.edu causing over 14,000 pages of e-mails to flood the Plaintiff's private account (Exhibit 22). Even though the Plaintiff brought this to the attention of the DOE, they did not investigate it and did not take it into account when they concluded that they "found credible the University's explanation that the delivery failure message was in fact an unintended consequence of the re-routing of the emails . . . and the information shows that the University responded to and attempted to end the technical problem upon learning of it" (Exhibit 22). The Defendants lied to the DOE under the belief that because they were not questioned about the second DOS attack neither the DOE nor the Plaintiff were aware of it when in fact the DOE simply did not address it. The second unsolicited bulk mail

did not result from an email sent by the Plaintiff to the school but by an email sent by the Plaintiff's email account to ian.szekeres@rosalindfranklin.edu after her account was accessed without authorization resulting in the exact same DOS attack as the one they admitted to being at fault for. This is not unintentional and it is not a "technical glitch." After the DOE questioned the IT directors at the school solely about the August 2, 2013 spam, the Defendants realized that the Plaintiff was no longer silently taking abuse from them as she had done for years and believing their second DOS attack had not yet been noticed, they then attempted to erase the evidence of the second DOS attack in September 2013 by trying again to illegally access the Plaintiff's account on November 5, 2013 (Exhibit 22). Due to their prior criminal trespass, Yahoo security services had been monitoring the Plaintiff's email and temporarily locked it preserving the evidence that the Defendants illegally accessed, tampered with and interfered with the Plaintiff's private email and computer and lied to the investigators with the DOE before attempting to cover it up (Exhibit 22).

The Illinois Law and Practice Treatise states, "An injury to or interference with possession, with or without physical force, constitutes a trespass to personal property." ILLINOIS LAW PRACTICE, §3, Trespass to Personal Property. According to the Restatement of Torts, there are two ways to commit this tort: "A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." RESTATEMENT (SECOND) OF TORTS, §217. Harm to the personal property or diminution of its quality, condition, or value as a result of a defendant's use can also result in liability. RESTATEMENT (SECOND) OF TORTS, §218(b).

The repeated and abhorrent criminal actions of the Defendants that sent thousands of continuously bulk emails to the Plaintiff's email account resulted in not only barring the Plaintiff's

access to her email accounts but slowed her Internet connection by over-burdening the ISP's resources thereby diminishing and at one point even halting her computer's functioning. The trespass into and use of the Plaintiff's account by sending emails to the school under her name given the long-standing legal posture of the Plaintiff with the Defendants is particularly grievous. Confidential communications with attorneys, personal and private communications included those related to issues with the school and documents saved and sent through the Plaintiff's email has all been compromised.

The Plaintiff's allegations in the instant case are analogous to harms alleged by the plaintiff in *Sotele v. Directrevenue* where the Court denied the defendants' motion to dismiss they based on the claim that the plaintiff "fail[ed] to plead causation and damages as required to state a trespass to personal claim" 384 F. Supp.2d 1219 (N.D. Ill. 2005). The Court found the case was similar to the "ISP plaintiffs in the *CompuServe* line of cases. Simply put, plaintiff alleges that Spyware interfered with and damaged his personal property, namely his computer and his Internet connection, by over-burdening their resources and diminishing their functioning. Accordingly, the court denies DirectRevenue's motion to dismiss" *Sotelo v. Directrevenue*, 384 F. Supp.2d 1219 (N.D. Ill. 2005).

The Plaintiff here does not allege her "property" is in Defendants' possession or has been rendered entirely worthless, but rather that it was interfered with. *See W. Prosser W. Keeton, Torts* § 14, 85-86 (5th ed. 1984) ("[The claim of trespass to personal property's] chief importance now, is that there may be recovery . . . for interference with the possession of chattels which are not sufficiently important to be classified as conversion. . . ."); *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015,1022 (S.D. Ohio 1997) ("A plaintiff can sustain an action for trespass to chattels, as opposed to an action for conversion, without showing a substantial interference with

its right to possession of that chattel."). A series of federal district court decisions, beginning with CompuServe, Inc., has approved the use of trespass to personal property as a theory of liability for "spam e-mails" sent to an Internet service provider ("ISP") based upon evidence that the vast quantities of spam e-mail overburdened the ISP's own computer and made the entire computer system harder to use for computer users, the ISP's consumers. *See also America Online, Inc. v. IMS*, 24 F. Supp. 2d 548 (E.D. Va. 1998); *Hotmail Corp. v. Van Money Pie Inc*., 1998 WL 388389 (N.D.Cal. Apr. 16, 1998); *America Online, Inc. v. LCGM, Inc*., 46 F. Supp. 2d 444 (E.D.Va. 1998); *America Online, Inc. v. Prime Data Systems, Inc*., 1998 WL 34016692 (E.D.Va. Nov. 20, 1998). Although the above cases do not apply Illinois law, the law regarding trespass to personal property applied is substantially similar to that used in Illinois. Even though those cases focused on ISP (Internet Service Providers) as opposed to private computer users like the Plaintiff, Illinois Court "reviewed this distinction and concluded that 'The elements of trespass to personal property — interference and damage — do not hinge on the identity of the plaintiff, and the cause of action may be asserted by an individual computer user who alleges unauthorized electronic contact with his computer system that causes harm, such as Spyware.'" *Sotelo v. Directrevenue,* 384 F. Supp.2d 1219 (N.D. Ill. 2005).

Several courts have granted preliminary injunctions to plaintiffs who have alleged that their computer equipment and systems were impaired in similar ways to the Plaintiff, finding that the harm alleged could state a trespass to chattels claim. For example, in *CompuServe*, the defendant was in the business of sending bulk unsolicited e-mail advertisements, "spam," to subscribers of *CompuServe*, 962 F. Supp. 1015. The *CompuServe* court held the element of damage to the system could be established by the fact that the "multitudinous electronic mailings demand the disk space and drain the processing power of plaintiff's computer equipment," and impose added

81

inconvenience and Internet connection costs on CompuServe's customers. 962 F. Supp. at 1022; see also *Hotmail,* 1998 WL 388389, at *7 (defendant transmitted tens of thousands of misdirected, unauthorized e-mail messages to plaintiff, thereby filling up the plaintiff's computer storage space, threatening to damage the plaintiff's ability to service its legitimate customers, and adding to the plaintiff's personnel costs). In this case, the Defendants transmitted tens of thousands of emails through two separate denial of service attacks resulting in over 14,000 pages of unsolicited bulk emails by tampering with and gaining unauthorized access to her personal computer. Plaintiff has sufficiently pleaded a claim for trespass of chattels against the Defendants.

## X.    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

To prove negligence, a direct victim must establish duty, breach, causation, and damages. *Corgan,* 143 Ill. 2d at 306; *Parks v. Kowancki*, 193 Ill. 2d 164 (2000). A direct victim does not need to prove that the emotional distress manifested itself in a physical symptom such as an injury or illness. *Corgan*, 143 Ill. 2d at 312. A direct victim only needs to prove that he or she suffered an immediate or instinctive emotional response which was severe or extreme, or a long lasting traumatic neurosis which was severe and extreme, or both. *Corgan*, 143 Ill. 2d at 311.

Under Illinois law, it is well-settled that there is generally no duty to protect others from the criminal acts of third parties. *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 531 N.E.2d 1358 (1988); *Jackson v. Shell Oil Co*., 272 Ill. App. 3d 542, 650 N.E.2d 652 (1st Dist. 1995). However, some commentators have criticized the concept of duty and have pointed out that "`duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Prosser*, Torts sec. 53, at 325-26 (4th ed. 1971). A person engaging in conduct that creates risks to others, however, has a

duty to exercise reasonable care to avoid causing them physical harm. Restatement (Third) of Torts § 6, cmt. b (2010); *Karas v. Strevell*, 227 Ill. 2d 440, 451, 884 N.E.2d 122 (2008) ("every person owes a duty of ordinary care to guard against injuries to others"). The general rule is that one must act as would a prudent and reasonable person under the circumstances. Restatement (Third) of Torts § 7, *Reporter's Note*, at 85 (2010) (and cases cited therein).

Whether a duty exists and, if so, the nature of that duty must be determined by the courts as a matter of law. *Marshall v. Burger King Corp.*, 355 Ill. App. 3d 685, 688 (2d Dist. 2005). The relationship of the parties to each other determines the duty owed by one to another. *Ziemba v. Mierzwa*, 142 Ill. 2d 42, 47 (Ill. 1991)(stated in dicta). In determining whether a duty exists under given circumstances, a court will consider the likelihood of injury, the foreseeability of that injury, the magnitude of the burden of eliminating or guarding against the risk, and the consequence of placing that burden on the defendant. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 526 (Ill. 1987); *Largosa v. Ford Motor Company*, 303 Ill. App. 3d 751, 754 (1st Dist. 1999). The question of whether a duty exists is ordinarily a question of law for the court to decide.

Whether a Defendant's conduct creates a risk of harm to others sufficiently foreseeable is a question of law because the existence of a duty does not arise solely from the relationship between the parties, but also from the need for protection against reasonably foreseeable harm. The substantial factor test is the standard by which a defendant's conduct will be deemed a cause of the plaintiff's injuries: The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm. Restatement (Second) of Torts §431 (1965).

The injury sustained by the Plaintiff that has given rise to this claim against the Defendants is that she has been wrongfully convicted of a felony crime. Repeatedly the Defendants have attempted to describe this injury as "self-inflicted" and convince the Court that the Plaintiff is trying to "blame others for her own . . . criminal misbehavior . . . including two criminal harassment convictions upon her own guilty plea" (Mtn. to Dismiss, Dkt. #31). That the injury was sustained when the Plaintiff plead guilty does not absolve the Defendants. It is a "well-established principle of tort law that the particular manner or method by which a plaintiff is injured is irrelevant to a determination of the [defendant's] liability for negligence." *Nelson v. Commonwealth Edison Co*., 124 Ill. App. 3d 655, 660, 465 N.E.2d 513, 517 (1984). *Colonial Inn*, 288 Ill. App. 3d at 42, 680 N.E.2d at 414 ("Focusing on the potential for injury rather than on the specifics of the harm that did occur, we find the duty problem is relatively simple.")

The Defendants have already exposed that they have known since the Plaintiff was falsely arrested in January 2009 that she was innocent of the crime to which she plead guilty and it was Individual A, still an active LGH staff member, who engaged in "criminal misbehavior." A reasonable person under these circumstances would alert the authorities. A reasonable person recognizing that one of their employees has committed a criminal act of moral turpitude would take actions to protect patient and public safety. Advocate's human resources vice president, Penny Pilarcyk, was involved in the 2009 criminal case and so the Defendants certainly had the opportunity to refute that Individual A was the on-call physician or verify that his statements and stipulated testimony were fabricated. The Defendants knew in 2008 that Individual A had made the same accusation of telephone harassment against the Plaintiff to have her fired from her residency and this was proven to be fabricated and that he had been making numerous false statements to the police in 2006. The knowledge of Individual A's lies to the hospital and

authorities to harm the Plaintiff contributed to the resignations of the CEO of LGH and Vice Chairman of Medicine at RFUMS and the Defendants cannot deny that they did not know top administrators at the hospital and the school had resigned. Individual A's habitual false accusations against the Plaintiff for "harassment" was also the main subject of the EEOC complaint against LGH. The Defendants knew that if irrefutable evidence emerged that Individual A was not only victimizing the Plaintiff but making the same false accusations of telephone harassment against her under oath that he made to have her fired from her residency position, the affiliation with LGH would never be approved.

On January 20, 2009 a crime was committed against the Plaintiff. The Defendants didn't commit the crime. Nor did the Defendants lie to LGH in 2005 claiming that the Plaintiff was making harassing telephone calls from Chicago while she was in Sydney, Australia – Individual A did that. But, as in 2005, the Defendants not only did not stop Individual A's victimization of the Plaintiff but they ensured that he achieved his objective to permanently injure and harm her. It was the Defendants who terminated the Plaintiff from LGH and it was the Defendants who contacted Defendant Meczyk and State's Attorney Anita Alvarez to ensure that Individual A's crime was covered up and the evidence that would exonerate the Plaintiff be destroyed. It was the Defendants who planned to have the Plaintiff falsely imprisoned to prevent her from filing her EEOC case against LGH on time and coercively confine her. In 2015, it was the Defendants who overtly acted in furtherance of this criminal conspiracy to conceal Individual A's crime by trying to destroy the exculpatory phone reports and keep them from the Plaintiff.

Even if the initial crime was not committed by the Defendants, they involved themselves in a way to guarantee that the Plaintiff was injured as Individual A intended and in doing so the injury the Plaintiff suffered flowed directly from the actions of the Defendants. *Nelson v. Union*

85

*Wire Rope Corp.*, 31 Ill. 2d 69, 86, 199 N.E.2d 769, 779 (1964) ("every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act, and such duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons").

If the Defendants had not tortiously interfered with the Plaintiff's counsel and had not contacted the State's Attorney directing her to destroy the evidence and convict the Plaintiff, the crime committed by Individual A could not have harmed the Plaintiff. Restatement (Second) of Torts § 432(2) states that if two forces, one caused by the negligence of the defendant and the other not, could each independently cause harm to another, the defendant's actions may be found to be a substantial factor in bringing about the harm to the plaintiff.

But for the Defendants corruption of the State and her counsel, Individual A would be a convicted felon and the Plaintiff a practicing physician but the sought after affiliation with LGH would not have been approved. The Defendants placed their own personal interests ahead of the Plaintiff unconcerned of the harm inflicted on her. As a result of the Defendants' conduct, the Plaintiff was subjected to repeated physical assaults while confined in Maximum Security of the Cook County Jail. The Plaintiff was so traumatized and terrified that she plead guilty to a crime knowing that doing so ended her life-long goal of becoming a physician. For someone who published a book on health care policy while just an undergraduate, continued writing and publishing on health care after losing their residency position and even traveled to remote and dangerous regions of the world just to be able to engage in patient care after being barred from medicine in America because of a criminal conviction, it should not be hard to appreciate how severe the distress the Plaintiff must have been subjected to in order to capitulate to pleading guilty to a felony crime. The Defendants knew that their actions to conceal Individual A's crime would

86

inflict such harm on the Plaintiff, but they did not care anymore than they did when RFUMS' Vice Chairman and LGH terminated the Plaintiff with only six more months left of training for no reason other than that Individual A demanded it. "One justification for imposing liability for negligent conduct that causes physical harm is corrective justice; imposing liability remedies for an injustice done by the defendant to the plaintiff. An actor who permits conduct to impose a risk of physical harm on others that exceeds the burden the actor would bear in avoiding the risk impermissibly ranks personal interests ahead of others. This, in turn, violates an ethical norm of equal consideration when imposing risks on others. Imposing liability remedies this violation." Restatement (Third) of Torts § 6, cmt. d (2010). The Defendants' actions unquestionably give rise to a duty. They foresaw the harm that would come to the Plaintiff and acted to ensure that the Plaintiff be placed under such severe emotional distress that she would do anything to escape it.

## CONCLUSION

For the reasons herein stated, the Court should deny the Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedures or in the alternative to grant the Plaintiff Leave to File a Second Amended Complaint. Further, Plaintiff requests any and all additional relief which the Court may deem appropriate under the circumstances.

Submitted this 25th day of January 2016.

Respectfully submitted,


/s/ Prabhjot Uppal, MD_____
Prabhjot Uppal, MD
Plaintiff, *pro se*
650 W. Olive Ave
Merced, CA 95348
(312) 576-4000
jodyuppal@hotmail.com

87

## CERTIFICATE OF SERVICE

I the undersigned, a non-attorney, hereby certify that I caused a copy of Plaintiff's Memorandum in Support of Her Opposition to Defendants' Motion to Dismiss or in the alternative Motion for Leave to File a Second Amended Complaint to be served upon counsels of record via ECF filing on January 25th, 2016.

/s/ Prabhjot Uppal, MD____

Prabhjot Uppal, MD
Plaintiff, *pro se*
650 W. Olive Ave
Merced, CA 95348
(312) 576-4000
jodyuppal@hotmail.com

## TABLE OF EXHIBITS

| Exhibit Number | Description |
|:---:|:---|
| 1 | White Coat Tales book |
| 2 | Vargish Email 2006 |
| 3 | LCME Affiliation Agreement |
| 4 | Replacement Theology |
| 5 | 2008 RFUMS Letter |
| 6 | Pope Benedict XVI and SSPX |
| 7 | Police Reports 2009 |
| 8 | Phone Reports |
| 9 | David Stark and LGH |
| 10 | Anthony A. Armada and LGH |
| 11 | November 3, 2009 Court Transcripts |
| 12 | Dr. Eric Gall Email |
| 13 | LCME Approval March 2010 |
| 14 | 2011 Sinai and DePaul |
| 15 | 2011 Mtn for Discovery and attempted false arrest |
| 16 | 2012 De Paul and Tomwokiak |
| 17 | 2013 Cathy Crowley resignation |
| 18 | October 2013 Court Transcript |
| 19 | 2015 Faculty By Laws |
| 20 | 2015 Tomwokiak Leaves RFUMS |
| 21 | EEOC Right to Sue Notice 2009 |
| 22 | DOS attacks and email hacking |