## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PRABHJOT UPPAL, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 15 C 8077 |
| | ) | |
| K. MICHAEL WELCH, ROSALIND | ) | |
| FRANKLIN UNIVERSITY OF | ) | |
| MEDICINE AND SCIENCE, RALPH | ) | |
| E. MECZYK, ANTHONY A. ARMADA, | ) | |
| JAMES H. SKOGSBERGH, ADVOCATE | ) | |
| HEALTH AND HOSPITAL | ) | |
| CORPORATION dba ADVOCATE | ) | |
| LUTHERAN GENERAL, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

CHARLES P. KOCORAS, District Judge:

Plaintiff Prabhjot Uppal, M.D. ("Dr. Uppal") filed this *pro se* action against various defendants on September 14, 2015. *See* Dkt. 1. The Court dismissed Dr. Uppal's original 83-page complaint for failure to comply with Fed. R. Civ. P. 8(a), *see* Dkt. 12, after which she filed an Amended Complaint naming as defendants Rosalind Franklin University of Medicine and Science (the "University"), K. Michael Welch, Advocate Health and Hospital Corporation d/b/a Advocate Lutheran General ("Lutheran General"), Anthony A. Armada, James H. Skogsbergh, and Ralph E. Meczyk. Now before the Court are all defendants' motions to dismiss. *See* Dkts. 21, 30, 34. For the following reasons, all three motions are granted.

## BACKGROUND

The allegations in Dr. Uppal's Amended Complaint[1] comprise 140 paragraphs, address events spanning over a decade, and involve prior state criminal proceedings against her, her own (unsuccessful) civil action against the University in this district, and certain administrative complaints. As required under Fed. R. Civ. P. 12(b)(6), the Court assumes these allegations to be true. And in concluding that they require dismissal of Dr. Uppal's claims as untimely, barred by *res judicata*, and for failure to state a claim for which relief can be granted, the Court has considered them carefully and in detail. Here is a summary of what Dr. Uppal alleges.

Dr. Uppal earned her Doctorate of Medicine degree from the defendant University in June 2005, after which "she began a one-year preliminary internal medicine residency" at Lutheran General in July 2005. Dkt. 15, ¶ 14. According to her Complaint, Dr. Uppal was told during the first month of her residency that a neurosurgeon named Dr. George Bovis "had written a letter to the Department of Medicine demanding that restrictions be placed on Dr. Uppal's training," *id*. at ¶ 15; a week later, she was required "to sign a piece of paper agreeing to restrictions on her training which included not having contact with any neurosurgical patients, with Dr. Bovis, his patients or any of his partners," *id.* at ¶ 16; and four months after that, she was "terminated from her residency position" and received a letter "stating she was terminated for violating the restrictions" in the paper she had signed. *Id*. at ¶ 20.

---

[1] Docket numbers 13, 14, and 15 appear to be identical copies of Dr. Uppal's Amended Complaint. For convenience, citations herein to the Amended Complaint ("Complaint") reference only Dkt. 15.

Dr. Uppal further alleges that about seven months after her termination, in June 2006, she filed an EEOC complaint against Lutheran General for "sex discrimination/retaliation," *id*. at ¶ 22; and less than two months afterward, Dr. Bovis "began filing false police complaints about Dr. Uppal with the Northbrook Police Department." *Id*. at ¶ 23. During the same timeframe, between 2005 and 2007, the University and Defendant Welch allegedly "obstructed Dr. Uppal's efforts to apply for other residency positions including destroying letters of recommendation, failing to upload documents and failing to perform other duties as mandated by the Association of American Medical Colleges." *Id*. at ¶ 24. Eventually, in the fall of 2007, Dr. Uppal "was able to send out completed residency applications and received numerous interviews with residency programs around the country," during which "the American Medical Association and other third parties became apprised of Uppal's situation" and unspecified "violations" at the University and Lutheran General. *Id*. at ¶ 26. According to her Complaint, the University and Lutheran General then retaliated against Dr. Uppal for her communications with these third parties by sending her a letter in August 2008 "stating that she was 'no longer endorsed by the Chicago Medical School.'" *Id*. at ¶ 29. This had the effect of "permanently barring her from applying to residency programs; a requirement to be licensed." *Id*.

Meanwhile, in about June 2008, Dr. Uppal hired Defendant Meczyk "to represent her against the false charges Bovis had brought against her in 2006." *Id*. at ¶¶ 4, 30. According to Dr. Uppal, Mr. Meczyk directed her to contact "someone from

the hospital" who was "involved" in the events leading to the termination of her residency in 2005 "to speak for her," or "he wouldn't prepare her case for trial." *Id*. at ¶ 31. Specifically, Mr. Meczyk allegedly "instructed her to contact Dr. Ruge advising her that she would not be in violation of any court orders or laws." *Id*. at ¶ 33. But after she allegedly attempted to page Dr. Ruge to her number on January 20, 2009, "Dr. Uppal was taken into custody for violating the no-contact terms of her bond," and "was charged with witness harassment for allegedly contacting and communicating with Bovis on January 20, 2009" (not Dr. Ruge), although Dr. Uppal insists that Dr. Bovis "was not who she had paged, intended to contact or believed she had spoken to." *Id*. at ¶¶ 34-35; Dkt. 24, at 4. Dr. Uppal further alleges that Mr. Meczyk later assured her "that there would be no trial, that the charges would be dismissed and to be at court on November 3, 2009." Dkt. 15, ¶ 37. But when she appeared on that date, Dr. Uppal "was told by Meczyk that she was 'guaranteed to lose' and she had to plead guilty to [a] felony charge." *Id*. at ¶ 40. And when she refused, Mr. Meczyk allegedly "misled the Court to believe that Uppal had absented herself in order to have a warrant issued for her arrest and have her taken into custody," and thus "coerce Uppal to plead guilty." *Id*. at ¶¶ 40-41.

According to her Complaint, Dr. Uppal was thereafter "placed in Maximum Security" and remained in custody until January 19, 2010. *Id*. at ¶¶ 41, 45, 76; Dkt. 37, at 40. As a result, she was allegedly unable to contact the lawyer handling her discrimination case, which was due to be filed by November 14, 2009 (having

received a right-to-sue-letter from the EEOC), so she "requested Meczyk to make sure her EEOC case was filed on time." Dkt. 15, ¶¶ 36, 42. "Upon being released from custody," however, "Dr. Uppal learned that the EEOC case had not been filed and, since the 90 day period in which to file had expired, the case was closed." *Id*. at ¶ 43. According to Dr. Uppal, this loss of her ability to pursue her discrimination claim paved the way for a planned merger between the University and Lutheran General, since "the Liaison Committee on Medical Education ('LCME') would not approve of the merger until the Plaintiff's EEOC complaint was resolved." *See id*. at page 2 and ¶ 44. Thus, with her EEOC case so "obstructed," the merger between the University and Lutheran General "was approved by the LCME." *Id*. at ¶ 44.

As for the criminal charges against her, Dr. Uppal claims that on January 19, 2010, she "capitulated to a guilty plea never knowing any facts about the charges against her." *Id*. at ¶ 43. She also alleges that she has since "made numerous attempts to uncover the material facts and evidence of the 2009 criminal case," *id*. at ¶ 45, but was obstructed by her various attorneys, including Mr. Meczyk. *Id*. at ¶¶ 45-47, 52-53. According to Dr. Uppal's Complaint: (1) "In 2011, after Uppal's out-of-state lawyers contacted Meczyk to have her case file turned over to them, he brought false violation of probation charges against Uppal in an attempt to have her taken into custody," ¶ 45; (2) "Between January and October 2013, multiple efforts to secure Uppal's file from Meczyk, including the initiation of proceedings to hold him in contempt, failed," ¶ 47; (3) "In the Spring of 2014, Uppal was able to subpoena the

call detail for her phone number on January 20, 2009, however, it became clear that the attorneys she was hiring to represent her were being pressured not to pursue the case and to prevent exonerating evidence of the 2009 case from coming into Uppal's possession," ¶ 52; and (4) "From 2014 through 2015, Uppal's second appellate counsel, Nishay Sanan, repeatedly lied to her and her family, refused to authenticate the incoming numbers to her phone on January 20 2009 that would exonerate her, falsified and tampered with evidence and took various other actions to conceal the fact that Bovis had lied under oath to secure false criminal charges against her." ¶ 53.

Dr. Uppal also alleges sabotage by the University IT Staff. She claims that they responded to a 2013 request for her academic records by committing "various computer crimes," including "a denial-of-service ('DOS') attack against Dr. Uppal." Dkt. 15, ¶ 49. And in September 2013, while a complaint with the U.S. Department of Education regarding this alleged attack was pending, Dr. Uppal maintains that the University's IT staff "hacked into Uppal's email," and "sent emails from her private account," thereby "triggering a second malicious DOS attack." *Id.* at ¶¶ 50, 121.

Dr. Uppal eventually sued the University in this district in April 2015. *See Uppal v. Rosalind Franklin Univ. of Med. & Sci.*, No. 15-cv-03806, 2015 WL 5062823 (N.D. Ill. Aug. 26, 2015) (dismissal with prejudice). According to her Complaint in the instant action, that earlier action sought "in part to address the continuing issue of [the University's] obvious and ongoing interference with her legal cases both directly and through third parties." Dkt. 15, ¶ 54. In addition, Dr. Uppal's

complaint in that prior suit alleged the same "computer crimes" by the University's IT Staff that she alleges here. *See* Dkt. 12 in Case No. 15-cv-3806, ¶ 27.[2]  It also alleged the same refusal by the University as of August 2008 to support Dr. Uppal's applications to other residency programs that she likewise alleges in this case, including a citation to the same August 25, 2008, letter from the University that Dr. Uppal cites and submits in this case. *See* Dkt. 15, ¶ 29; Dkt. 37, at 17; Dkt. 37-1, at 18; Case No. 15-cv-3806, at Dkt. 12, ¶ 12, and Dkt. 12-2.

Referring explicitly to this letter, which was attached to the complaint in her earlier lawsuit against the University, Judge Guzman dismissed Dr. Uppal's claims in that case (for breach of fiduciary duty and injunctive relief) with prejudice, as time-barred by the applicable statute of limitations. *See* 2015 WL 5062823, at *2-3 and n.1 (Aug. 26, 2015 dismissal Order: "Plaintiff's complaint establishes on its face that her claims are hopelessly time-barred."). Dr. Uppal's Complaint here acknowledges that outcome there. *See* Dkt. 15, ¶ 58 (referring to "dismissal of the federal case on statutory grounds"). Less than three weeks later, Dr. Uppal filed this case. *See* Dkt. 1 (complaint dated September 14, 2015). Defendants now move to dismiss.

---

[2]  The Court properly considers this complaint and other public court records in Dr. Uppal's earlier action against the University solely to take "judicial notice of the indisputable facts that those documents exist, they say what they say, and they have had legal consequences," not "as proof of disputed facts in any other sense." *Indep. Trust Corp. v. Steward Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012); *Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1097 n.1 (7th Cir. 2015) ("we may take judicial notice of public records not attached to the complaint in ruling on a motion to dismiss under Rule 12(b)(6)").

## DISCUSSION

Dr. Uppal's Complaint in this case is divided into three "Causes of Action"—the first is asserted against all defendants, the second against only Mr. Meczyk, and the third against the University and Mr. Welch. *See* Dkt. 15. Each Cause of Action is then subdivided into fourteen separate "Counts."[3] The purported predicate for these claims is an alleged "conspiracy" to "push through the merger" between the University and Lutheran General that had been planned since 2004. Dkt. 15, at 2-3.

According to Dr. Uppal's Complaint, "at least two or more of the Defendants named in this Amended Complaint, along with other known and not yet known co-conspirators, conspired to have Plaintiff taken into custody on November 3, 2009 without legal excuse on the criminal charges in order to prevent her from filing her suit against Advocate Lutheran General Hospital, induce her to plead guilty to a felony crime she did not commit and cover up the longstanding gross misconduct and criminal acts by faculty at [Lutheran General] in order to secure approval of the merger with [the University] by the LCME." *Id.* With this background, the Court now turns to Dr. Uppal's claims, beginning with those against the University.

---

[3] The first Cause of Action asserts six Counts against all defendants for "Conspiracy to Interfere with Civil Rights, Civil Action for Deprivation of Rights, Action for Neglect to Prevent" (Count I); "Spoliation of Evidence" (Count II); "Abuse of Process" (Count III); "False Imprisonment" (Count IV); "Tortious Interference with a Contract" (Count V); and "Negligent Infliction of Emotional Distress" (Count VI). The second Cause of Action asserts five Counts against Mr. Meczyk for "Breach of Fiduciary Duty" (Count I); "Fraudulent Concealment" (Count II); "Fraudulent Misrepresentation" (Count III)); "Aiding and Abetting" (Count (IV); and "Unjust Enrichment" (Count V). And the third Cause of Action asserts three Counts against the University and Mr. Welch for "Trespass of Chattels" (Count I); "False Light" (Count II); and "Unjust Enrichment" (Count III).

## I.      Claims Against the University and Mr. Welch

Dr. Uppal's Third Cause of Action is entitled "Personal Injury" and asserts three Counts against the University and Mr. Welch (in addition to those asserted against all defendants in her First Cause of Action).  The first Count, for "Trespass of Chattels," alleges the same "computer crimes," "unauthorized access to Plaintiff's private email account," and resulting "denial of service attack," *see* Dkt. 15, ¶¶ 49-50, 120-23, alleged in Dr. Uppal's prior lawsuit against the University.  *See* Dkt. 12 in Case No. 15-cv-3806, ¶ 27 (alleging "a series of computer crimes including repeated targeted denial of service attacks" by University "Information Technology staff").

Similarly, the third Count for "Unjust Enrichment" alleges that the defendants took $250,000 in tuition from Dr. Uppal but then acted "in various ways to ensure that Plaintiff can never practice medicine . . . tantamount to refusing to provide Plaintiff her medical degree," Dkt. 15, ¶¶ 132-35; just as Dr. Uppal alleged in her prior lawsuit against the University.  *See* Dkt. 12 in Case No. 15-cv-3806, ¶¶ 5, 8, 15-16, 32 (alleging that the University took "over $250,000 in tuition from Dr. Uppal," but failed "to do what is required under the AAMC to assist Dr. Uppal to continue her medical career," and she is thus "unable to apply for residency programs, practice medicine and utilize her medical degree," which is "tantamount to refusing to provide Dr. Uppal her medical degree").  The University and Mr. Welch correctly assert that both of these claims are barred by *res judicata* or "claim preclusion."  Dkt. 31, at 8-9.[4]

_____

[4] Although *res judicata* is an affirmative defense properly raised by a motion for judgment on the pleadings under Rule 12(c), a district court may resolve the

"Under *res judicata*, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Cannon v. Burge*, 752 F.3d 1079, 1101 (7th Cir. 2014) (internal quotation marks omitted). Both sides agree that the doctrine thus requires a final judgment on the merits, the same cause of action, and the same parties or their privies. Dkt. 31, at 8-9; Dkt. 37, at 29. A dismissal with prejudice, such as the dismissal of Dr. Uppal's prior action against the University, "constitutes a final judgment on the merits." *Cannon*, 752 F.3d at 1101.[5] And there is no dispute that the University was a party in the prior case, or that its President, Mr. Welch, was in privity with it. *See Huon v. Johnson & Bell, Ltd*, 757 F.3d 556, 558-59 (7th Cir. 2014) (president in privity with firm sued in prior case). Instead, Dr. Uppal contends that the causes of action in the two cases are "entirely different," because they entail "entirely different operative facts and claims." Dkt. 37, at 30-31. Not so.

Contrary to Dr. Uppal's assertions, the operative facts underlying her "unjust enrichment" and "trespass of chattels" claims here are the same as those alleged in support of the breach of fiduciary duty claim in her prior case. Indeed, the Opinion dismissing that case referred to the same allegations—of the University's retaliatory

defense under Rule 12(b)(6) where (as here) it has before it everything "needed in order to be able to rule on the defense." *Walczak v. Chi. Bd. of Educ.*, 739 F.3d 1013, 1016, n.2 (7th Cir. 2014) (quoting *Carr v. Tillery*, 591 F.3d 909, 913 (7th Cir. 2010)).

[5] "Because the earlier judgment was rendered by a federal court, the federal law of claim preclusion applies here," *id*., although as a "general rule, federal common law borrows the preclusion principles of the laws of the state in which the federal court that dismissed the diversity suit sat"—here, Illinois. *CFE Group, LLC v. FirstMerit Bank, N.A.*, 809 F.3d 346, 351 (7th Cir. 2015). This Court therefore looks to case law applying *res judicata* under both federal and Illinois law.

"computer crimes" and refusal to support Dr. Uppal's residency applications, and her resulting inability "to apply to residency programs" or "practice medicine despite her degree" and the "$250,000 tuition" she paid for it, "thereby preventing her from accessing her academic credentials"—that Dr. Uppal makes here. *See* 2015 WL 5062823, at *1-2; Dkt. 15 ¶¶ 29, 49-50, 120-21, 132-34. "The fact that the present suit redescribes the wrongful acts alleged" as "predicate acts" in a conspiracy "is irrelevant." *Carr*, 591 F.3d at 913-14 (re-alleging facts in support of RICO claim did not avoid *res judicata* bar); *Matrix IV, Inc. v. Am. Nat. Bank and Trust Co. of Chi.*, 649 F.3d 539, 548 (7th Cir. 2011) (same). "You cannot maintain a suit, arising from the same transaction or events underlying a previous suit, simply by a change of legal theory." *Carr*, 591 F.3d at 913. "Even if the two claims are based on different legal theories, the 'two claims are one for purposes of res judicata if they are based on the same, or nearly the same, factual allegations." *Matrix IV*, 649 F.3d at 547 (quoting *Hermann v. Cencom Cable Assocs.*, 999 F.2d 223, 226 (7th Cir. 1993)).

This principle applies with particular force here, where "the facts comprising the alleged fraudulent scheme predate" the earlier lawsuit. *Matrix IV*, 649 F.3d at 548. To the extent any additional facts are alleged, "they do not suffice to destroy the essential factual commonality of these claims." *Id*. Thus, because Dr. Uppal's prior case alleged substantially the same chain of events that she alleges in this case, and the events relied upon here predated her earlier case (which terminated only three weeks before this case was filed), Dr. Uppal's trespass of chattels and unjust enrichment claims here are barred by the judgment there.

Dr. Uppal's "False Light" Count fares no better. This claim alleges that the University and Mr. Welch "through and by their attorney William McErlean made public by filing several documents with the federal court and thereby giving publicity to matters concerning Plaintiff that placed Plaintiff before the public in a false light." Dkt. 15, ¶ 126. These defendants correctly argue that statements directed to a court in the course of litigation "are protected by Illinois' litigation privilege and cannot give rise to a false light claim." Dkt. 31, at 14.[6] Dr. Uppal gives no details as to the nature of these statements, nor does she allege that they were irrelevant to the proceeding, only that "Defendants had knowledge of and acted with reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed." Dkt. 15, ¶ 198. But the privilege applies "regardless of the attorney's knowledge of the statement's falsity," *Lewis*, 523 F.3d at 745-46, and "however reckless or dishonest" the statement might have been. *MacGregor*, 478 F.3d at 791.

Dr. Uppal thus alleges no facts that could save her false light claim from Illinois' broad litigation privilege. *See MacGregor*, 478 F.3d at 791 (statement must

[6] *See Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 745 (7th Cir. 2008) ("certain statements, including statements made by a lawyer during the course of litigation, are accorded absolute privilege and therefore cannot give rise to a defamation claim"); *MacGregor v. Ruthberg*, 478 F.3d 790, 791 (7th Cir. 2007) ("Illinois like other states recognizes an absolute privilege for statements in testimony or pleadings in a judicial proceeding."); *Starnes v. Cap. Cities Media, Inc.*, 39 F.3d 1394, 1396 (7th Cir. 1994) ("Illinois law confers an absolute privilege upon statements made in the course of judicial proceedings if those statements are relevant to the controversy."); *Scheib v. Grant*, 22 F.3d 149, 156 (7th Cir. 1994) ("we begin with 'the oft-stated principle in Illinois that anything said or written in a legal proceeding is protected by an absolute privilege against defamation actions, subject only to the qualification that the words be relevant or pertinent to the matters in controversy'" (quoting *Defend v. Lascelles*, 502 N.E.2d 712, 714 (Ill. App. 4th Dist. 1986) (ellipses omitted)).

be "unarguably irrelevant to the case in which it was given" to fall outside the privilege). Indeed, as the University and Mr. Welch also note correctly, Dr. Uppal makes no attempt in her 92-page Opposition to address this privilege or otherwise support her false light claim in any respect (*see* Dkt. 37), which is reason alone to dismiss it. That "silence" operates as a concession of the defendants' argument and the infirmity of the claim, and thus acquiesces to its dismissal. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Accordingly, the three Counts in Dr. Uppal's Third Cause of Action against the University and Mr. Welch are dismissed with prejudice.

## II.     Claims Against Mr. Meczyk

Dr. Uppal's claims against Mr. Meczyk alone are set out in her "Second Cause of Action." *See* Dkt. 15, at 18-24. This portion of her Complaint is entitled "Legal Malpractice," and further incudes individual "Counts" for "Breach of Fiduciary Duty," "Fraudulent Concealment," "Fraudulent Misrepresentation," "Aiding and Abetting," and "Unjust Enrichment." *Id*. Mr. Meczyk moves to dismiss all claims against him as "barred by the Illinois two-year statute of limitations for claims against lawyers." Dkt. 21, at 1; *see also* 735 ILCS 5/13-214.3(b) (action against attorney "based on tort, contract, or otherwise . . . arising out of . . . professional services . . . must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought.").[7]

---

[7] "Although generally a plaintiff is not required to plead around an affirmative defense, such as a statute of limitations, the district court can dismiss a complaint as

"The parties agree that the Illinois State two-year statute of limitations contained in 735 ILCS 5/13-214.3(b) applies in this case," and that it requires an action to be "commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." Dkt. 24, at 8 (quoting § 5/13-214.3(b)). It is also "not refuted that Meczyk's representation of the Plaintiff ended in 2010 nor that the injuries sustained by the Plaintiff occurred at the time." *Id.* Instead, Dr. Uppal argues that her claims against Mr. Meczyk did not accrue until 2015 under Illinois' discovery rule, or the statute of limitations on those claims was tolled until 2015 under Illinois' equitable tolling or fraudulent concealment doctrines, *id.*, because that is when she finally obtained phone records that Mr. Meczyk allegedly had been concealing, which disproved the criminal charge to which he allegedly "induced" her to plead guilty. *Id.* at 3-5, 11; Dkt. 15, ¶ 97. Dr. Uppal contends that she could not file her claims against Mr. Meczyk before then. Dkt. 24, at 9. But a simple reading of her Complaint forecloses any reliance on Illinois' discovery rule or its equitable tolling or fraudulent concealment doctrines.

Dr. Uppal's Complaint alleges that Mr. Meczyk was her attorney "from on or about June of 2008 through January 19, 2010," and that he had engaged in the following conduct before that representation concluded: (1) on November 3, 2009, he told Dr. Uppal that "'she was 'guaranteed to lose' and she had to plead guilty to a

---

untimely if the plaintiff has admitted all the elements of the affirmative defense." *Khan v. U.S.*, 808 F.3d 1169, 1172 (7th Cir. 2015); *O'Gorman v. City of Chi.*, 777 F.3d 885, 889 (7th Cir. 2015) ("if a plaintiff alleges facts sufficient to establish a statute of limitations defense, the district court may dismiss the complaint on that ground.").

felony charge," after assuring her "that there would be no trial" and "that the charges would be dismissed," Dkt. 15, ¶¶ 37, 40; (2) on the same date, he then "misled the Court to believe that Uppal had absented herself in order to have a warrant issued for her arrest and have her taken into custody," the purpose of which "was clearly intended to coerce Uppal to plead guilty" to the pending criminal charge, Dkt. 15, ¶¶ 40-41; (3) in January 2010, he allowed her to enter "a guilty plea never knowing any facts about the charges against her," *id*. at ¶ 43; and (4) he failed "to make sure her EEOC case was filed on time," although Dr. Uppal had requested him to do so while she was incarcerated and could not reach the attorney handling that case. *Id*. at ¶¶ 42-43. Under the discovery rule embedded in Illinois' statute of limitations for such claims, Dr. Uppal "knew or reasonably should have known" by 2010 that she had a claim against the attorney who, while she was incarcerated, allegedly failed to file her discrimination claim on time, thereby causing that claim to be lost.[8] And that conclusion is all the more inescapable when that attorney also allegedly coerced her to plead guilty to a crime she insisted she did not commit, by misrepresenting to the court that she was missing and thereby having her incarcerated in the first place.

Even under the discovery rule, therefore, Dr. Uppal's claims against Mr. Meczyk had accrued by 2010, and the two-year statute of limitations on those claims

---

[8] *See Janousek v. Katten Muchin Rosenman LLP*, 44 N.E.3d 501, 505 (Ill. App. 1st Dist. 2015) ("Section 214.3(b) incorporates the discovery rule 'which delays commencement of the statute of limitations until the plaintiff knew or reasonably should have known of the injury and that it may have been wrongfully caused.") (quoting *Dancor Int'l Ltd. v. Friedman, Goldberg & Mintz*, 681 N.E.2d 617, 621 (Ill. App. 1st Dist. 1997)).

had run several years before she finally sued him in 2015. Contrary to Dr. Uppal's assertions, moreover, Illinois' equitable tolling and fraudulent concealment doctrines do not change this result. "Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite the exercise of all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Mitchell v. Donchin*, 286 F.3d 447, 451 (7th Cir. 2002) (quoting *Shropshear v. Corp. Counsel of City of Chi.*, 275 F.3d 593, 595 (7th Cir. 2001)); *In re Estate of Mondfrans*, 9 N.E.3d 1, 5 (Ill. App. 2d Dist. 2014) ("Equitable tolling requires a showing of due diligence on the part of the plaintiff."). Fraudulent concealment, by contrast, "denotes efforts by the defendant, above and beyond the wrongdoing upon which the plaintiff's claim is founded, to prevent, by fraud or deception, the plaintiff from suing in time." *Shropshear*, 275 F.3d at 595. "The Illinois cases also require due diligence by the plaintiff who charges fraudulent concealment." *Id*. "Due diligence" is "guided by reference to the hypothetical reasonable person," and thus, "where the evidence leaves no room for a reasonable difference of opinion, the court may properly resolve such issues as a matter of law." *Mondfrans*, 9 N.E.3d at 5 (quoting *Mackereth v. G.D. Searle & Co.*, 674 N.E.2d 936, 941 (Ill App. 1st Dist. 1996)). There is no room for doubt about the untimeliness of Dr. Uppal's claims against Mr. Meczyk.

Dr. Uppal alleges that (1) she began her efforts to uncover the material facts underlying her 2009 criminal case as early as 2010, but was unable to obtain her case file from Mr. Meczyk, Dkt. 15, ¶ 45; (2) in 2011, after her out of state-lawyers sought her case file from Mr. Meczyk, "he brought false violation of probation charges

against Uppal in an attempt to have her taken into custody," *id.*; (3) in January 2013, her lawyer "was forced to file Dr. Uppal's first petition for post-conviction relief without ever having any of the files," *id.* at ¶ 47; (4) that January 2013 post-conviction petition asserted the ineffective assistance of Dr. Uppal's trial counsel, Mr. Meczyk, *see* Dkt. 24, at 4; Dkt. 37, at 22; and (5) in June 2013, the lawyers prosecuting that post-conviction proceeding on Dr. Uppal's behalf initiated contempt proceedings against Meczyk for his refusal to turn over her file.[9] Thus, by January 2013, well over two years before she sued Mr. Meczyk, Dr. Uppal not only knew she had a claim against him, she was asserting his ineffective assistance of counsel in state court. *See* Dkt. 1, at Ex. 33, at 3, 11-20. And by June 2013, also over two years before she sued, both sides were litigating against each other in state court—with Mr. Meczyk bringing violation of probation charges against Dr. Uppal, and Dr. Uppal bringing contempt proceedings against Mr. Meczyk. Dkt. 15, ¶¶ 45, 47.

---

[9] Dr. Uppal's original complaint alleged that her lawyer initiated contempt proceedings against Meczyk on June 7, 2013, Dkt. 1 at ¶ 98, whereas her current Complaint refers generally to "multiple efforts to secure Uppal's file from Meczyk," including contempt proceedings, between "January and October 2013." Dkt. 15, ¶ 47. The Court is mindful that "facts or admissions from an earlier complaint that are not included in a later complaint cannot be considered on a motion to dismiss." *Scott v. Chunak & Tecson, P.C.*, 725 F.3d 772, 783 (2013). But there is no need to consider Dr. Uppal's earlier allegations, since that complaint also attached court records demonstrating Dr. Uppal's Petition for Rule to Show Cause against Mr. Meczyk in June 2013, as well as the state court's March 2013 Order requiring production of Dr. Uppal's case file which the Petition for Rule to Show cause sought to enforce. *See* Dkt. 1, at Ex. 53. This Court may take judicial notice of those documents because they are public court records, *see supra* note 2, and because they recite "the dates on which certain actions were taken or were required to be taken in the earlier state-court litigation—facts readily ascertainable from the public court record and not subject to reasonable dispute." *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012).

Equitable tolling does not apply once the plaintiff is "aware of the 'possibility' of a claim." *Mitchell*, 286 F.3d at 451 (quoting cases). The same is true for tolling due to fraudulent concealment (and under Illinois' five-year fraudulent concealment tolling statute, 735 ILCS 5/13-215), which no longer applies once "the plaintiff discovered the fraudulent concealment, or should have discovered it through ordinary diligence, and a reasonable time remained within the limitations period." *Diotallevi v. Diotallevi*, 2 N.E.3d 1232, 1242 (Ill. App. 2d Dist. 2013); *J.S. Reimer, Inc. v. Vill. of Orland Hills*, 990 N.E.2d 831, 843 (Ill. App. 1st Dist. 2013) (no fraudulent concealment where plaintiffs had knowledge of their cause of action within the statutory time frame). Accordingly, neither doctrine applies here, since Dr. Uppal plainly knew of Mr. Meczyk's alleged ineffective assistance and concealment of her case file by mid-2013, over two years before she sued him.

Dr. Uppal nevertheless argues that the statute of limitations on her claims against Mr. Meczyk should be tolled until 2015, when detail for the two incoming calls to her phone on January 20, 2009, which allegedly exonerate her of the criminal charge to which she pled guilty, "was subpoenaed." Dkt. 24, at 9 (it was "not until 2015 that the Plaintiff discovered the phone reports authenticating the phone calls that she knew that Meczyk had deceived her and had acted out of an undisclosed conflict of interest"). But Dr. Uppal's Complaint admits that "her phone with caller ID for January 20, 2009," in her possession at the time and several years thereafter, similarly "confirmed that no phone calls were made from Bovis to her on that date." Dkt. 15, ¶ 51. She also says she knew from the outset that she was innocent of the criminal

18

charge of harassing Dr. Bovis on that date (which is why she initially refused to plead guilty), because he "was not who she had paged, intended to contact or believed she had spoken to." Dkt. 24, at 4. Dr. Uppal also admits that she had reviewed the police reports relating to her criminal charge by October 2010, and "saw that Meczyk had lied" about the evidence against her. Dkt. 37, at 20. And she further concedes that "phone record evidence and police reports provide a sufficient factual basis to support the claims against" Mr. Meczyk, Dkt. 24, at 10, and she had seen both her caller ID and the police reports by October 2010—nearly five years before she sued him.

Dr. Uppal's later receipt of ostensibly better evidence—the phone records that Mr. Meczyk and her next two sets of lawyers allegedly refused to subpoena earlier— does not alter this result. *See Terry v. Talmontas*, No. 11 CV 6083, 2014 WL 1153505, at \*6 (N.D. Ill. Mar. 21, 2014) (no equitable tolling where plaintiff knew "on the day of his arrest" that "there was no basis for the allegations" and later "had an opportunity to review the police reports in the case," despite lack of other files). "The missing information must go to the existence of the claim, not its details." *Miceli v. F.B.I., Chi. Div.*, No. 02 C 5749, 2002 WL 31654948, at \*9 (N.D. Ill. Nov. 21, 2002) (no equitable tolling; what matters is "whether a reasonable person would be aware of the possibility of a claim" (quoting *Mitchell*, 286 F.3d at 451)); *J.S. Reimer*, 990 N.E.2d at 843 (fraudulent concealment requires "representations designed to prevent discovery of the cause of action" or "induce" delay). Because Dr. Uppal was plainly aware of her claims against Mr. Meczyk by no later than 2010, those claims are now time-barred, and therefore dismissed with prejudice.

### III.    Conspiracy Claims Against All Defendants

Dr. Uppal's last set of claims are set out in her "First Cause of Action" for "Conspiracy," which includes six Counts against all defendants. *See supra* note 3. These claims allege that "Defendants, acting in concert with and with [sic] other known and unknown co-conspirators, conspired to accomplish a lawful purpose, a merger between Rosalind Franklin University of Medicine & Science and Advocate Lutheran General Hospital, by an unlawful means," including "joint activity to maliciously oppress, threaten, injure and otherwise harm Dr. Uppal as well as fraudulently conceal and/or destroy material facts regarding their actions." Dkt. 15, ¶¶ 63, 65. As to Mr. Meczyk, these claims are barred by Illinois' two year statute of limitations for claims against attorneys for the same reasons explained above. *See supra* Part II (735 ILCS 5/13-214.3(b) provides two-year statute of limitations for all actions against attorney "based on tort, contract, or otherwise"); Dkt. 21, at 5 (seeking dismissal of all claims under all legal theories). The remaining defendants seek dismissal of these claims as barred by *res judicata* and for failure to allege a cognizable claim. The Court considers each argument, and each claim, in turn.

### A.    *Res Judicata*

The University and Mr. Welch argue that Dr. Uppal's conspiracy claims, like the "personal injury" claims in her Third Cause of Action, are similarly barred by *res judicata* because they involve "the same operative facts" as the cause of action dismissed by Judge Guzman, and because the doctrine applies equally to claims that "could have been brought in that case." Dkt. 31, at 8-14; *see also Matrix IV*, 649 F.3d

at 547 (*res judicata* bars issues actually decided in prior suit and all other issues that could have been brought). Relatedly, Lutheran General and Messrs. Armada (its former CEO) and Skogsbergh (its CEO and President) argue that they were in privity with the University as to Dr. Uppal's prior action, and *res judicata* therefore bars her current claims against them, as well. Dkt. 34, at 2, 9; Dkt. 15, ¶¶ 5-6.

"Privity is said to exist between parties who adequately represent the same legal interests." *Chi. Title Land Trust Co. v. Potash Corp. of Saskatchewan Sales Ltd.*, 664 F.3d 1075, 1080 (7th Cir. 2011) (quoting *People ex rel. Burris v. Progressive Land Developers*, 602 N.E.820, 825 (Ill. 1992)). Similar to the situation here, privity has been held to exist between a defendant group of physicians and a hospital that jointly utilized the services of a physician who sued the former for discrimination in connection with the termination of his employment, and then attempted to sue the hospital. *See Tartt v. Nw. Comm. Hosp.*, 453 F.3d 817, 823 (7th Cir. 2006). Key to the privity determination in *Tartt* were the facts that the plaintiff physician's hospital privileges were conditioned upon his employment with the former defendant, that his claims against the hospital arose from the same employment relationship that was at issue in the prior case, and that the hospital "could have been joined" in the earlier suit. *Id.* Similarly here, Dr. Uppal's claims against the Lutheran General defendants stem from the same residency program that was at issue in her prior case (Dkt. 15, ¶¶ 15-20); her residency was conditioned by both the University and Lutheran General (*id.* at ¶¶ 15-16); and Lutheran General was the subject of discrimination and other allegations in Dr. Uppal's prior lawsuit, as

noted in Judge Guzman's opinion dismissing that case.[10]  Moreover, Dr. Uppal does not dispute the Lutheran General defendants' assertion of privity, thereby conceding the issue.  *See Bonte*, 624 F.3d at 466.  Rather, she again contends that her conspiracy claims here are "entirely different" from the cause of action that Judge Guzman dismissed, primarily because "indispensable phone reports that comprise the vital operative facts to the claims in this current case were found to be totally irrelevant to the claim brought in the older case."  Dkt. 37, at 30-31.

According to Dr. Uppal, "the phone reports would prove that the Plaintiff was innocent in the 2009 case," and "the cover up and constitutional and civil rights violations against the Plaintiff . . . to secure approval of the affiliation with [Lutheran General] by unlawful means," that are alleged in her conspiracy claims here.  *Id*. at 24.  But the irrelevance of these phone records in Dr. Uppal's prior suit—even if it was the University who urged their irrelevance in that suit—is not determinative.  *See Huon*, 757 F.3d at 559 (that defendants "thwarted" attempts to litigate discrimination claims in earlier suit by arguing their irrelevance did not preclude *res judicata* where later claims arose from the same group of operative facts).  "Whether all of the facts of one particular claim are relevant to another claim is not a fact considered when

---

[10]  *See* Dkt. 12 in Case No. 15-cv-3806, ¶ 20 ("Abruptly from 2005 to the present time, Dr. Uppal began to be harassed and victimized by staff at Lutheran General Hospital in Park Ridge, Illinois as well as staff at [the University]"); ¶ 22 ("During the Fall of 2006 . . . Dr. Uppal was told . . . that in 2004 [the University] had made a decision to switch their teaching hospital affiliation from Mt. Sinai Hospital in Chicago to Lutheran General Hospital"); ¶ 26 ("Senior faculty positions including the chairmanship were assigned to Lutheran General Hospital staff and remains as so to date.").  *See also* 2015 WL 5062823, at *1 (citing these allegations).

determining whether a later-brought claim is barred by res judicata." *Peregrine Fin. Grp., Inc. v. TradeMaven, L.L.C.*, 909 N.E.2d 837, 842 (Ill. App. 1st Dist. 2009) (quoting *Cole v. Bd. of Trs. of Univ. of Ill.*, 497 F.3d 770, 774 (7th Cir. 2007)). Again, "the key is that the claims arise from the same core of operative facts," *Matrix IV*, 649 F.3d at 548, and they do here.

As in her earlier case, Dr. Uppal alleges harassment by the University and Lutheran General, and a corresponding refusal to support her efforts to find a residency position at another institution, during the same time period the University and Lutheran General were attempting to secure their affiliation with each other and replacing University staff with Lutheran General Staff. Dkt. 15, ¶¶ 17, 22, 29, 44; Dkt. 12 in Case No. 15-cv-3806, ¶¶ 20, 22, 26. That Dr. Uppal now incorporates these allegations into an overarching conspiracy theory—involving the University, Lutheran General, and four sets of lawyers plotting to mount fraudulent criminal charges against her and cover-up of that effort—does not diminish the pivotal point that the ***facts*** alleged (as opposed to the ***legal theories*** asserted) are the same in both cases. Because the first claim Dr. Uppal based on those facts was dismissed with prejudice in her earlier suit against the University, *res judicata* now bars her current claims against the University and those in privity with it—Mr. Welch, Lutheran General, and Messrs. Armada and Skogsbergh—also with prejudice.[11]

---

[11] This holding applies to all six Counts in Dr. Uppal's First Cause of Action, except the portion of Count II ("Spoliation of Evidence") that occurred after Judge Guzman's dismissal. *See* Dkt. 15, ¶¶ 58 (alleging destruction of documents pursuant to protective order after dismissal of the federal case), 67-69; Dkt. 37, at 24 (same).

### B. Failure to State a Claim

A related problem with the claims in Dr. Uppal's First Cause of Action is their failure to allege facts supporting a conspiracy. Instead, these claims center on the same discrimination and retaliation alleged in her prior suit (hence, the *res judicata* bar), and lack the factual basis necessary to allege a conspiracy of any type, let alone one to violate Dr. Uppal's civil rights, destroy evidence, abuse process, falsely imprison her, or interfere with her attorney relationships. *See* Dkt. 15, ¶¶ 59-86. In other words, the conspiracy allegations added to this case are conjecture. Dr. Uppal urges the Court to accept such scant pleading, arguing that "conspiracy is generally established 'from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.'" Dkt. 37, at 27 (quoting *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 895 (Ill. 1994)). But Seventh Circuit authority requires more than conjecture:

> The Rules of Civil Procedure set up a system of notice pleading. Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy. Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope. [Plaintiff's] complaint does not get even that far.

*Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013); *see also Cooney v. Rossiter*, 583 F.3d 967, 970-71 (7th Cir. 2009) ("Even before" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a bare allegation of conspiracy was not enough to survive a motion to dismiss").

Thus, each defendant's agreement to join the conspiracy "is a necessary and important element of this cause of action." *Borsellino v. Goldman Sachs Group, Inc.* 477 F.3d 502, 509 (7th Cir. 2007). Dr. Uppal's Complaint "does not get even that far." *Knight*, 725 F.3d at 818. Dr. Uppal's federal conspiracy claims (Count I) thus fail at the outset for lack of an adequately alleged conspiratorial agreement (in addition to other shortcomings discussed below). Moreover, a civil conspiracy claim under Illinois law also requires "at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff." *Borsellino*, 477 F.3d at 509. As shown below, Dr. Uppal has failed to allege such an actionable tort.[12]

### 1. Conspiracy Under 42 U.S.C. §§ 1983, 1985, and 1986

Dr. Uppal's "First Cause of Action" begins with purported conspiracy claims under 42 U.S.C. §§ 1983, 1985, and 1986 for "Conspiracy to Interfere with Civil Rights," "Deprivation of Rights," and "Action for Neglect to Prevent." Dkt. 15, at 14. As to the first, Defendants correctly argue that Dr. Uppal's Complaint fails to allege that the private defendants here "jointly engaged with any state officials," as necessary for liability under § 1983. *See* Dkt. 31, at 9; Dkt. 34, at 4-5. Dr. Uppal attempts to remedy this deficiency in her Opposition by arguing: (1) "the government has been pervasively entwined with the school since the school's management is under the control of city lawyers who represented the government's interests," Dkt.

---

[12] Both sides assume Illinois law applies to Dr. Uppal's state claims; and thus, the Court applies Illinois law, as well. *See Healy v. Metropolitan Pier and Exposition Auth.*, 804 F.3d 836, 841 n.1 (7th Cir. 2015) ("Because Illinois is the forum state, and because no party has raised a choice of law issue, Illinois law governs."); *McCoy Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir. 2014) (same).

37, at 32; (2) the relationship "is one where the State so closely encourages the school's activity that it can be said to be 'cloaked with the authority of the state,'" *id*. at 33 (quotation omitted); and (3) the State's Attorney's office "knowingly and intentionally destroyed and concealed exculpatory evidence" that "none of the Defendants who are private entities could have accessed," thereby demonstrating "the coordination of the Defendants with the State." *Id*. Again, such conclusory conspiracy allegations fail on their face. *Rossiter*, 583 F.3d at 971 (dismissing § 1983 claim alleging joint private/state action: "No factual allegations tie the defendants to a conspiracy with a state actor."); *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 398 (7th Cir. 2015) ("It is well established that 'a bare allegation of a conspiracy between private and state entities is insufficient to bring the private entity within the scope of § 1983.'" (quoting *Messman v. Helmke*, 133 F.3d 1042, 1045 (7th Cir. 1998)).

Dr. Uppal's § 1985(2) claim similarly fails for lack of any conspiracy to deter her from attending or testifying in any court. *See* Dkt. 37, at 46-48. Once again, Dr. Uppal attempts to fill this void in her Opposition, arguing here that the defendants "conspired to have the Plaintiff's bond revoked and have her arrested without legal excuse or probable cause," thereby preventing her from filing her discrimination claim and ultimately testifying against Lutheran General in federal court. Dkt. 37, at 47. But Dr. Uppal's Complaint and Opposition both lack any factual allegations of any conspiratorial agreement by these defendants with either the state authorities who arrested or prosecuted her or the complainant in that criminal case (Dr. Bovis). "Even under notice pleading, a complaint must indicate the parties, the general purpose, and

approximate date of the agreement to form a conspiracy so that the defendant has notice of the charges against him." *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 517 (7th Cir. 2007) (dismissing § 1985(2) claim).

Dr. Uppal's claim under § 1985(3) fails for the same reason, as well as its failure to allege an underlying constitutional violation. *See Wilson v. Price*, 624 F.3d 389, 395 n.2 (7th Cir. 2010) (claim under § 1985(3) "requires that a plaintiff allege, among other things, that the defendants intentionally conspired to deprive him of equal protection of the laws"). Here again, Dr. Uppal's Opposition attempts to supply the missing violation, this time arguing that the defendants' unsubstantiated conspiracy to have her "forcefully arrested" was undertaken "out of an invidious animus to the Jewish people" and "to de-Judaize the university." Dkt. 37, at 56-57, 61. Notably, Dr. Uppal's Complaint "makes no such allegation, but rather consists mainly of conclusory allegations, which is insufficient to meet the pleading standards of Rule 8," *Wilson*, 624 F.3d at 395 n.2; and the equally conclusory accusations of an anti-Jewish conspiracy in Dr. Uppal's Opposition are similarly wanting. Dr. Uppal has thus failed to allege any cognizable claim under § 1985(2) or (3). And, lacking any cognizable claim under either provision of § 1985, Dr. Uppal's claim under 42 U.S.C § 1986 fails, as well. *Smith v. Gomez*, 550 F.3d 613, 617-18 (7th Cir. 2008).

### 2. Spoliation of Evidence

Count II of Dr. Uppal's First Cause of Action alleges "spoliation of evidence" as follows: "From January 2009 through to the present time, the Defendants along with other known and not yet known co-conspirators have routinely destroyed files

and evidence including documents held in a government warehouse relevant to the 2009 criminal case brought against Uppal and through various corrupt means have obstructed Uppal from gaining access to this evidence." Dkt. 15, ¶ 68. To the extent this claim addresses actions prior to the dismissal of Dr. Uppal's earlier lawsuit against the University, it is barred by *res judicata* for the reasons explained above. In addition, to the extent this claim again relies upon unspecified actions "in conjunction with the State"—since "none of the Defendants who are private entities could have accessed these files," Dkt. 37, at 33, 64—it falls along with Dr. Uppal's other conclusory conspiracy allegations. And, finally, to the extent this claim rests upon the destruction of discovery documents pursuant to a Protective Order entered in Dr. Uppal's prior lawsuit, *see* Dkt. 15, ¶ 58; Dkt. 37, at 24, 71, it fails under Illinois law.

"The Supreme Court of Illinois has emphasized . . . that the state does not recognize a tort of intentional spoliation of evidence, and that negligent spoliation is not itself an independent tort but rather a type of negligence." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 509-10. Thus, as the defendants argue, Dr. Uppal must allege both a duty to preserve the documents in question and a breach of that duty. *Id.*; *see also* Dkt. 31, at 10-11; Dkt. 34, at 5. But far from demonstrating such a duty, Dr. Uppal's Complaint and Opposition both acknowledge that the discovery documents at issue were subject to destruction under a Protective Order entered in her prior lawsuit. *See* Dkt. 15, ¶ 58; Dkt. 37, at 71. And while Dr. Uppal alleges here that this Protective Order was entered "without Uppal's knowledge" (Dkt. 15, ¶ 58), the case docket reflects her *pro se* motion to preserve the documents and vacate the

protective order, which the district court denied. *See* Dkt. 47 in Case No. 15-cv-3806.

Moreover, the University explains (and Dr. Uppal does not dispute) that its counsel

never possessed or received the documents, and any destruction in compliance with

the Protective Order was "presumably" performed by Dr. Uppal's counsel, not the

University's. *See* Dkt. 31, at 10; Dkt. 38, at 7. Dr. Uppal has thus failed to

demonstrate a breach, as well as a duty, in support of her spoliation claim.

### 3. Abuse of Process

Count III of Dr. Uppal's First Cause of Action alleges that "Defendants have

abused the process of two official court proceedings," namely, the state criminal case

against her and her own case against the University in this district. *See* Dkt. 15, ¶ 71.

Both allegations fail. As to the criminal case, again, the defendants here were neither

the prosecutor nor the complainant in that case; and in any event, Illinois decisions

make clear that "calling the police and signing a criminal . . . complaint" does "no

more than institute proceedings," which "does not in and of itself constitute abuse of

process." *Evans v. West*, 935 F.2d 922, 923 (7th Cir. 1991). Similarly, Dr. Uppal's

civil suit against the University was brought ***against*** the University (not ***by*** the

University), and no other defendants here were parties there. Thus, Dr. Uppal's own

lawsuit cannot support an abuse of process claim both because the institution of civil

proceedings does not constitute abuse of process, *id*., and because the University was

not the party who instituted that suit. Indeed, Dr. Uppal makes no attempt in her

Opposition to support this aspect of her abuse of process claim (*see* Dkt. 37, at 66-69),

which is, once again, reason alone to dismiss it. *See Bonte*, 624 F.3d at 466.

### 4. False Imprisonment

Dr. Uppal's "false imprisonment" claim in Count IV fails for similar reasons. This Count similarly charges that "between November 3, 2009 and January 19, 2010, Defendants intentionally confined Plaintiff without legal justification." Dkt. 15, ¶ 76. But again, none of the defendants here prosecuted or were complainants on the criminal charge for which Dr. Uppal was incarcerated. And again, Dr. Uppal's conclusory assertion in her Opposition—that the defendants confined her "in joint action with the State," Dkt. 37, at 40—"is not enough." *Rossiter*, 583 F.3d at 971.

### 5. Tortious Interference with a Contract

Count V of Dr. Uppal's First Cause of Action alleges the following tortious interference with her agreements with her lawyers: "From 2008 through to the present time, the Defendants have either directly or indirectly contacted Uppal's various legal counsel with the intent and effect of inducing her legal counsel to breach their contractual relationships with Uppal." Dkt. 15, ¶ 80. The Complaint fails to identify the "various legal counsel" with whom Dr. Uppal had such "contractual relationships," or how they were induced to breach them. Instead, it again alleges the defendants' general "purpose of depriving Uppal of her legal rights and otherwise causing injury including preventing Uppal from securing evidence regarding the 2009 criminal case in a form admissible to a court proceeding." *Id*. at ¶ 81.

A claim for tortious interference under Illinois law requires a plaintiff to allege "(1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the

contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach." *G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 543 (7th Cir. 2012). Dr. Uppal's claim fails at the first step, since it identifies no contract or attorney with whom Dr. Uppal had such a contract. At most, earlier paragraphs refer to "attorneys she was hiring" who "were being pressured not to pursue the case and to prevent exonerating evidence of the 2009 case from coming into Uppal's possession," and one particular lawyer (Nishay Sanan) who "repeatedly lied to her and her family, refused to authenticate the incoming numbers to her phone on January 20, 2009 that would exonerate her, falsified and tampered with evidence and took various other actions to conceal the fact that Bovis had lied under oath to secure false criminal charges against her." Dkt. 15, ¶¶ 52-53. None of these allegations attributes any inducing conduct to any of the defendants in this case. Indeed, the Complaint compounds this problem by alleging that any inducement was committed by unnamed "Defendants . . . either directly or indirectly." *Id*. at ¶ 80.

Dr. Uppal's Opposition tacitly concedes the lack of factual allegations necessary to support her tortious interference claim, arguing again that "circumstantial evidence often involves linking what may be apparently insignificant and unrelated events to establish a pattern." Dkt. 37, at 70. According to Dr. Uppal, "a clear repetitive pattern has been established all directed towards ensuring that the authentication of the incoming calls to the Plaintiff's landline phone on January20, 2009 remains out of the Plaintiff's reach permanently." *Id*. Thus, Dr. Uppal surmises that "every single lawyer" she hired since 2008 "has been tortuously interfered with

by the Defendants" based solely on her companion allegation that "every lawyer has intentionally worked against the Plaintiff and in the interest of the Defendants without any known preexisting conflicts of interest." *Id.* at 69-71. But Dr. Uppal's mere dissatisfaction with (or distrust of) her own lawyers is an insufficient basis to charge the defendants here with inducing them to betray her.[13]

### 6.    Negligent Infliction of Emotional Distress

Dr. Uppal's final claim against all defendants is for "negligent infliction of emotional distress." *See* Dkt. 15, ¶¶ 82-86. As Dr. Uppal acknowledges, "to state a claim for negligent infliction of emotional distress, she must allege that: (1) the defendant owed her a duty; (2) the defendant breached that duty; and (3) her injury was proximately caused by that breach." *Johnson v. Bishof*, 33 N.E.3d 624, 647 (Ill. App. 1st Dist. 2015); Dkt. 37, at 82. As Dr. Uppal also acknowledges, whether such "a duty exists," and "the nature of that duty," are questions for the Court to decide as a matter of law. Dkt. 37, at 83; *Bishof*, 33 N.E.3d at 647 ("Whether a duty exists is a question of law for the court to decide."). "Unless a duty is owed, there is no negligence, and plaintiffs cannot recover as a matter of law." *Bishof*, 33 N.E.3d at

---

[13] The same is true of the new tortious interference allegation in Dr. Uppal's Opposition—that the University's counsel (Mr. McErlean) allegedly "arranged for the Plaintiff's attorney to secure a higher paying position at a different law firm in exchange for abandoning the Plaintiff and entering into an unopposed protective order to have the reports destroyed and permanently kept from the Plaintiff." Dkt. 37, at 24, 71. In addition to the absence of any such allegation in Dr. Uppal's Complaint, she fails to identify the attorney who Mr. McErlean allegedly "bribed" in this fashion, *id.* at 71, or attribute such action to the University. Moreover, Dr. Uppal's Opposition admits that this alleged change in employment occurred in October 2015, *id.*, after that case was already dismissed and Dr. Uppal had filed, and the court had denied, her objections to the protective order. *See* Docket in Case No. 15-cv-3806.

647 (brackets omitted, quoting *Wash. v. City of Chi.*, 720 N.E.2d 1030, 1032 (Ill. 1999)). "The existence of a duty depends on whether the plaintiff and the defendant stood in such a relationship to each other that the law will impose upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Bajwa v. Metro. Life Ins. Co.*, 804 N.E.2d 519, 526 (Ill. 2004). "If the victim has not alleged facts sufficient to impose a duty on the defendants, she has failed to state a claim and her action should be dismissed." *Bishof*, 33 N.E.3d at 647. That is the situation here.

According to Dr. Uppal's Opposition, the defendants had a duty, "recognizing that one of their employees has committed a criminal act of moral turpitude," to "alert the authorities," "to refute" Dr. Bovis' allegedly false criminal complaint against Dr. Uppal, "or verify that his statements and stipulated testimony were fabricated." Dkt. 37, at 84. But neither Lutheran General nor the other defendants had any obligation to Dr. Uppal (a former resident) to monitor a criminal complaint filed by one of their physicians, let alone the truthfulness of such a complaint. Nor could Lutheran General be faulted for failing to "alert the authorities" to the baselessness of such a criminal charge after Dr. Uppal herself pled guilty to it. Nor does Dr. Uppal's repeated claim throughout her Opposition of a "conspiracy to conceal" the falsity of Dr. Bovis' complaint affect this analysis. *See* Dkt. 37, at 18, 22-23, 33, 35, 49, 51, 66, 70-72, 85. "The complaint in this case, though otherwise detailed, is bereft of any suggestion, beyond a bare conclusion, that the remaining defendants were leagued in a conspiracy." *Rossiter*, 583 F.3d at 971 ("mere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her was not enough").

33

## IV. Leave to Amend

Dr. Uppal's two Opposition briefs also include requests for leave to file a second amended complaint "to address technical deficiencies raised by the Defendants" and place "all allegations properly before the Court." Dkt. 24, at 12-13; Dkt. 37, at 87. That request is denied. For one thing, the deficiencies raised by the defendants are not merely technical; they are highly substantive. And Dr. Uppal's two Opposition briefs, which consume 100 pages and include extensive allegations beyond those in her already lengthy Complaint, amply apprise the Court of the conspiracy and claims she seeks to allege. Also significant, Dr. Uppal's Amended Complaint here is her fourth pleading attempt in two successive lawsuits. But most important, its infirmities are not mere pleading deficiencies; in addition to their legal failings, any claim that Dr. Uppal may have had is now time-barred or precluded by *res judicata*. These are insurmountable hurdles, which require denial of leave to amend because it would be futile. *Adams v. City of Indianapolis*, 742 F.3d 720, 734 (7th Cir. 2014) (affirming denial of leave to file futile second amended complaint).

## CONCLUSION

For the foregoing reasons, the Motions to Dismiss of all defendants (Dkts. 21, 30, 34) are granted. All claims in Dr. Uppal's Amended Complaint (Dkts. 13-15) are dismissed with prejudice. Judgement is entered herewith in favor of all defendants.

Dated: May 19, 2016

Charles P. Kocoras
United States District Judge